**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| WALGREEN CO., | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 21-cv-2522 |
| v. | ) |
| | ) Honorable Jorge L. Alonso |
| AARON PETERS, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

## AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiff Walgreen Co. d/b/a Walgreens ("Walgreens") files its Amended Complaint for

Damages and Injunctive Relief against Aaron Peters ("Peters"), stating as follows:

### I.    INTRODUCTION

1.    This is an action for injunctive relief, compensatory damages, and attorneys' fees

and costs arising out of Peters' breach of his fiduciary duties as a high-level employee of

Walgreens and his misappropriation and theft of Walgreens' confidential and propriety

information and trade secrets.  Peters was a long-time employee of Walgreens and was directly

involved in analyzing potential real estate decisions regarding Walgreens locations across the

United States.  In this position of trust, he had access to volumes of Walgreens' confidential data

and documents regarding all Walgreens locations – all of which included protected trade secrets.

On December 9, 2019, Peters left Walgreens and took a position at L2 Partners, LLC ("L2"), a

company that specializes in buying properties that Walgreens leases.  Walgreens recently has

determined that, immediately before he left Walgreens' employ to join L2, Peters illegally

downloaded an incredibly large amount of Walgreens' confidential and proprietary data and

1

documents – including certain of Walgreens trade secrets – to an external hard drive, which, upon information and belief, he took with him when he started working for L2 (the "Illegally Obtained Data").

2. The Illegally Obtained Data Peters stole from Walgreens includes, but is not limited to, almost 30,000 emails (including emails protected by the attorney-client privilege), spreadsheets with profit and loss statements for every Walgreens location in the United States, and documents describing, in detail, the analysis and decision-making process used by Walgreens in its real estate and other business decisions. Walgreens keeps such information confidential and secret and derives independent economic value by this information and data not being generally known to others who can obtain economic value from its disclosure or use of the information.

3. Upon information and belief, Peters has since used Walgreens' trade secrets with L2 to target Walgreens' stores for purchase and to determine strategically how to prevent Walgreens from exercising its contractual right of first refusal in such transactions. Since Peters left Walgreens and joined L2, L2 has targeted and obtained almost eighty million dollars ($80,000,000.00) worth of properties that Walgreens leases. As part of this process, L2 told Walgreens' landlords (through its broker) that because of L2's "experience" with Walgreens, it can make offers to purchase Walgreens' leased properties that would not trigger Walgreens' right of first refusal. Upon information and belief, however, L2 and Peters used the Illegally Obtained Data and other Walgreens' trade secrets to complete these transactions in direct competition with Walgreens.

4. Since filing the initial Verified Complaint, Walgreens has continued its investigation into Peters' wrongful conduct and has recently discovered the Peters has also been

accessing, via a web-based portal, Walgreens' confidential business and financial information and trade secrets (the "Portal Data"). Each of these sessions post-dated Peters' employment with Walgreens and violated Walgreens' confidentiality policies, and, therefore, was without authorization. In fact, Walgreens discovered that Peters accessed the Portal Data without authorization on fifty-three (53) separate occasions beginning eleven (11) days after he left Walgreens' employ and continuing up until as recently as May 5, 2021 – when Walgreens discovered the full extent of his unauthorized access and took additional steps to prevent future access.

5. Walgreens took Peters' deposition and inquired as to Peters' theft, disclosure, and use of the Illegally Obtained Data and the Portal Data. Rather than responding substantively to Walgreens' questions, Peters instead asserted his Fifth Amendment right against self-incrimination.

6. Peters' actions, described herein, constitute a breach of his fiduciary duty of loyalty to Walgreens, a violation of the federal Defend Trade Secrets Act, 18 U.S.C. § 1836, and a conversion of Walgreens' property, for which Walgreens is entitled to pursue a civil remedy.[1]

## II.   THE PARTIES

7. Plaintiff Walgreens is an Illinois Corporation with its principal place of business in Deerfield, Illinois.

8. Defendant Peters resides in this judicial district and may be found at his residence located at 412 E. 14th Street, Lockport, IL 60441.

---

[1] Peters' conduct described herein remains subject to criminal penalties set forth in the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"), but to avoid unnecessary briefing on Walgreens' right to bring a civil claim under the CFAA, Walgreens dismissed its CFAA claim without prejudice to refiling this claim.

### III.   JURISDICTION AND VENUE

9.      Subject-matter jurisdiction of this Amended Complaint is proper pursuant to 28 U.S.C. § 1331, as this is a civil action arising under the Defend Trade Secrets Act, 18 U.S.C. § 1836.

10.     This Court has supplemental jurisdiction over all of Walgreens' related claims arising under state law pursuant to 28 U.S.C. § 1367.

11.     Venue is proper in this Court under 28 U.S.C. § 1391.

### IV.   FACTUAL BACKGROUND

12.     Walgreens is the leading retail pharmacy across the United States, specializing in providing access to prescription drugs, as well as providing health and wellness products and information, beauty and personal care products, and photo services, consumables and general merchandise.

**A.   Peters' Employment with Walgreens**

13.     Peters began working for Walgreens in 2003, and at the time of his resignation on December 9, 2019, Peters was the Senior Director of Walgreens' Market Planning and Research Department ("MPR Dep't"), with an annual salary well into the six figures.  As Senior Director, Peters was the most senior executive whose sole responsibility was market strategy.

14.     As Senior Director, Peters helped manage Walgreens' MPR Dep't and was intimately involved in all aspects of Walgreens' market planning and research and in certain of Walgreens' real estate decisions for the entire United States.  Walgreens entrusted Peters with access to raw confidential and proprietary data that that Walgreens and Peters could and did use to analyze, track, predict, and make recommendations based on the performance of every Walgreens store nationwide including, without limitation, information concerning sales, lease terms, operations, adjusted operating income and cash flow, as well as sales reports, dashboards,

and spreadsheets compiling this data. The confidential information and documents Peters had access to, and which would be contained in his emails, relates to and was used in all Walgreens' strategy decisions. These decisions involved mergers and acquisitions, growth potential for existing store locations, lease terms and extensions, and identifying potential new market or new store locations. In 2019, Peters managed at least twenty (20) Walgreens employees who reported to him.

15.    Peters also used this information to advise Walgreens' real estate decisions, including its decision to exercise or waive Walgreens' right of first refusal ("ROFR") to purchase properties if a current landlord sought to sell, a right typically found in Walgreens' property leases. For example, Peters, as Senior Director of Walgreens' MPR Dep't, would review confidential information available to the MPR Dep't and, using certain confidential metrics, make recommendations in favor of or against Walgreens' exercise of its ROFR. Peters further had the duty and authority to designate matters as confidential.

16.    Walgreens provided Peters with a Walgreens-owned laptop (the "Computer") for his employment, which Peters used to access Walgreens' confidential and proprietary data and communicate concerning Walgreens' marketing decisions and real estate transactions throughout the United States.

17.    To safeguard its confidential information, Walgreens adopted multiple policies regarding its employees' access and use of confidential data and information technology.

18. Specifically, Walgreens adopted the "Protection of Confidential Information Policy" on or about April 29, 2010, which provides as follows:

**Purpose**

. . .

The purpose of this policy is to protect Confidential Information from disclosure or use outside Walgreens or for personal gain, either during or after employment, without proper authorization to do so.
. . .

**Policy**

Confidential Information [defined to include but not be limited to business plans and strategies, financial data, and research and development] should be used by team members only for legitimate Walgreen business purposes in accordance with contractual and/or legal requirements, and should only be disclosed **within Walgreens** to those team members who have a legitimate business **need to know** such information. . . . Confidential Information should never be used or disclosed for any non-Walgreen business purpose, either during or after your employment with the Company.

. . .

Violations of this policy regarding Protection of Confidential Information may violate the law and can lead to legal and disciplinary action, including the possibility of immediate termination of employment.

(the "Confidentiality Policy"). (Confidentiality Policy, attached hereto as Exhibit 1.)

19. Additionally, Walgreens has had in place a "Global End User Security Policy" since at least December 10, 2018, which provides in relevant part:

**3.1 Acceptable use**
. . .
WBA [Walgreens Boots Alliance, defined to include Walgreens] information must not be sent or transferred to:
• unauthorized individuals or organizations,
• any online storage site which is not an approved WBA storage solution,

6

• any personal email accounts.

WBA owned computing devices (such as laptops, desktops, mobile devices), applications (such as business applications, intranet applications, email applications, instant messaging applications), communication systems (such as voice and conferencing), and network resources, (including access to the Internet and other on-line resources), are provided by WBA for the use of its employees and authorized third-parties for business purposes. These systems, devices, applications and networks are the property of WBA and must be used in accordance with WBA policies, professional standards, as well as laws and regulations.

. . .

### 3.5 Device management

WBA systems and information may only be accessed by authorized devices, such as:

• WBA owned desktop and laptop computers or authorized personal laptops/computers,
• WBA owned telephones,
• WBA owned or authorized storage media,
• WBA owned or authorized smart phones and tablets including personal devices authorized by IT Leadership.

. . .

In addition, WBA end users leaving the Company must return all WBA owned equipment and electronic and non-electronic data to their line managers.

. . .

### 3.7 Data storage

WBA end users must only store WBA information on devices authorized by WBA. The following external storage devices/mechanisms are prohibited without approval from the end user's manager AND IT Leadership or designee which will only be given for exceptional circumstances:

• External storage devices such as flash drives and external hard drives;
• CDs/DVDs;
• Internal and external websites; or
• Any other external storage media not listed above.

### 3.8 Disclosure of Confidential Information and data transfer

WBA end users are prohibited from disclosing, storing, or transmitting Confidential Information to anyone internal or external, who is not authorized to receive the information. Confidential Information is information that WBA has a legal, regulatory or contractual obligation to protect, or, where

unauthorized disclosure, compromise, or destruction could result in severe damage, or could have a serious adverse financial and/or reputational impact on WBA, or provide significant advantages to a competitor.

. . .

In the event Confidential Information must be shared with external users or third-parties, the sender must validate the following:
• All recipients are authorized,
• The data is encrypted during transmission, and
• A current, executed Non-Disclosure Agreement ("NDA") or appropriate contracts requiring confidentiality maintained with the external users or third-parties is on file.

(the "Security Policy").[2] (Security Policy, attached hereto as Exhibit 2.)

20.     Peters reviewed and acknowledged Walgreens' Confidentiality and Security Policies on March 21, 2018 and March 26, 2019.

21.     The MPR Dep't, including Peters, also received annual training and information from Walgreens' legal and/or compliance teams regarding confidentiality and protecting trade secrets.

22.     Peters was well aware of Walgreens' policies regarding the confidentiality of its trade secrets. During multiple employee evaluations, Peters acknowledged that a critical aspect of his job was keeping this information confidential, stating he had "gone above and beyond to continually stress the importance of not sharing confidential data with the wrong people and have ensured that potentially proprietary information has remained in safe keeping" and that he had been "involved with a lot of proprietary/confidential information and have refrained from sharing anything inappropriate."

---

[2] The Security Policy was amended and updated on or about October 4, 2019, but these provisions did not change from the December 2018 version.

**B. Peters' Theft of Walgreens' Trade Secrets and Confidential Information and Documents While Employed by Walgreens**

23. Upon information and belief, in or about November 2019, Peters accepted an offer of employment with L2.

24. According to information recovered from the Computer, Peters knowingly violated the Confidentiality and Security Policies and misappropriated Walgreens' trade secrets on multiple occasions, including immediately before leaving Walgreens.

25. A forensic examination of the Computer establishes that on November 20, 2019 – shortly before he left Walgreens to join L2 – Peters manually archived his Walgreens email file on the Computer (the "Email Archive") and transferred and saved the Email Archive to an unauthorized, personal external drive. (Declaration of John Jorgensen ("Expert Decl."), attached hereto as Exhibit 3, ¶ 14[3].)

26. The Email Archive contained almost 30,000 emails total, including multiple emails and attachments about Walgreens' real estate transactions and strategy and about the performance of Walgreens' stores, including income and profit data for all Walgreens' stores for fiscal year 2018, as well as emails clearly designated as "confidential" and/or "privileged." (*Id.* ¶ 13.) The following emails are representative of the documents in the Email Archive:

   a. An email with an attached Excel spreadsheet of FY2018 profit and loss data for all Walgreens stores;

   b. An email with an attached list that identifies the top 500 Walgreens stores by FY2018 Adjusted Operating Income;

---

[3] Exhibit 3 is attached in its redacted form. It is identical to Exhibit 3 in the original Complaint, and Plaintiff's request to file this exhibit under seal [Dkt. No. 7] has already been granted [Dkt. No. 18].

      c.      An email with an attached FY2019 profit and loss data, including sales, profits, and payroll and other expenses, for 6 (six) Walgreens stores in advance of an executive tour;

      d.      An email labeled "time sensitive" and with an attached form for approval of the exercise of a right of first refusal;

      e.      An email with an attached PowerPoint presentation about the exercise of a right of first refusal; and

      f.      An email labeled "PRIVILEGED AND CONFIDENTIAL" with an attached spreadsheet of store data.

(*Id.* and redacted copies of Exs. B-G.)

27.      Peters also knowingly violated Walgreens' Security and Confidentiality Policies on December 5, 2019, when he once again downloaded and accessed on his unauthorized, personal external drive certain documents regarding Walgreens' internal processes, analyses, and decisions in connection with its acquisition of certain stores from a competitor. Peters, through counsel, has indicated in open court that a least a portion of the Illegally Obtained Data is contained on a computer file that remains in his possession entitled "Aaron Documents 12-8-2019." December 9, 2019 was Peters last day at Walgreens.

28.      The Illegally Obtained Data includes numerous trade secrets of Walgreens. For example, the Adjusted Operating Income data misappropriated by Peters pertains to Walgreens' stores and is owned by Walgreens. The Adjusted Operating Income is a trade secret of Walgreens as it contains is highly confidential business and financial information regarding the individual profitability of each Walgreens Store. Moreover, each document containing the Adjusted Operating Income information is also trade secret document itself because it compiles

the business and financial information into one place where it can be accessed. Walgreens

permits only a limited number of employees who are bound by the Confidentiality and Security

Policies to access this information in one place, and then only for Walgreens-related purposes.

29.     Walgreens uses the Adjusted Operating Income and documents compiling such

information in interstate commerce to analyze its market position and make business decisions,

including without limitation whether to exercise its right of first refusal and purchase property

leased by Walgreens nationwide. The Adjusted Operating Income and documents compiling

such information are also used for developing strategy for Walgreens' mergers and acquisitions,

identifying new markets and future growth potential. Walgreens obtains value because the

Adjusted Operating Income data is not generally known to, and not readily ascertainable through

proper means by, others who could obtain economic value from it. If Walgreens' competitors

know the true level of success of Walgreens' locations, they could use that information to

identify where to place competing businesses. If a third party obtained access to Walgreens'

Adjusted Operating Income data, it could use that data to determine the likely price that

Walgreens would pay to purchase the property where the store is leased. In fact, the Illegally

Obtained Data includes details of the process by which Walgreens determines whether to

exercise it right of first refusal in its leases and analyzes lease terms, including without limitation

whether and when to negotiate lease extensions. This information would therefore allow a third

party, such as L2, to structure their offers to buy in a way that would prevent Walgreens from

exercising their right of first refusal, effectively rendering Walgreens' right of first refusal

useless.

30.     The remainder of the Illegally Obtained Data is similarly owned by Walgreens

and is highly confidential business information, including without limitation profit and loss

information, store performance on underperforming stores, and attorney-client privileged information, as well as compilations of such information, that Walgreens permits only a limited number of employees who are bound by the Confidentiality and Security Policies to access and then only for Walgreens-related purposes. Walgreens obtains value from the secrecy of the Illegally Obtained Data by Walgreens' competitors not knowing the details of Walgreens' operations and other market conditions.

31. Moreover, Walgreens takes reasonable efforts to safeguard the foregoing Illegally Obtained Data where, among other things:

a. All employees with access to the Illegally Obtained Data (which constitutes trade secret information and documents) are party to the Confidentiality and Security Policies. As more fully set forth above, the Confidentiality and Security Policies, which expressly define the Illegally Obtained Data as confidential, preclude their use for non-Walgreens' purposes and preclude their download and dissemination;

b. All computers containing the Illegally Obtained Data are password protected; and

c. As noted above, hard-copies of certain copies of the trade secret Illegally Obtained Data bear a confidential and proprietary legend.

32. Peters was aware that the Illegally Obtained Data he pilfered was, in fact, trade secrets. Peters was also aware of the foregoing security surrounding the Illegally Obtained Data and actively – and surreptitiously – avoided that security to accomplish his theft.

33. The Illegally Obtained Data therefore contains Walgreens' trade secrets as defined by the Defend Trade Secrets Act.

34. Peters misappropriated the Illegally Obtained Data by breaching his duties to Walgreens to keep such information confidential.

35.     Peters further failed to return the Illegally Obtained Data before leaving Walgreens, further violating Walgreens' Security and Confidentiality Policies.

36.     Nothing in Peters' employment with Walgreens would require him to download the Illegally Obtained Data, let alone to do so on an unauthorized, personal external drive, or fail to return the same after his departure.

37.     Upon information and belief, Peters downloaded the Illegally Obtained Data with the intent of giving himself, and/or L2, an improper competitive advantage through unlawful use of the Illegally Obtained Data.

38.     Peters subsequently disclosed the Illegally Obtained Data to L2, which was not authorized to receive the same, and some of the Illegally Obtained Data is currently located on a laptop owned by L2 and issued to Peters.

39.     Indeed, when asked under oath whether he disclosed the Illegally Obtained Data to L2, Peters asserted his Fifth Amendment right against self-incrimination.

### C. Peters' Theft of Walgreens' Trade Secrets and Confidential Information and Documents After Termination of His Employment with Walgreens

40.     In addition to Peters' downloading of the Illegally Obtained Data immediately prior to terminating his employment with Walgreens, Peters has continued to access Walgreens' confidential information and documents after his employment with Walgreens terminated, thus knowingly misappropriating Walgreens' trade secrets on multiple occasions after leaving Walgreens.

41.     Certain Walgreens' confidential business and financial information and documents, including compilations of such information, are accessible through a web-based portal (the "Portal"). (Declaration of Mark Syslo, attached hereto as Exhibit 6, ¶ 3.)

42.     The confidential information and documents on the Portal are divided by subject matter (the "Projects"). (*Id.* ¶ 4.)

43.     Only a very limited number of Walgreens employees are provided with access to the Portal. (*Id.* ¶ 5.)

44.     To be granted access to Projects on the Portal, the Walgreens employee must have a Walgreens-related need for the information and documents accessible through the Portal. (*Id.* ¶¶ 2, 5)

45.     Once a Walgreens employee is granted access to the Portal, the Walgreens employee then has to register an individual user account and set up a password. (*Id.* ¶ 4)

46.     Once an employee's employment with Walgreens terminates, the Walgreens employee is not authorized to access the Portal. (*Id.* ¶ 6.)

47.     Peters was granted access to the Portal for Walgreens-related business and used his Walgreens email account, aaron.peters@walgreens.com, as a sign in. (*Id.* ¶ 7.)

48.     Peters' Portal access was limited to Projects related to real estate transactions and store performance (the "Portal Data"). (*Id.*)

49.     The Portal Data is gathered, developed, and owned by Walgreens.

50.     Like the Illegally Obtained Data, the Portal Data contains Walgreens' confidential sales and revenue and other store performance information and documents, including compilations of such confidential information, related to Walgreens' real estate transactions and market strategy.

51.     Like the Illegally Obtained Data, Walgreens keeps the Portal Data confidential and secret, (*id.* ¶¶ 5-6), and Walgreens derives independent economic value by the Portal Data

not being generally known to others who can obtain economic value from its disclosure or use of the information.

52.     For example, one type of document that Peters accessed via the Portal after his employment with Walgreens terminated is a document called a "One Pager."  Each "One Pager" contains information regarding a particular Walgreens store, compiled into one place where it can be accessed, and is developed and owned by Walgreens.  Each "One Pager" is a trade secret of Walgreens as it contains highly confidential store performance and financial information that Walgreens permits only a limited number of employees, who are bound by the Confidentiality and Security Policies, to access this information in one place, and then only for Walgreens-related purposes.

53.     Walgreens uses the "One Pager" information in interstate commerce to analyze its market position and make business decisions, including without limitation whether to exercise its right of first refusal and purchase property leased by Walgreens nationwide.  Walgreens obtains independent economic value from the "One Pager" information because it is not generally known to, and is not readily ascertainable through proper means by, others who could obtain economic value from it.  Indeed, if a third party obtained access to the information in the "One Pager," it could use that data to, among other things, make a more competitive offer to purchase a Walgreens-leased property and price Walgreens out, effectively rendering Walgreens' right of first refusal useless.  Further, Walgreens' competitors could use this information to determine strategically where to place competing stores and also target markets identified by Walgreens as a new market with future growth potential.

54.     The Portal Data therefore contains Walgreens' trade secrets.

55.     After Peters' employment with Walgreens terminated, "aaron.peters@walgreens.com" misappropriated the Portal Data by continuing to access the Portal and view the Portal Data.  (*Id.* ¶ 8.) Peters was aware that his conduct was unauthorized, in violation of the Confidentiality and Security Policies, and illegal.

56.     Walgreens received a report indicating that "aaron.peters@walgreens.com" accessed a specific Project after Peters terminated his employment with Walgreens, and Walgreens blocked "aaron.peters@walgreens.com" from having access to that Project. (*Id.*)

57.     However, according to the Portal records, "aaron.peters@walgreens.com" changed his approach and continued to access the Portal Data through other Projects. (*Id.*) Walgreens then blocked access to all Projects to which aaron.peters@walgreens.com was ever granted access. (*Id.* ¶ 9.)

58.     Between December 20, 2019 and up until as late as May 5, 2021, "aaron.peters@walgreens.com" accessed Projects and Portal Data on the Portal and viewed Walgreens Portal Data on fifty-three (53) separate occasions.  (*Id.* ¶ 8)

59.     User "aaron.peters@walgreens.com" was not authorized to access or view any information or documents on the Portal, including without limitation any "One Pager" document, once Peters' employment terminated on December 9, 2019; any access of the Portal by Peters or viewing of Walgreens' confidential information or documents thereon after December 9, 2019 was without authorization.

60.     Peters has admitted under oath that his email address while employed by Walgreens was "aaron.peters@walgreens.com."

61. However, when asked under oath whether he used such email address to access Walgreens' computer system, including the Portal, since he left the employment of Walgreens, Peters asserted his Fifth Amendment right against self-incrimination.

62. Similarly, when asked under oath whether he believed he was authorized to access the Walgreens' computer system, including the Portal, since he left the employment of Walgreens, Peters again asserted his Fifth Amendment against self-incrimination.

**D. L2/Peters' Attempt to Circumvent Walgreens' ROFR**

63. Walgreens began to suspect that Peters violated Walgreens' Confidentiality and Security Policies after L2 began targeting Walgreens' high-performing stores for purchase through offers that were seemingly designed to circumvent the terms of Walgreens' ROFR at those locations.

64. L2's campaign against Walgreens appears to have been precipitated by Walgreens' refusal to partner with L2 in a series of real estate transactions L2 proposed to Walgreens in June 2020.

65. In 2020, L2 began a campaign, upon information and belief, using the Illegally Obtained Data and Portal Data disclosed to L2 by Peters, designed to purchase properties where Walgreens had high-performing stores by making offers to purchase these properties with unjustifiably higher than market purchase prices, signing sale agreements prior to the offers being presented to Walgreens and setting closing dates that would fall immediately after Walgreens' ROFR period.

66. As part of this campaign, L2 and Peters advertised through brokers, Marcus & Millichap, that based on their "experience" with Walgreens, they "pay the absolute highest and

17

best price the market will bear; without triggering a ROFR." (Marcus & Millichap February 3, 2021 Email, attached hereto as Exhibit 4.)

67.     Upon information and belief, L2 exploited the Illegally Obtained Data and Portal Data it received from Peters to design offers to prevent Walgreens from being able to exercise its ROFR with the goal of enhancing L2's portfolio at Walgreens' expense.

68.     The precision of L2's campaign suggested L2 had direct knowledge of Walgreens' high-performing stores, the terms of its ROFRs, and other trade secrets and confidential information and documents about Walgreens' real estate decisions.  Such trade secrets and confidential information and documents were not publicly available, but were contained in the Illegally Obtained Data and the Portal Data.

69.     In fact, upon information and belief, Peters and his current employer, L2, used the Illegally Obtained Data and the Portal Data to purchase at least six (6) different Walgreens-leased properties in four (4) separate states.  In each instance, L2's purchase price was, on average, just less than 10% higher than the amount Walgreens would have paid to purchase the properties based on its confidential market and store performance information and analysis.  The fact that L2's purchase price in each instance was consistently just slightly over what Walgreens would have paid suggests that L2 had knowledge of and used Walgreens' trade secret information and confidential process for determining how much Walgreens will pay to purchase any particular store under its right of first refusal.  Thus, upon information and belief, as a result of L2 and Peters' use of Walgreens' trade secrets and confidential information and documents, L2 was able to price Walgreens out of these purchase transactions, and Walgreens was unable to exercise its right of first refusal because of Peter' conduct.

70. Based on L2's apparent knowledge of Walgreens' trade secrets and confidential information, Walgreens suspected that Peters accessed and disclosed Walgreens' trade secrets and confidential information and documents to L2.

71. Walgreens hired a forensic computer expert to examine the Computer, incurring costs in excess of $5,000, and that expert discovered the above-described violations of Walgreens' Confidentiality and Security Policies.

72. On May 6, 2021, Walgreens demanded that Peters immediately return the Illegally Obtained Data. (Declaration of David M. Pernini ("Pernini Decl."), attached hereto as Exhibit 5.) As of this filing, Peters has refused to comply. (*Id.* ¶ 4.)

## V. CAUSES OF ACTION

### COUNT ONE
### BREACH OF THE FIDUCIARY DUTY OF LOYALTY

73. Walgreens realleges each of the allegations in the foregoing paragraphs of this Amended Complaint as if set forth herein.

74. Walgreens placed Peters in a position of trust and confidence by providing him with access to Walgreens' confidential and proprietary information and trade secrets that are not known or accessible outside of Walgreens.

75. Peters accepted this position of trust and confidence and promised to act in Walgreens' best interest by, among other things, agreeing not to use or disclose Walgreens' confidential and proprietary information and trade secrets for anyone else's benefit.

76. Peters abused Walgreens' trust, failed to act in Walgreens' best interests, and breached his duty of loyalty and fiduciary duties to Walgreens by, including without limitation: (a) downloading the Illegally Obtained Data onto an unauthorized, personal external drive; (b), upon information and belief, disclosing the Illegally Obtained Data to L2, which was not

authorized to receive that information; (c) accessing the Portal and viewing the Portal Data without authorization after his employment with Walgreens terminated; and (d), upon information and belief, disclosing the Portal Data to L2, which was not authorized to receive that information.

77. As a direct and proximate result of Peters' breach of his duty of loyalty, Walgreens has suffered damages in an amount to be determined at trial. Walgreens is entitled to injunctive relief against Peters to recover all Walgreens' property misappropriated and to prevent future loss and damages, plus court costs, and attorney's fees.

**COUNT TWO**
**MISAPPROPRIATION OF TRADE SECRETS, 18 U.S.C. § 1836**

78. Walgreens realleges each of the allegations in the foregoing paragraphs of this Amended Complaint as if set forth herein.

79. The Illegally Obtained Data and the Portal Data is gathered, developed and owned by Walgreens.

80. The Illegally Obtained Data and the Portal Data is highly confidential business and financial documents and information, including without limitation profit and loss information, store performance and revenue information, and attorney-client privileged information, as well as compilations of such information.

81. As more fully set forth above, Walgreens takes reasonable efforts to keep the Illegally Obtained Data and the Portal Data secret by, without limitation, requiring Walgreens employees to be bound by the Confidentiality and Security Policies and restricting access to only those limited Walgreens employees with a Walgreens-related need for the information and documents and permitting access for only Walgreens-related purposes. Peters also received

annual training from Walgreens' legal and/or compliance departments on the importance of maintaining confidentiality of Walgreens' confidential data and documents and trade secrets.

82.     The Illegally Obtained Data and the Portal Data is not publicly available and is not readily ascertainable by anyone outside of Walgreens' employ, much less by someone or some entity that could benefit economically from the use of the Illegally Obtained Data and the Portal Data.

83.     The Illegally Obtained Data and the Portal Data derives independent economic value from not being generally known in that Walgreens uses it to analyze and make business decisions in interstate commerce, including decisions relating to, without limitation, operations, commercial property purchasing, negotiation of lease terms, and exercise or waiver of Walgreens' right of first refusal in its leases.

84.     If an outsider or other entity obtained the trade secret and confidential information in the Illegally Obtained Data and the Portal Data, such entity could use it to determine precisely how to make an offer to purchase property that would effectively price Walgreens out of exercising its right of first refusal.

85.     Peters misappropriated the Illegally Obtained Data and the Portal Data beginning in 2019 and continuing up to and including May 5, 2021.

86.     Peters willfully and maliciously misappropriated the Illegally Obtained Data and Portal Data by improper means, including without limitation in violation of the Confidentiality and Security Policies and without authorization after his employment with Walgreens terminated.

87.     In fact, upon information and belief, Peters and his current employer, L2, used the Illegally Obtained Data and the Portal Data to make an offers to purchase at least six (6) different

Walgreens-leased properties in separate states in amounts that were, on average, less than 10% higher than the amount Walgreens would have purchased the properties for based on its market and store performance analysis. The fact that L2's purchase price in each instance was just over what Walgreens would have paid suggests that Peters disclosed to L2 and L2 is using Walgreens' trade secrets and confidential process for determining whether Walgreens will exercise or waive its right of first refusal to unlawfully compete with Walgreens for these properties.

88.      As a direct and proximate result of Peters' misappropriation of Walgreens' trade secrets, Walgreens has suffered damages in an amount to be determined at trial. Walgreens is entitled to double the actual damages and attorneys' fees for Peters' willful and malicious misappropriation of Walgreens' trade secrets pursuant to 18 U.S.C. § 1836(3)(C) and (D). Walgreens is also entitled to injunctive relief against Peters to recover all property misappropriated and to prevent future loss and damages.

**COUNT THREE**
**CONVERSION**

89.      Walgreens realleges each of the allegations in the foregoing paragraphs of this Amended Complaint as if set forth herein.

90.      The Illegally Obtained Data and the Portal Data was the product of Walgreens' commercial operations, specifically its market and store performance analysis and its real estate transactions throughout the United States, and is Walgreens' property. Walgreens has the legal right to immediate and sole possession of the Illegally Obtained Data and the Portal Data.

91.      Peters obtained Walgreens' property – namely, the Illegally Obtained Data and the Portal Data – by accessing, copying, exporting, and/or downloading the same onto an

external drive with the intent to deprive Walgreens of the same, in violation of Walgreens' internal policies and without its consent. Such actions constitute conversion under Illinois law.

92.     Peters is currently in possession of the Illegally Obtained Data and, upon information and belief, the Portal Data.

93.     Walgreens made a demand for Peters to return the Illegally Obtained Data and the Portal Data, but Peters has refused to do so.

94.     Peters' conversion of Walgreens' property directly and proximately caused and continues to cause Walgreens damage in an amount to be determined. Walgreens is entitled to injunctive relief against Peters to recover all property converted and prevent future loss and damages, as determined by the finder of fact, plus profits, court costs, and attorney's fees.

**COUNT FOUR**
**<u>REPLEVIN</u>**

95.     Walgreens realleges each of the allegations in the foregoing paragraphs of this Amended Complaint as if fully set forth herein.

96.     Through deceitful means, Peters acquired possession of the Illegally Obtained Data by downloading the same onto an unauthorized, personal external drive.

97.     Walgreens is the owner of the Illegally Obtained Data and is lawfully entitled to possession of the same.

98.     Despite Walgreens' demand, as of the date of this filing, Peters has yet to return the Illegally Obtained Data.

99.     Walgreens has a superior right to possession of the Illegally Obtained Data, and Peters is wrongfully detaining the same. Peters has not taken the Illegally Obtained Data for any tax, assessment, or fine levied by virtue of any law, against the property of Walgreens. Peters has not seized the Illegally Obtained Data under any lawful process against the goods and

23

chattels of Walgreens. Nor has Peters held the Illegally Obtained Data by virtue of any order for replevin against Walgreens.

100. Accordingly, Walgreens seeks an order pursuant to 735 Ill. Comp. Stat. Ann. 5/19-104 that the Illegally Obtained Data be seized and returned to Walgreens.

**COUNT FIVE**
**INJUNCTIVE RELIEF**

101. Walgreens realleges each of the allegations in the foregoing paragraphs of this Amended Complaint as if set forth herein.

102. Walgreens has valid, enforceable rights based on Peters' violation of Peters' fiduciary obligations to Walgreens and in violation of the Defend Trade Secrets Act.

103. Peters continues to maintain possession of the Illegally Obtained Data and, upon information and belief, the Portal Data, and, upon information and belief, continues to use such information to the detriment of Walgreens.

104. Peters' conduct is causing irreparable harm to Walgreens by, among other things, upon information and belief, allowing L2 access to the Illegally Obtained Data and the Portal Data, which upon information and belief, L2 uses the same to improperly interfere with Walgreens' landlord/lessee relationships.

105. Peters' conduct is of a continuing nature and will continue to harm Walgreens unless enjoined by the Court.

106. Walgreens has no adequate remedy at law and is therefore entitled to a preliminary and permanent injunction enjoining Peters from further violations of the law.

**DEMAND FOR JURY TRIAL**

107. Walgreens demands a jury trial on all issues so triable.

24

## PRAYER FOR RELIEF

**WHEREFORE**, Walgreens respectfully requests this Court to:

a.      Issue a preliminary and permanent injunction and/or Order of Replevin, compelling Peters to return the Illegally Obtained Data and the Portal Data, and any copies thereof to Walgreens, by delivering them to Walgreens' counsel of record;

b.      Issue an order requiring Peters to sit for a deposition within five days after returning the Illegally Obtained Data for the limited purpose of determining what use Peters has made of the Illegally Obtained Data and the identity of all persons or entities to whom Peters has disclosed or provided copies of the Illegally Obtained Data, and that such deposition will not count toward the 1-day limitation for deponents contained in Rule 30(d)(1) of the Federal Rules of Civil Procedure;

c.      Award Walgreens a judgment against Peters in the amount to be proven at trial;

d.      Award Walgreens double the actual damages and attorneys' fees for Peters' willful and malicious misappropriation of Walgreens' trade secrets pursuant to 18 U.S.C. § 1836(3)(C) and (D);

e.      Award Walgreens pre-judgment and post-judgment interest as permitted by any applicable law; and

f.      Award Walgreens such other and further relief as the Court may deem just and equitable.

Respectfully submitted this 8th day of June, 2021,

 _/s/ Susan Valentine_____
Susan Valentine (Ill. ARDC # 6196269)
Valentine Austriaco & Bueschel, P.C.
105 West Adams Street, 35th Floor
Chicago, IL 60603
Telephone: (312) 288-8285

25

Facsimile: (312) 638-8137

Joseph D. Wargo, *admitted pro hac vice*
David M. Pernini, *admitted pro hac vice*
WARGO & FRENCH LLP
999 Peachtree Street, NE, 26th Floor
Atlanta, Georgia 30308
Telephone: (404) 853-1575
Facsimile: (404) 853-1501

*Counsel for Plaintiff Walgreen Co.*

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned attorney, hereby certify that I caused the attached **AMENDED COMPLAINT** to be filed through the ECF filing system and by email to the below listed counsel on June 8, 2021.

> **To:    Robert Chapman**
> **Christopher C. Kendall**
> **Lena Shapiro**
> **Chapman Spingola**
> **190 South LaSalle Street, Suite 3850**
> **Chicago, IL 60606**

I, the undersigned attorney, further certify that I caused the attached **AMENDED COMPLAINT** to be served by email on the below listed counsel who is not counsel of record on June 8, 2021.

> **To:    Joel W. Rice**
> **Andrew Welker**
> **Fisher & Phillips LLP**
> **10 South Wacker Drive, Suite 3450**
> **Chicago, IL 60606**
> **jrice@fisherphillips.com**
> **awelker@fisherphillips.com**

_/s/_   Susan Valentine