**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| WALGREEN CO., | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| AARON PETERS; L2 PARTNERS, LLC; | ) |
| LANCE LAZARUS; DANIEL MAROTTA; | ) |
| TAD GALIN; JEFF RICHARDS; LJL | )   Civil Action No. 1:21-cv-02522 |
| MANAGEMENT HOLDINGS LLC; | ) |
| APOLLO DEVELOPMENT, LLC; TKG | ) |
| EQUITY LLC; VIKING REAL ESTATE, | ) |
| LLC; ERLANGER DIXIE LLC; | ) |
| LOUISVILLE HIKES LANE LLC; OKC | ) |
| HEFNER LLC; BILL PEDERSEN; | ) |
| MATTHEWS REAL ESTATE | ) |
| INVESTMENT SERVICES; JAMES | ) |
| LAMBERT; ARISTEDES HASEOTES; | ) |
| BYRON HASEOTES; AND PETER NEARY | |
| | |
|     Defendants. | |

## <u>AMENDED COMPLAINT</u>

Plaintiff Walgreen Co. d/b/a Walgreens ("Walgreens") brings this action against

Defendants Aaron Peters, L2 Partners, LLC ("L2 Partners"), Lance Lazarus, Daniel Marotta, Tad

Galin, Jeff Richards (collectively, the "L2 Members"); LJL Management Holdings LLC, Apollo

Development, LLC, TKG Equity LLC, and Viking Real Estate, LLC (the "L2 Member Entities")

(L2 Partners, the L2 Members, and L2 Member Entities may hereinafter be collectively referred

to as the "L2 Defendants"); Erlanger Dixie LLC, Louisville Hikes Lane LLC, and OKC Hefner,

LLC (the "L2 Landlords"); Bill Pedersen and Matthews Real Estate Investment Services

("Matthews REIS") (collectively, the "Matthews Defendants"); and James Lambert, Aristedes

("Ari") Haseotes, Byron Haseotes, and Peter Neary (the "Named Investors") (all defendants may hereinafter be collectively referred to as "Defendants"), alleging as follows:

## I.    INTRODUCTION

1.    This is a civil action seeking compensatory and exemplary damages, attorneys' fees and costs, and equitable relief arising out of Defendants' continuous and intentional violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836, and the Racketeer Influenced and Corrupt Organizations Act of 1970, 18 U.S.C.A. § 1961, *et seq.* (the "RICO Act"), along with L2 Defendants' tortious interference with Walgreens' contractual and business relationships.

2.    L2 Partners is a real estate investment company that buys and sells commercial properties (including Walgreens-leased properties).  L2 Partners acquires these properties on its own and on behalf of individual investors who retain L2 Partners to provide information regarding and help acquiring such properties.  As set forth herein, since at least January 2019, L2 Defendants, along with the Matthews Defendants and Named Investors, have engaged in a systematic scheme to enrich themselves at Walgreens' expense by buying and selling Walgreens-leased properties (or "Walgreens properties") and preventing Walgreens from exercising its contractual right of first refusal ("ROFR")—a standard term in Walgreens' lease agreements.

3.    Defendants carried out their scheme in large part through the misappropriation of Walgreens' trade secrets and confidential information, including actual store-performance data (profit, prescriptions per day, total sales, etc.) for every single Walgreens store in the United States. Defendants illegally acquired information from former Walgreens employees, including Aaron Peters, a former Senior Director of Walgreens' Market Planning and Research Department.  In the months before leaving Walgreens to join L2 Partners, Peters stole tens of thousands of sensitive Walgreens files that he later disclosed to L2 Partners (collectively, the "Illegally Obtained Data").

4. Through the misappropriation of the Illegally Obtained Data, L2 Defendants were able to identify and target high-performing Walgreens properties that met specific investment criteria set by the Named Investors. The L2 Defendants then shared this information with the Matthews Defendants who contacted the landlords of those properties and convinced them to sell to L2 Defendants and the Named Investors in a manner designed to prevent Walgreens from exercising its ROFR. Relying on the Illegally Obtained Data conveyed by L2 Defendants, the Named Investors purchased more than 60 Walgreens properties through single-purpose entities organized by L2 Defendants (the "Investor Entities"). Defendants' conduct amounts to criminal theft of Walgreens' trade secrets in violation of the federal Defend Trade Secrets Act and constitutes a pattern of racketeering activity in violation of 18 U.S.C. § 1961(1) (the "Trade Secret Predicates").

5. However, Defendants were not content with the unlawful advantage seized through the Illegally Obtained Data, as Walgreens could still exercise its ROFR. Defendants therefore sought to circumvent Walgreens' ROFR through fraud. To that end, L2 Defendants, or their brokers, reached out to Walgreens' landlords and proposed a higher purchase price that the landlord would partially refund at closing ("Partial Refund"). The Partial Refund would appear in a "side agreement" that Defendants concealed from Walgreens – despite the fact that Walgreens' leases required disclosure of all terms and conditions for the purchase of the property. Defendants then prepared fraudulent letters of intent ("LOIs") and purchase and sale agreements ("PSAs") that intentionally omitted the Partial Refund, concealing the Partial Refund from Walgreens. By concealing the Partial Refunds, Defendants artificially inflated the purchase price it represented to Walgreens, preventing Walgreens from validly exercising its ROFR and purchasing the property on the same terms as those provided in the bona fide offer. Defendants sent the fraudulent LOIs

and PSAs to Walgreens through the United States Postal Service or another commercial carrier, committing multiple acts of mail and wire fraud, violating 18 U.S.C. §§ 1341 & 1343, and constituting a pattern of racketeering activity under 18 U.S.C. § 1961(1) ("Partial Refund Predicates") (the Trade Secret and Partial Refund Predicates may hereinafter be collectively referred to as the "Pattern of Racketeering Activity").

6.      In addition to the Partial Refund Predicates, L2 Defendants further interfered with Walgreens' ROFR by inducing Walgreens' landlords to execute sale agreements before giving Walgreens notice of a bona fide offer.  L2 Defendants also set closing dates immediately after the ROFR period expired, preventing Walgreens from exercising its contractual right to purchase that property on the same terms as those provided in the bona fide offer.

7.      By misappropriating Walgreens' trade secrets, conducting their enterprise through the Pattern of Racketeering Activity, and by tortiously interfering with Walgreens' contractual rights, Defendants were able to illegally acquire at least $177,371,138 worth of Walgreens properties while preventing Walgreens from exercising its ROFR rights in the last two years alone, depriving Walgreens in excess of $23,000,000.

## II.   THE PARTIES

8.      Plaintiff Walgreens is an Illinois Corporation with its principal place of business in Deerfield, Illinois.

9.      Defendant L2 Partners is a Florida limited liability company with its principal place of business at 1790 Coral Way, Miami, Florida 33145.  L2 Partners' members include Defendants LJL Management Holdings LLC, Apollo Development, LLC, TKG Equity LLC, Viking Real Estate, LLC, which are owned by Defendants Lance Lazarus, Dan Marotta, Tad Galin, and Jeff Richards, respectively.

10. Defendant Lance Lazarus, an individual and co-founder of L2 Partners, is a member of LJL Management Holdings LLC, and maintains an interest in the L2 Landlords. Defendant Lazarus resides in Florida and may be found at his residence located at 220 W. San Marino Dr., Miami Beach, Florida 33139.

11. Upon information and belief, L2 Partners is named after Lance Lazarus.

12. Defendant Dan Marotta, an individual and co-founder of L2 Partners, is a member of Apollo Development, LLC, and, upon information and belief, maintains an interest in the L2 Landlords. Defendant Marotta resides in this judicial district and may be found at his residence located at 632 Fox Trail Dr., Batavia, Illinois 60510.

13. Defendant Jeff Richards is an individual and employee of L2 Partners, is a member of Viking Real Estate, LLC, and, upon information and belief, maintains an interest in the L2 Landlords. Defendant Richards resides in this judicial district and may be found at his residence located at 704 Ridgelawn Trail, Batavia, Illinois 60510.

14. Defendant Tad Galin is an individual and employee of L2 Partners, is a member of TKG Equity LLC, and, upon information and belief, maintains an interest in the L2 Landlords. Defendant Galin resides in Florida and may be found at his residence located at 821 NE 35th St., Boca Raton, Florida 33431.

15. Defendant Aaron Peters is an individual and employee of L2 Partners. Defendant Peters resides in this judicial district and may be found at his residence located at 412 E. 14th Street, Lockport, IL 60441.

16. Defendant Erlanger Dixie LLC is a Florida limited liability company managed by Lance Lazarus, with its principal place of business at 1790 Coral Way, Miami, Florida 33145.

17.     Defendant Louisville Hikes Lane LLC is a Florida limited liability company managed by Lance Lazarus, with its principal place of business at 1790 Coral Way, Miami, Florida 33145.

18.     Defendant OKC Hefner, LLC is a Florida limited liability company managed by Lance Lazarus, with its principal place of business at 1790 Coral Way, Miami, Florida.  Naaman Abdullah is OKC Hefner, LLC's principal owner.  Upon information and belief, each L2 Member maintains an ownership interest in OKC Hefner, LLC.

19.     Defendant Bill Pedersen is an individual and Market Leader for Matthews REIS and a member of its Executive Leadership team.  Bill Pedersen resides in California and may be found at his residence located at 4582 Alla Rd., Los Angeles, CA 90066.

20.     Matthews REIS is a Delaware corporation founded in 2015 with its principal place of business at 841 Apollo St., Suite 150, El Segundo, CA 90245, and operates offices in multiple states, including Illinois.

21.     Defendant James Lambert is an individual who retained L2 Partners to provide Illegally Obtained Data regarding Walgreens and help acquiring numerous Walgreens properties. Defendant James Lambert resides in Florida and may be found at his residence located at 981 Hillsboro Mile, Hillsboro Beach, FL 33062.

22.      Defendant Ari Haseotes is an individual who retained L2 Partners to provide Illegally Obtained Data regarding Walgreens and help acquiring numerous Walgreens properties. Defendant Ari Haseotes resides in Massachusetts and may be found at his residence located at 18 Lovers Lane, Southborough, MA 01772.

23.     Defendant Peter Neary is an individual who retained L2 Partners to provide Illegally Obtained Data regarding Walgreens and help acquiring numerous Walgreens properties.

Defendant Peter Neary resides in Florida and may be found at his residence located at 605 Lincoln Rd., Ste. 430, Miami Beach, FL 33139.

24.     Defendant Byron Haseotes is an individual who retained L2 Partners to provide Illegally Obtained Data regarding Walgreens and help acquiring numerous Walgreens properties. Defendant Byron Haseotes resides in Florida and may be found at his residence located at 310 E Alexander Palm Rd., Boca Raton, FL 33432.

### III.  <u>JURISDICTION AND VENUE</u>

25.     This Court has subject-matter jurisdiction over this action pursuant to (1) 18 U.S.C. § 1964, as this is a civil action arising under the RICO Act, and (2) 28 U.S.C. § 1331, as this is a civil action arising under the Defend Trade Secrets Act and the RICO Act.

26.     This Court has personal jurisdiction over the Defendants that reside and do business in Illinois, including Aaron Peters, Jeff Richards, Dan Marotta, Matthews REIS, Apollo Development, LLC, and Viking Real Estate, LLC.  For the remaining Defendants, this Court has personal jurisdiction as, alleged below, the Defendants' intentional conduct was expressly aimed at Illinois, where Walgreens is incorporated and where Defendants knew the effects of their conduct would be felt.

27.     This Court likewise has personal jurisdiction and venue pursuant to the RICO Act, 18 U.S.C. § 1965(b), as the ends of justice require that Defendants, who reside in multiple judicial districts within the territorial boundaries of the United States—including Illinois, Florida, Massachusetts, and California—be brought before this Court, rather than forcing Walgreens to splinter its lawsuit to bring claims against each Defendant.

28.     Venue is likewise proper in this judicial district pursuant to 28 U.S.C. § 1391, because, as alleged below, this judicial district is where many of the Defendants reside and where a substantial part of the events or omissions giving rise to Walgreens' claims occurred.

## IV.   FACTUAL BACKGROUND

29.     L2 Partners, organized on October 14, 2013, is a commercial real estate investment company that purchases retail properties—including properties owned or leased by Kroger, Publix, CVS, Hy-Vee, and Rite Aid—but primarily acquires Walgreens properties.  L2 Partners is owned, controlled, and/or directed by Lance Lazarus, Dan Marotta, Jeff Richards, and Tad Galin, both individually and through the L2 Member Entities.

30.     L2 Partners purchases properties on its own or on behalf of, and with express authority granted by, investors, including the Named Investors.  The investors retain L2 Partners pursuant to consulting agreements (the "Consulting Agreements") that authorize L2 Partners to search for Walgreens properties that match the investors' criteria.  The Consulting Agreements expressly state that L2 Partners will "provide the Client with certain information specific to WALGREENS locations[,]" and identify "one or more choices" that match the Client's criteria, and will then "negotiate acquisition for the Client's purchase of specific WALGREENS location (s) with current location owners under such terms and conditions directed by the Client[.]" (Consulting Agreement Exemplar, attached hereto as Exhibit 1).  For each property that L2 Partners purchases, either on its own or on behalf of an investor (such as the Named Investors), the L2 Defendants organize an L2 Investor Entity as a single-purpose investment vehicle to take title to the property.

31.     Walgreens properties are a valuable investment commodity because they provide landlords with a predictable source of long-term income—namely, rent from Walgreens.  The

value of a Walgreens property is largely dependent on whether Walgreens intends to renew its lease at that location and continue paying rent, which is in turn informed internally by Walgreens based on the individual store's performance. Thus, identifying store performance is critical to successful investment, as it is a strong indicator as to whether Walgreens will continue to lease a particular property and pay rent to the landlord.

32.     As shown herein, Defendants conducted the enterprise identified below through the Pattern of Racketeering to prevent Walgreens from exercising its ROFR and capturing the value of those Walgreens properties. Through this, in the last two years alone, Defendants acquired at least $177,371,138 worth of Walgreens properties while preventing Walgreens from exercising its ROFR rights, which Walgreens estimates caused damages in excess of $23,000,000.

### The Enterprise

33.     As explained below, the RICO enterprise at issue is comprised of L2 Defendants, Peters, the investors (including the Named Investors), the Investor Entities, and L2 Defendants' brokers (including the Matthews Defendants) (collectively, the "Enterprise"). The Enterprise is associated for the shared purpose of acquiring high-performing commercial properties leased to drug and grocery stores. In the Enterprise, investors provide L2 Defendants with specific criteria for the Walgreens properties they want to acquire. Brokers provide L2 Defendants with a list of properties that are currently on the market, which L2 Defendants review to identify properties that meet the investor's criteria. Finally, after L2 Defendants discuss the property with the investor, the investor decides whether it wants to purchase the property and sets the terms of that purchase. As described below, Defendants have used the Enterprise to engage in a pattern of racketeering through the appropriation of Walgreens' trade secrets and by employing fraudulent LOIs and PSAs.

**The Pattern of Racketeering Activity**

34.    For years, L2 Defendants used the Illegally Obtained Data to identify and acquire high-performing Walgreens properties that matched the Named Investors' criteria.

35.    To aid its efforts, the Enterprise armed its most trusted brokers with the Illegally Obtained Data, which the brokers used to target landlords of high-performing Walgreens properties and convince them to sell to the Enterprise's members.  The brokers likewise used the Illegally Obtained Data to advertise investor-owned properties to third parties.  One of those brokers is Bill Pedersen, Market Leader for Matthews REIS and a member of its Executive Leadership.  (*See* Matthews REIS Website, attached as Exhibit 2).  Pedersen has worked for Matthews REIS since its inception in 2015, and, upon information and belief is one of Matthews REIS' founding members.  Bill Pedersen, acting on behalf of Matthews REIS, used the Illegally Obtained Data in the course of his work for the Enterprise, earning Matthews REIS a commission for each transaction.

36.    After the broker convinced the landlord to sell, L2 Defendants then prepared pitch-decks using the Illegally Obtained Data to describe the Walgreens property's investment potential. The Named Investors then reviewed the pitch-deck and discussed the Walgreens property with L2 Defendants.  If the Named Investor approved the purchase, L2 Defendants acquired the Walgreens property on behalf of the Named Investor.  This entailed a concerted effort to prevent Walgreens from exercising its ROFR, including negotiating an inflated purchase price with the landlord, withholding material details of the transaction from Walgreens, and preparing fraudulent LOIs and PSAs sent to Walgreens through the United States Postal Service or another commercial carrier.

37.    The Enterprise's Pattern of Racketeering Activity was only interrupted when Walgreens discovered a portion of the scheme after initiating suit against L2 Partners on March

11, 2021. *Walgreens v. L2 Partners, LLC, et al.*, 21CV-50235, Franklin County, Tennessee (the "Franklin Action").[1] By conducting the Enterprise through the Pattern of Racketeering Activity, along with tortiously interfering with Walgreens' contractual rights, Defendants have wrongfully acquired at least the following properties:

| ROFR Notice Date | Store # | Address | LOI/PSA Purchase price |
|---|---|---|---|
| 2020.09.16 | 1770 | 2625 Adlai Stevenson Dr, Springfield, IL | $4,285,714 |
| 2020.11.16 | 2361 | 12802 E 96th, Owasso, OK | $5,606,000 |
| 2020.03.30 | 3442 | 7506 N Shadeland Ave, Indianapolis, IN | $2,440,000 |
| 2019.02.08 | 3542 | 1607 N. Zaragoza Rd., El Paso, TX | $2,850,000 |
| 2020.09.12 | 3555 | 1880 N. Belcher Rd., Clearwater, FL | $4,100,000 |
| 2020.12.02 | 3668 | 7101 Hefner Rd, Oklahoma City, OK | $4,436,363 |
| 2020.12.15 | 3846 | 2410 Ballpark Way, Arlington, TX | $4,403,333 |
| 2020.08.20 | 3910 | 100 SE Green Oaks, Arlington, TX | $4,237,000 |
| 2021.01.19 | 3914 | 5755 Constitution Ave, Colorado Springs, CO | $3,537,152 |
| 2020.05.21 | 4194 | 2021 Hikes Lane, Louisville, KY | $7,360,000 |
| 2020.10.08 | 4285 | 4142 Pontchartrain Drive, Slidell, LA | $4,400,000 |
| 2020.03.31 | 4439 | 1191 W Kansas St, Liberty, MO | $4,653,114 |
| 2020.03.18 | 4460 | 1295 Lily Cache Lane, Bolingbrook, IL | $4,222,222 |
| 2020.10.22 | 4567 | 6485 Wilmington Pike, Dayton, OH | $3,575,000 |
| 2020.10.22 | 4689 | 606 Valley St, Manchester, NH | $3,905,000 |
| 2020.10.20 | 5309 | 1141 Capitol Dr, Pewaukee, WI | $4,828,000 |
| 2020.06.26 | 5459 | 9909 W Loomis Rd, Franklin, WI | $3,812,400 |
| 2020.11.28 | 5548 | 3104 Dixie Hwy, Erlanger, KY | $6,133,333 |
| 2021.03.15 | 5653 | 3800 Market St, Pascagoula, MS | $4,080,000 |
| 2020.08.11 | 6113 | 1625 S Webb Rd, Wichita, KS | $4,500,000 |
| 2020.09.10 | 6243 | 5005 Douglas Ave, Racine, WI | $6,578,000 |
| 2020.09.07 | 6584 | 8430 Broadway St, Pearland, TX | $5,400,000 |
| 2021.02.22 | 6616 | 2105 E Fire Tower Rd, Greenville, NC | $4,843,750 |

---

[1] Walgreens initiated the Franklin Action seeking injunctive relief to enforce its ROFR to purchase 2045 Fieldstone Parkway, Franklin, Tennessee, which L2 Partners sought to acquire. (*See infra* Part IV, B., b., ii.). In the interest of judicial efficiency, Walgreens voluntarily dismissed the Franklin Action without prejudice so that Walgreens may obtain all relief related to Defendants' conduct from this Court.

| | | | |
|---|---|---|---|
| 2020.09.01 | 6765 | 108 E Highland Dr, Jonesboro, AR | $5,538,000 |
| 2020.08.31 | 6959 | 702 Military Rd, Benton, AR | $5,935,000 |
| 2020.06.18 | 7213 | 16244 S Post Oak Road, Houston, TX | $4,244,000 |
| 2020.09.17 | 7222 | 112 S Highway 153, Mustang, OK | $4,704,000 |
| 2020.08.06 | 7549 | 4408 New Bern Ave, Raleigh, NC | $5,332,283 |
| 2020.06.29 | 7732 | 2700 New Pinery Rd, Portage, WI | $4,360,000 |
| 2020.03.30 | 7821 | 950 E Kenosha St, Broken Arrow, OK | $4,740,000 |
| 2020.10.30 | 7857 | 405 E 2nd St, Sand Springs, OK | $5,085,000 |
| 2021.01.27 | 9467 | 880 S Neosho Blvd, Neosho, MO | $3,260,000 |
| 2020.11.02 | 9743 | 350 Highway 62 E., Mountain Home, AR | $5,750,000 |
| 2020.06.29 | 10628 | 2602 Florence Blvd, Florence, AL | $4,569,474 |
| 2021.02.16 | 10971 | 442 W State Road, Island Lake, IL | $5,392,000 |
| 2020.09.11 | 11356 | 11343 S 96th Street, Papillion, NE | $5,250,000 |
| 2020.10.08 | 15638 | 26288 Kuykendahl Rd, Tomball, TX | $7,000,000 |
| 2020.06.17 | 16135 | 116 West Depot St, Angier, NC | $2,025,000 |
| Total: | | | $177,371,138 |

(Hereinafter, "Figure 1").

### A. Trade Secret Predicate Acts

#### a. *Peters' Tenure at Walgreens*

38.     The Trade Secret Predicates were facilitated, in part, by Aaron Peters stealing Illegally Obtained Data.

39.     Aaron Peters was a Walgreens employee from 2003 until December 6, 2019.  At the time of his departure, Peters was a Senior Director of Walgreens' Market Planning and Research Department ("MPR Department"), with an annual salary well into the six figures.  In his position, Peters supervised at least twenty Walgreens employees.

40.     As Senior Director, Peters was entrusted with highly sensitive confidential data and trade secrets, including actual sales figures for Walgreens stores.  Peters used this information to analyze, track, predict, and make recommendations about individual Walgreens properties.  One particularly sensitive document was the Trailing Twelve-Month Report (the "TTM Report"),

which contains the total sales, itemized prescription sales, profit margins, operating expenses, and adjusted operating income for every individual Walgreens store in the United States.

41.     Walgreens took reasonable protective measures to guard its trade secrets and confidential information from disclosure. Walgreens adopted multiple policies (the "Walgreens Policies") that all employees with access to confidential information, including Peters, were required to review and acknowledge.

42.     The MPR Department, including Peters, also received annual training and information from Walgreens' legal and/or compliance teams regarding confidentiality and protecting trade secrets, along with the Walgreens Policies covering the same. Indeed, as a Senior Director, Peters was responsible for making sure his subordinates were apprised of and complied with Walgreens Policies. Peters likewise led departmental professional development and training programs. During multiple performance reviews, Peters acknowledged that a critical aspect of his job was keeping sensitive information confidential.

### b.  *Peters' Theft of Walgreens Data*

43.     In early November 2019, Peters accepted a position with L2 Partners. Thereafter, until his last day at Walgreens, December 6, 2019, Peters surreptitiously downloaded large quantities of Walgreens data using his Walgreens-issued laptop, an unauthorized external hard drive, and possibly other devices. Peters downloaded the Illegally Obtained Data—more than 30,000 emails and documents, including the highly sensitive TTM Report—directly to his hard drive.

44.     The Illegally Obtained Data contains highly sensitive, proprietary and commercial information. For example, the adjusted operating income ("AOI"), contained in the TTM Report, identifies a store's profit after deducting costs and operating expenses from the store's total sales. AOI is one of the primary factors in assessing Walgreens store performance and is a trade secret.

Each document containing the AOI is likewise a trade secret because it compiles business and financial information into one place where it can be conveniently accessed. This information is not publicly available, and Walgreens only permits access to a limited number of employees. Those employees are bound by Walgreens' Policies and may only access this information in one place and only for Walgreens-related purposes.

45. Walgreens uses AOI in interstate commerce to analyze its market position and make business decisions, including whether to exercise its ROFR and purchase Walgreens properties nationwide. AOI also informs larger strategic decisions, like mergers and acquisitions, identifying new markets, and an individual store's future growth potential. AOI is valuable because it is not generally known to, and not readily ascertainable by, others who could obtain economic value from it. If Walgreens' competitors knew the profitability of Walgreens locations, reflected in the AOI, they could use that information to identify where to place competing businesses. Additionally, if a third party, like L2 Defendants or the Named Investors, obtained Walgreens' AOI data, it could use that data to identify high-performing Walgreens properties and determine the likely price that Walgreens would pay to exercise its ROFR and purchase those properties.

46. The Illegally Obtained Data also includes details of the process by which Walgreens determines whether to exercise its ROFR and analyzes lease terms, including without limitation whether and when to negotiate lease extensions. This information would therefore allow a third party, such as L2 Defendants or the Named Investors, to structure its offers to purchase in a way that would prevent Walgreens from exercising its ROFR, effectively rendering Walgreens' ROFR useless.

c. *Defendants Acquire and Misappropriate the Illegally Obtained Data*

47.     In anticipation of Peters' arrival, the L2 Defendants began preparations to purchase a large number of Walgreens properties using the Illegally Obtained Data.  In November 2019, while Aaron Peters was actively stealing from Walgreens, L2 Partners informed some of its closest brokers, like Matthews Defendants, that it intended to acquire a large number of Walgreens properties in the first quarter of 2020.  (*See* Nov. 12, 2019 Email, attached hereto as Exhibit 3 ("L2 Partners . . . is going to be aggressive again in Q1 2020."))[2]  The day after Peters joined the company, L2 Partners met Bill Pedersen, in person, to further discuss this acquisition.

48.     During its deposition, L2 Partners, represented by Dan Marotta, admitted that immediately after Peters joined L2 Partners in December 2019, he disclosed the Illegally Obtained Data to L2 Defendants.  (Deposition of L2 Partners in the Peters Action, attached hereto as Exhibit 4 ("L2 Dep."), at 24:16-25:9).  L2 Defendants, the Matthews Defendants, and the Named Investors have since used the Illegally Obtained Data to acquire numerous high-performing Walgreens properties and structure purchase offers in a way that would prevent Walgreens from exercising its ROFR.

   i.     Peters Discloses, and L2 Defendants Agree to Use, the Illegally
          Obtained Data

49.     L2 Partners assigned Peters to its Acquisition Team, which is led by Dan Marotta and Jeff Richards, and is responsible for identifying high-performing Walgreens properties for L2 Partners to target.  Marotta and Richards are also former Walgreens employees.

50.     L2 Partners admitted during its deposition that Peters told Defendants Marotta and Richards about the Illegally Obtained Data on his hard drive "from Walgreens" about a week after joining the company, and that Richards and Marotta then told the other L2 Members.  (Ex. 4, L2

---

[2] L2 Defendants made similar arrangements in November 2017, shortly after hiring John Shumrak, another former Walgreens employee.  (See Nov. 29, 2017 Email, attached hereto as Exhibit 5 ("These guys will be very active in 2018 and could be a great buyer for us.")).

Dep. at 24:16-25:9, 118:16-119:4).  L2 Partners further admitted that it and Peters both knew they had no right to use the Illegally Obtained Data "[b]ecause it was Walgreens' information," but L2 Partners took no steps to return it to Walgreens.  (*Id.* at 55:9-57:12).  On the contrary, L2 Partners admitted in deposition that it immediately used the Illegally Obtained Data to compile a list of the best performing Walgreens stores by comparing the AOI and rent (the "Top Walgreens List").  (*Id.* at 87:21-90:5; Jan. 7, 2020 Email, attached hereto as Exhibit 6).

51.     The L2 Defendants have since used the Illegally Obtained Data as part of L2 Partners' standard market research, allowing it to identify and acquire high-performing Walgreens properties on behalf of the Named Investors.  By accepting the benefits of Peters' misconduct and using it in their market analyses, L2 Defendants knowingly ratified Peters' theft.

52.     In addition to disclosing the Illegally Obtained Data, between December 7, 2019 and May 5, 2021—while employed by L2 Partners—Peters improperly accessed Walgreens' online portal (the "Portal") to obtain data concerning various Walgreens stores on fifty-three separate occasions.  Once it discovered the unauthorized access, Walgreens terminated Peters' Portal account.

      ii.      <u>Defendants Implement the Trade Secret Scheme</u>

53.     Beginning on or around December 2019, L2 Defendants used and disclosed the Illegally Obtained Data extensively.  With assistance from Matthews Defendants, L2 Defendants used the Illegally Obtained Data to identify high-performing Walgreens properties that matched criteria set by the Named Investors.  The Named Investors, relying on the Illegally Obtained Data, then approved those acquisitions and the terms of the purchase for each targeted Walgreens property.

### 1. L2 Defendants Use the Illegally Obtained Data to Target Walgreens Properties

54.     L2 Defendants and the Matthews Defendants repeatedly used the Illegally Obtained Data to identify and acquire high-performing Walgreens properties.

55.     The Illegally Obtained Data allowed L2 Partners to quickly identify the performance of every single Walgreens store in the United States.  L2 Partners admitted in deposition that by using the Illegally Obtained Data, L2 Defendants could quickly identify the highest-performing Walgreens stores for the Named Investors and others, as well as evaluate offers provided by brokers.  (Ex. 4, L2 Dep. at 30:15-30:23, 58:5-58:23).  L2 Partners further admitted that having information for each individual Walgreens store in one place was very convenient.  (*Id.* at 85:9-85:13).

56.     L2 Partners additionally admitted that it used the Illegally Obtained Data to target Walgreens properties that were not on the market and, acting through the Matthews Defendants, sought to convince Walgreens' landlords to sell those properties to members of the Enterprise.  (*Id.* at 58:5-58:23).  For example, immediately after Peters joined L2 Partners, he prepared a version of the Top Walgreens List using the Illegally Obtained Data.  L2 Defendants provided this list to Matthews Defendants, who were aware that the list was derived from Illegally Obtained Data.  (Jan. 9, 2020 Email, attached hereto as Exhibit 7 ("We've got the first lead off the list.")).  Matthews Defendants then used the Top Walgreens List to focus their efforts on the properties that met the Named Investors' criteria.  Between 2020 and 2021, using the Top Walgreens List, Matthews Defendants convinced the landlords of at least Colorado Springs, Louisville, and Broken Arrow, identified in Figure 1, to sell to the Enterprise's members.

57.     L2 Defendants also used the Illegally Obtained Data to acquire properties on their own behalf, including the Erlanger and Louisville Properties, identified in Figure 1.

58.     L2 Defendants also used the Illegally Obtained Data to reevaluate Walgreens properties that they attempted – but failed – to purchase before hiring Peters.  Using the Illegally Obtained Data, the L2 Defendants identified which stores matched Named Investors' criteria and were worth a second look.

59.     L2 Partners also used the Illegally Obtained Data to evaluate the offers it received from brokers.  Before deciding whether to make an offer to purchase or propose the property to the Named Investors, the L2 Members used the information contained in the highly sensitive TTM Report to identify the AOI, total sales, and prescriptions sold per day for that store, minutes after learning that the store was on the market.  L2 Partners could not have identified that information without having access to the Illegally Obtained Data.

60.     L2 Partners further used the Illegally Obtained Data to determine the optimum purchase price for Walgreens properties, which L2 Defendants used to prevent Walgreens from exercising its ROFR.  Specifically, L2 Partners would choose a price based on the Illegally Obtained Data that it knew was just high enough that Walgreens would not exercise its ROFR.  For six different Walgreens properties in four states, L2 Partners' purchase price was, on average, slightly less than 10% higher than Walgreens' internal metrics valued the property.  L2 Partners was able to calculate this number by using the Illegally Obtained Data.  Thus, by using the Illegally Obtained Data, L2 Partners was able to price Walgreens out of these transactions, depriving Walgreens' right to exercise its ROFR against a bona fide offer.

61.     L2 Defendants further used the Illegally Obtained Data to negotiate lease extensions and higher rental rates from Walgreens.  By using Walgreens' store-performance data, L2 Defendants had an illegal advantage during the lease renegotiation process.  The Illegally

Obtained Data therefore emboldened L2 Defendants to demand higher rental rates and longer lease terms.

62.     Finally, L2 Defendants and the Matthews Defendants also used the Illegally Obtained Data to advertise investor-owned Walgreens properties to third parties. In this regard, while the Enterprise used the Illegally Obtained Data between 2019 and 2021, L2 Defendants apparently have a history of stealing and appropriating Walgreens internal sales data.

63.     Based on the records produced in discovery by third parties, the earliest known example of L2 Partners' theft took place in September 2015, after Richards joined the company. L2 Partners retained Matthews Defendants to advertise an investor-owned Walgreens in Springfield, Oregon. To aid their efforts, L2 Defendants gave Matthews Defendants a "deck with actual sales and RX," which is not publicly available. (*See* September 18, 2015 Email, attached as Exhibit 8 ("[Y]ou can share this with the buyer, but do not send this out to anyone else.")).

64.     After reviewing the pitch-deck, the buyer agreed to go forward with the sale. During its due diligence, however, the buyer pointed out that the numbers on a Walgreens-generated sales report[3] were far lower than what L2 Partners represented in its pitch-deck. (*See* September 25, 2015 Email, attached as Exhibit 9). Attempting to allay those concerns and justifying the store's purchase price, Pedersen advised:

> One of the partners at the sellers company is a former real estate executive at Walgreens and still has very strong ties to their real estate department. **He has access to information that most don't have access to and this becomes very useful when looking at store performance.**
>
> If you look at the Executive Summary in the Springfield OR info document I sent over, we have the ▬▬▬▬▬▬▬. This is actually better than the reported store sales. Remember, the way

---

[3] Pursuant to a requirement in some lease agreements, Walgreens generates a sales report that describes a small fraction of the total sales at an individual store. Walgreens provides that report to its landlord, which is only allowed to share that report with prospective purchasers.



Walgreens reports is ███████████████████████████
█████████████████████████████████ **But that is just
to get to an estimated number**, and that is hoping that Walgreens
is doing the right ratio in Rx sales. When you have the total sales,
**you know exactly what the sales are** at the store. When you divide
the ████████████, you get █████████ in store sales [as opposed to the
███████]. We originally quoted the ████ is
because it is the common language for Walgreens store sales.

(*Id.* (emphasis added); *see also* February 14, 2018 Email, attached as Exhibit 10 ("John, I spoke

with another former Walgreens real estate executive, Jeff Richards currently of L2 Partners . . .

[and] [h]e confirmed the sales of █████ at this location. . . . He said the nearest Walgreens . . .

does about █████ in sales.")). Thus, from its very inception, the Enterprise systematically and

illegally used stolen Walgreens data as part of its business plan for obtaining Walgreens properties.

### 2. L2 Defendants Use the Illegally Obtained Data to Solicit and Include the Named Investors in the Scheme

65.     L2 Partners used the Illegally Obtained Data to purchase Walgreens properties on

behalf of its investors. Those investors retained L2 Partners specifically to locate and acquire

Walgreens properties with the Illegally Obtained Data.

66.     In the course of this work, and to solicit additional investors, L2 Partners used the

Illegally Obtained Data to create "site specific reports" in the form of pitch-decks, describing the

potential investment value of a particular Walgreens property. Each pitch-deck contained a

financial summary, which identified that store's profit, total sales, the number of prescriptions sold

each day, and a statement of that store's ranking when compared to all Walgreens locations

nationwide—none of which is publicly available. In one pitch-deck presented to the Named

Investors, L2 Partners even advised that the Walgreens store's high sales figures were attributable

to the high volume of HIV medication sold at that store. Given their sophistication, the Named

Investors were aware that data regarding the volume of HIV medication sold at that store was not

publicly available.  Thus, the Named Investors knew that this information was derived from the Illegally Obtained Data.

67.     L2 Partners admitted in deposition that Peters prepared the pitch-decks and included the Illegally Obtained Data in the same to describe the store's performance.  (Ex. 4, L2 Dep. at 56:21-57:6).  Marotta and Richards each reviewed those pitch-decks and were aware that the store-performance data was derived from the Illegally Obtained Data.  (*See, e.g.*, Aug. 19, 2020 Email, attached hereto as Exhibit 11).

68.     After reviewing the information contained therein, Lazarus and Galin used the pitch-deck to advertise the Walgreens property to L2 Partners' investors.  If the investor was interested, Lazarus and Galin would set up a phone call for an oral pitch-deck meeting, where they would discuss the Walgreens store's performance and the terms of purchase.  Upon information and belief, during these pitch-deck meetings, Lazarus and Galin informed the Named Investors, L2 Partners' largest clients, about the Illegally Obtained Data.

69.     Using the Illegally Obtained Data, L2 Partners consistently identified the strongest performing stores and made unconditional guarantees about their future performance.  For example, L2 Partners was able to target high-performing Walgreens properties that only had a few years remaining on the lease.  Generally, a commercial tenant with an expiring lease would make a property less valuable to buyers.  Because it had access to the Illegally Obtained Data, however, L2 Partners was able to easily determine whether Walgreens was likely to extend a lease.  Thus, relying on the Illegally Obtained Data, L2 Partners frequently guaranteed that if Walgreens did not renew its lease, L2 Partners would refund its consultation fee.  The Named Investors received such guarantees for Walgreens properties they agreed to purchase in Broken Arrow, Oklahoma, and Elk River, Minnesota.  L2 Partners would not have made such a guarantee without access to the

Illegally Obtained Data.  The Named Investors therefore knew that L2 Partners had access to stolen data.

70.     James Lambert, one of the Named Investors, actively facilitated L2 Partners' efforts to secure additional investors.  Indeed, upon information and belief, James Lambert introduced L2 Partners to Byron and Ari Haseotes and then agreed to serve as trustee for at least three Walgreens properties the Haseotes' purchased in Mocksville, North Carolina; Abilene, Texas; and Wichita, Kansas.  L2 Partners identified these properties with the Illegally Obtained Data.  For his first purchase, Byron Haseotes asked that L2 Partners deal with James Lambert on Byron's behalf, rather than deal directly with L2 Partners.  (*See* January 6, 2021 Email from Byron Haseotes, attached as Exhibit 12).  By acting as intermediary between L2 Partners and its newer investors, James Lambert facilitated the Enterprise in acquiring additional Walgreens properties with the Illegally Obtained Data.

### 3.  The Named Investors Misappropriate the Illegally Obtained Data

71.     After reviewing the pitch-deck and speaking with Lazarus and Galin, if the Named Investors decided that the Walgreens property and terms of purchase met their criteria, the Named Investors would execute a Consulting Agreement, retaining L2 Partners.  An example of that Consulting Agreement, executed by James Lambert on August 13, 2020, provided:

> **Scope of Work**. The Client hereby acknowledges that it has independently confirmed and expressly acknowledges the Consultant's experience and expertise specific to the transaction of WALGREENS stores. In consonance therewith, **the Consultant agrees to provide the Client with certain information specific to WALGREENS locations** that is solely intended to aid the client with its acquisition decision-making. The Consultant's service may include but shall not be limited to: (i) **consulting with Client regarding the acquisition of specific existing WALGREENS locations and/or any preferred location identified by the Client**; (ii) **providing site specific reports including pictorial and demographic information**; (iii) **conducting a search of available WALGREENS locations to obtain one or more choices that match the Client's criteria**; (iv) **assist in the preparation of appropriate acquisition specific**

**documentation**; (v) **negotiate acquisition for the Client's purchase of specific WALGREENS location(s) with current location owners under such terms and conditions directed by the Client**; (vi) **assist in the closing of the WALGREENS transaction**.

(Ex. 1, Consulting Agreement Exemplar (Emphasis added)).

72.     The Named Investors signed similarly worded Consulting Agreements as a routine practice for each Walgreens-leased property they purchased through L2 Partners.  Based on the Named Investors' purchasing history and other documents:

> (1)     James Lambert signed approximately 28 Consulting Agreements, the first being executed on or around October 5, 2016;
>
> (2)     Byron Haseotes signed approximately 5 Consulting Agreements, the first being executed on or around November 9, 2020, where Byron signed in place of Ari Haseotes;
>
> (3)     Ari Haseotes signed approximately 14 Consulting Agreements, the first being executed on or around June 16, 2020; and
>
> (4)     Peter Neary signed approximately 15 Consulting Agreements, the first being executed on or around January 31, 2019.

73.     Pursuant to the executed Consulting Agreements, James Lambert retained L2 Partners to provide information regarding and help acquiring nearly 30 properties since 2016, 8 of which are identified in Figure 1.

74.     Pursuant to the executed Consulting Agreements, Ari Haseotes similarly retained L2 Partners for 14 properties, 11 of which are identified in Figure 1.

75.     Pursuant to the executed Consulting Agreements, Byron Haseotes retained L2 Partners for 5 Walgreens properties, 4 of which are identified in Figure 1.

76.     Pursuant to the executed Consulting Agreements, Peter Neary retained L2 Partners for 15 properties, 2 of which are identified in Figure 1.

77.     After the Named Investor executed the Consulting Agreement, L2 Partners organized an Investor Entity, prepared an operating agreement on behalf the Named Investors, and appointed the Named Investor as sole member of the Investor Entity.

78.     In return for L2 Partners' services, the Named Investors paid L2 Partners a flat rate of $150,000 for a property with a purchase price of up to $3,000,000, and 4.5% of the purchase price exceeding that amount. Through this compensation, L2 Partners was able to continue to solicit investors and acquire additional Walgreens properties through the use of the Illegally Obtained Data.

79.     By executing the Consulting Agreements, the Named Investors retained L2 Partners to provide them with Walgreens' information (including the Illegally Obtained Data), and to search for and provide information regarding additional Walgreens properties that matched the Named Investors' criteria. For the Named Investors, the L2 Partners Acquisition Team used the Illegally Obtained Data to identify specific Walgreens properties, specifically discussing whether that property matched the Named Investors' criteria. (*See, e.g.*, September 12, 2020 Email, attached hereto as Exhibit 13 ("The returns are a bit light here but this is better real estate at better rents then the majority of deals Ari & Lambert are taking."); Jul. 15, 2020 Email, attached hereto as Exhibit 14 ("Dan, AP sent this last week and I think it's at least worth a discussion for Lambert [and then identifying the specific sales, AOI and prescriptions per day using the Illegally Obtained Data].")). As L2 Partners misappropriated the Illegally Obtained Data in the course of the very business that the Named Investors appointed L2 Partners to perform, the Named Investors are both directly and vicariously liable for L2 Partners' misappropriation.

80. The Named Investors were fully aware that the Illegally Obtained Data was stolen from Walgreens. The Named Investors knew that L2 Partners' entire Acquisition Team was comprised of former Walgreens employees. Further, the Named Investors are sophisticated buyers, who purchased dozens of pharmacies and were familiar with customs and industry practices in the pharmacy real estate industry—particularly, the confidentiality of store-performance data such as store-by-store profit, total sales, internal store ranking, and especially, the amount and type of prescription medications sold at an individual store. Indeed, it was so unusual for L2 Partners to have such detailed information regarding Walgreens that internal email communications among the L2 Defendants show that investors inquired about the source of store-performance data contained in the pitch-decks.

81. Further, L2 Partners confirmed to the Named Investors that it was using the Illegally Obtained Data when L2 Partners began guaranteeing that Walgreens would renew its lease. Such a guarantee is unusual, and the Named Investors knew that L2 Partners would not risk its consultation fee without insider-information about that store's performance. Finally, upon information and belief, Lazarus and Galin informed the Named Investors of the improper acquisition of the Illegally Obtained Data during their pitch-deck meetings.

82. The Named Investors misappropriated Walgreens' trade secrets contained in the pitch-decks by both (a) using that information to decide whether to purchase the Walgreens property, (b) by executing the Consulting Agreement, approving L2 Partners' misappropriation of Walgreens' trade secrets, and (c) ultimately purchasing the Walgreens-leased property.

**B. The Partial Refund Predicates and Interference With Walgreens' ROFR**

83. Unsatisfied with the unlawful advantage they acquired with the Illegally Obtained Data, Defendants sought to prevent Walgreens from exercising its ROFR and acquiring targeted

Walgreens properties. To that end, Walgreens' typical ROFR requires that, before a landlord may accept a third-party offer to purchase a Walgreens property (the "Bona Fide Offer"), Walgreens is entitled to notice and a copy of the Bona Fide Offer and an opportunity to purchase the property on those same terms.

84. Defendants sought to prevent Walgreens from exercising its ROFR by misrepresenting the purchase price shown in the Bona Fide Offer provided to Walgreens and demanding that landlords execute PSAs before Walgreens received a Bona Fide Offer. L2 Partners admitted in deposition that it was aware that Walgreens' lease required landlords to provide all terms and conditions of an offer as part of the ROFR notice. (Ex. 4, L2 Dep. at 58:21-59:12). Nonetheless, L2 Partners, along with its brokers and the Named Investors, asked landlords to violate these contractual obligations to Walgreens.

*a. Acquiring Properties Through Partial Refund Scheme*

85. For at least the properties identified below, L2 Defendants, or their broker, contacted landlords located in different states, by wire and other communications, and offered to pay the landlord an inflated purchase price. The landlord would then partially refund that inflated purchase price to an investor at closing through a side agreement that was not disclosed to Walgreens. Landlords were incentivized to participate in this scheme as it might allow them to avoid paying a brokerage fee that they would incur if Walgreens exercised its ROFR.

86. L2 Defendants' entire purpose in offering the Partial Refund was to deceive Walgreens into believing that L2 Partners was paying a higher purchase price than it actually agreed to pay. Thus, L2 Defendants, or their broker, asked landlords to conceal the Partial Refund from Walgreens and delay executing an agreement for the Partial Refund until after Walgreens' ROFR period expired. L2 Defendants prepared an LOI or PSA, intentionally omitting the Partial

Refund, knowing the LOI or PSA: (1) was the only source of information Walgreens had about the Bona Fide Offer; (2) needed to contain all material terms of the purchase to satisfy the terms of the landlord's lease with Walgreens; and (3) would be delivered to Walgreens by United States Postal Service or another commercial interstate carrier, as was required by the lease.

87.     In an effort to conceal their true purpose, L2 Defendants framed the Partial Refund as a maintenance credit, even though the condition of the property had nothing to do with the size of the Partial Refund.  For example, on August 11, 2020, Richards, on behalf of the L2 Defendants, proposed paying the landlord of a Walgreens property in Cedar Park, Texas, an additional $381,174 if the landlord agreed to refund $200,000 at closing and conceal the same from Walgreens, increasing the purchase price of the Cedar Park property from $4,476,923 to $4,858,097.  (*See* Aug. 11, 2020 Email, attached hereto as Exhibit 15).  Richards described the Partial Refund as a "maintenance credit," despite the fact that L2 Partners had done nothing to assess the physical condition of the Cedar Park property.

88.     In describing his conversation with Richards, the landlord's broker, Andy Gatchell, stated:

> They [L2 Defendants] told me they've had a couple acquisitions recently where Walgreens executed their ROFR, so they want to increase the price **in an attempt to discourage WAG from doing that on Cedar Park**. The kicker here is that they're asking Seller to provide a $200,000 credit at closing which they've termed a "Maintenance Credit" for out of pocket cap ex if WAG vacates after their lease expires. The net result is a **$181,097 increase in net proceeds to the Seller, resulting in a 6.25% net cap rate**.
>
> I'd like to take credit for this as the result of sheer brokerage brilliance, however, this literally fell in my lap just now. Talking it through with them, I think it all makes sense and ensures that the buyer is even more locked in. And on the off-chance WAG does execute their ROFR at such an aggressive price, Mr. Klein still makes more money.

In return, they're asking that we submit the ROFR notice to WAG upon PSA execution and **that we don't execute the Maintenance Credit agreement until after the PSA has been signed and Walgreens has waived their ROFR**. . . .

(*Id.* (emphasis added)).

89.     Unless a broker was acting as an intermediary, Marotta and Richards typically contacted the landlords and bargained for the Partial Refund.  However, throughout these negotiations, Marotta and Richards conferred with Peters, Galin, and Lazarus, the latter of whom frequently signed the fraudulent LOI or PSA.

90.     The Partial Refunds were ultimately paid to an Investor Entity.  In carrying out the Partial Refund scheme, L2 Partners was acting on behalf of its investors (including the Named Investors) pursuant to its authority under the Consulting Agreement by "negotiat[ing] acquisition for the Client's purchase of specific WALGREENS location (s) under such terms and conditions **directed by the Client**[.]"  (Ex. 1, Consulting Agreement (emphasis added)).

91.     L2 Defendants further informed the investors of the Partial Refund before closing on the property through the pitch-deck.  The investors were likewise aware that, while ostensibly for repairs, the Partial Refund had no connection to the actual condition of the Walgreens property. (Aug. 28, 2017 Email, attached as Exhibit 16 ("We are getting a $60,000 Roof Credit at closing. The roof does not currently need to be replaced, but this credit will pay for a new roof at some point in the future, which is the main expense on a NN property.")).  Indeed, the pitch-decks Peters prepared made no mention that the property needed maintenance.  Instead, the pitch-decks described the Partial Refund as a discount to the purchase price.

92.     The Named Investors had actual knowledge that the Partial Refund was omitted from the LOI or PSA in the course of performing their due diligence at closing.  Further, given that L2 Partners had a contractual obligation to convey all terms of the acquisition for the Named

Investors' approval, L2 Partners informed the Named Investors that the Partial Refund was omitted from the LOI or PSA during their pitch-deck meeting.

93.     Nevertheless, before closing, the Named Investors authorized L2 Partners' mail and wire fraud violations, furthering their shared goal of acquiring Walgreens properties and circumventing Walgreens' ROFR.

94.     In addition to using Walgreens' trade secrets and confidential information, L2 Defendants were able use the Partial Refund to acquire at least the following Walgreens properties on behalf of their investors, including the Named Investors, described in sections i-vi below:

      i.     <u>Store No. 3542, 1607 N. Zaragoza Rd., El Paso, TX ("El Paso Property")</u>

95.     Upon information and belief, L2 Defendants began negotiations to purchase the El Paso Property from SRGS LLC ("SRGS") in or around January 2019. L2 Partners' broker and SRGS's representative were at all relevant times located in Illinois and California, respectively. All negotiations for the purchase of the El Paso Property by L2 Partners were conducted by telephone or email.

96.     Before February 8, 2019, L2 Defendants bargained to purchase the El Paso Property for $2,850,000, intending to receive a $150,000 Partial Refund from SRGS at closing, but ultimately receiving $75,000. (*See* March 14, 2019 Email from Jack Stead, attached hereto as Exhibit 17 ("Additionally, they are asking for a $75,000 credit instead of the **previously requested** $150,000.") (emphasis added)).

97.     On February 15, 2019, Walgreens received a PSA for the El Paso Property by certified mail and by FedEx. The PSA, dated February 8, 2019, identified that L2 Partners intended to purchase the El Paso Property for $2,850,000, but did not identify the Partial Refund. (El Paso Property PSA, attached hereto as Exhibit 18).

98.     L2 Defendants drafted the material terms of the El Paso Property PSA and intentionally omitted the Partial Refund.  By omitting the Partial Refund with knowledge that the fraudulent PSA would form the basis for Walgreens' purchase price under its ROFR, L2 Defendants acted with the specific intent to prevent Walgreens from exercising its ROFR against an artificially high purchase price.  When L2 Defendants prepared the PSA, signed by Lance Lazarus, they (1) knew the statements contained therein, specifically regarding the purchase price, were false; (2) knew that the PSA would be submitted to Walgreens through the use of United States Postal Service or other interstate commercial carrier, as was required by the lease; and (3) intended to defraud Walgreens into waiving its ROFR.

99.     Based on the language as represented in the PSA, Walgreens, acting in good faith and exercising its business judgment, decided to not exercise its ROFR.

100.    The Partial Refund was ultimately paid to an Investor Entity managed by Named Investor Peter Neary, upon whose behalf L2 Partners negotiated acquisition of the El Paso Property, including the receipt of the Partial Refund and concealing the same from Walgreens.

101.    Prior to closing, given that L2 Partners had a contractual obligation to convey all terms of the acquisition to Peter Neary for his approval pursuant to the Consulting Agreement, L2 Partners informed Peter Neary that it omitted the Partial Refund for the El Paso Property from the PSA delivered to Walgreens by certified mail and through a private interstate carrier, FedEx Corporation.  Nevertheless, based on his purchase history and other documentation, Peter Neary executed the Consulting Agreement and approved the terms of the El Paso Property acquisition. Peter Neary therefore engaged in mail and wire fraud violations, along with L2 Partners.

102.    As a result of the undisclosed Partial Refund, L2 Partners was able to purchase the El Paso Property on behalf of Peter Neary for $2,775,000—$75,000 less than what was advertised

to Walgreens in the PSA. Walgreens relied on the fraudulent PSA L2 Partners and Peter Neary provided and therefore did not exercise its ROFR for the El Paso Property.

ii.    <u>Store No. 6113, 1625 S. Webb Rd., Wichita, KS ("Wichita Property")</u>

103.    L2 Defendants began negotiations to purchase the Wichita Property from 1625 S. Webb LLC, a Kansas company, ("KS Webb") on or around August 3, 2020. Jeff Richards and Shane Smith, KS Webb's broker, were at all relevant times located in Illinois and Michigan, respectively. All negotiations for the purchase of the Wichita Property by L2 Partners were conducted by telephone or email.

104.    On August 11, 2020, L2 Defendants bargained to purchase the Wichita Property for $4,500,000, which included a $200,000 Partial Refund from KS Webb at closing. (*See* Aug. 12, 2020 Email from Jeff Richards, attached hereto as Exhibit 19; Aug. 11, 2020 Email from Shane Smith, attached hereto as Exhibit 20).

105.    On August 18, 2020, Walgreens received the LOI for the Wichita Property by FedEx. The LOI, dated August 11, 2020, identified that L2 Partners intended to purchase the Wichita Property for $4,500,000 but did not identify the $200,000 Partial Refund that L2 Partners bargained to receive from KS Webb at closing. (Wichita Property LOI, attached hereto as Exhibit 21).

106.    L2 Defendants drafted the material terms of the Wichita Property LOI on August 11, 2020, hours after securing the Partial Refund. L2 Defendants intentionally omitted the $200,000 Partial Refund with the specific intent to defraud Walgreens by artificially inflating the purchase price and deterring Walgreens from exercising its ROFR. When L2 Defendants prepared the LOI, signed by Dan Marotta, they (1) knew the statements contained therein, specifically regarding the purchase price, were false; (2) knew that the LOI would be submitted to Walgreens

through the use of United States Postal Service or other interstate commercial carrier, as was required by the lease; and (3) intended to defraud Walgreens into waiving its ROFR.

107.    Based on the representations in the LOI, Walgreens did not exercise its ROFR. Specifically, at $4,500,000, the potential profit margin was too thin to justify the purchase. Had L2 Partners disclosed the $200,000 refund, Walgreens would have exercised its ROFR and purchased the Wichita Property.

108.    On June 30, 2020, L2 Partners organized 1625 S Webb LLC ("DE Webb"), a Delaware Investor Entity. (DE Webb Certificate of Formation, attached hereto as Exhibit 22). L2 Partners then conveyed ownership of DE Webb to Ari Haseotes. (*Id.* (Certificate of Amendment signed by Ari Haseotes on August 31, 2020)). L2 Partners negotiated acquisition of the Wichita Property on Ari Haseotes' behalf, and ultimately the Partial Refund was paid to DE Webb, concealing the same from Walgreens.

109.    L2 Partners disclosed the Partial Refund to Ari Haseotes in the pitch-deck Peters prepared for the Wichita Property, emailed on or around August 17, 2020. Given that L2 Partners had a contractual obligation to convey all terms of the acquisition for his approval pursuant to the Consulting Agreement, Ari Haseotes knew that the Partial Refund was omitted from the LOI delivered to Walgreens by an interstate commercial carrier. Nevertheless, based on his purchase history and other documentation, Ari Haseotes executed the Consulting Agreement and approved the terms of the Wichita Property acquisition. Ari Haseotes therefore engaged in mail and wire fraud violations, along with L2 Partners.

110.    Additionally, on September 22, 2020, in furtherance of the scheme and directed by Ari Haseotes, L2 Partners executed an amended PSA, increasing the Partial Refund to $250,000. L2 Partners and KS Webb agreed to and executed the amended Partial Refund by email. (*See* Sept.

22, 2020 Email from Shane Smith, attached hereto as Exhibit 23; Amended Wichita Property PSA, attached hereto as Exhibit 24).

111.    As a result of the undisclosed Partial Refund, L2 Partners was able to purchase the Wichita Property on behalf of Ari Haseotes, closing on October 30, 2020, for $4,250,000— $250,000 less than what was advertised to Walgreens in the LOI.   Walgreens relied on the fraudulent LOI that L2 Partners and Ari Haseotes provided and therefore did not exercise its ROFR.

iii.    <u>Store No. 6243, 5005 Douglas Ave., Racine, WI ("Racine Property")</u>

112.    L2 Defendants began negotiating to purchase the Racine Property from Chas, LLC in or around August 2020.  Jack Stead, the same broker for the El Paso Property, and Chas, LLC's representative were at all relevant times located in Illinois and Wisconsin, respectively.   All negotiations for the purchase of the Racine Property by L2 Partners were conducted by telephone or email.

113.    On September 10, 2020, Jack Stead, at L2 Defendants' behest, bargained for L2 Partners to purchase the Racine Property for $6,578,000, and for L2 Partners to receive a $250,000 Partial Refund from Chas, LLC, at closing.

114.    On September 17, 2020, Walgreens received the LOI for the Racine Property by certified mail and by FedEx.  The LOI, dated September 10, 2020, identified that L2 Partners intended to purchase the Racine Property for $6,578,000, but did not include the $250,000 refund L2 Partners bargained from Chas, LLC at closing.  (Racine Property LOI, attached hereto as Exhibit 25).

115.    L2 Defendants drafted the material terms of the Racine Property LOI on or around September 10, 2020, hours after securing the Partial Refund.  (Sept. 10, 2020 Email, attached

hereto as Exhibit 26). L2 Defendants intentionally omitted the $250,000 refund, concealing the same from Walgreens, with the specific intent to artificially inflate the purchase price for the Racine Property and prevent Walgreens from exercising its ROFR. When L2 Defendants prepared the LOI, signed by Dan Marotta, they (1) knew the statements contained therein, specifically regarding the purchase price, were false; (2) knew that the LOI would be submitted to Walgreens through the use of United States Postal Service or other interstate commercial carrier, as was required by the lease; and (3) intended to defraud Walgreens into waiving its ROFR.

116.    Based on the representations in the LOI, Walgreens did not exercise its ROFR. Specifically, at $6,578,000, the potential profit margin was too thin to justify the purchase. Had L2 Partners disclosed the $250,000 refund, Walgreens would have exercised its ROFR and purchased the Racine Property.

117.    On October 19, 2020, L2 Partners organized 5005 Douglas WI LLC, a Delaware Investor Entity, and named Ari Haseotes as its manager or member. L2 Partners negotiated acquisition of the Racine Property on Ari Haseotes' behalf, and ultimately the Partial Refund was paid to the Ari Haseotes Investor Entity, concealing the same from Walgreens. (Racine Property Final Seller's Statement, attached as Exhibit 27).

118.    L2 Partners disclosed the Partial Refund to Ari Haseotes in the pitch-deck Peters prepared for the Racine Property, emailed on October 1, 2020. (Racine Property Pitch-Deck, attached hereto as Exhibit 28). Given that L2 Partners had a contractual obligation to convey all terms of the acquisition for his approval pursuant to the Consulting Agreement, Ari Haseotes was likewise advised that the Partial Refund was omitted from the LOI delivered to Walgreens by certified mail and by FedEx. Nevertheless, based on the purchasing history and other documents, Ari Haseotes executed the Consulting Agreement before closing and approved the terms of the

Racine Property acquisition.  Ari Haseotes therefore engaged in mail and wire fraud violations, along with L2 Partners.

119.    As a result of the undisclosed Partial Refund, L2 Partners was able to purchase the Racine Property on behalf of Ari Haseotes, closing on December 1, 2020 for $6,328,000— $250,000 less than what was advertised to Walgreens in the LOI.  Walgreens relied on the fraudulent LOI L2 Partners and Ari Haseotes provided and therefore did not exercise its ROFR.

    iv.    <u>Store No. 3555, 1880 N. Belcher Rd., Clearwater, FL ("Clearwater Property")</u>

120.    L2 Defendants began negotiations to purchase the Clearwater Property from Pogback Real Estate, LLC ("Pogback") in or around August 2020. L2 Partners' agent, Anthony D'Ambrosia of Marcus & Millichap, and Pogback's broker, Jordan Woodcock, also of Marcus & Millichap, were at all relevant times located in New York and Michigan, respectively.  All negotiations for the purchase of the Clearwater Property by L2 Partners were conducted by telephone or by email.

121.    On September 12, 2020, L2 Defendants bargained to purchase the Clearwater Property for $4,100,000 and for L2 Partners to receive a $100,000 Partial Refund from Pogback at closing.  (*See* Ex. 13, Sept. 12, 2020 Email).

122.    On October 23, 2020, Walgreens received an LOI for the Clearwater Property by FedEx.  The LOI, dated October 22, 2020, identified that L2 Partners intended to purchase the Clearwater Property for $4,100,000 but did not identify the $100,000 Partial Refund that L2 Partners bargained from Pogback at closing.  (Clearwater Property LOI, attached hereto as Exhibit 29).

123.    L2 Defendants drafted the material terms of the Clearwater Property LOI and intentionally omitted the $100,000 Partial Refund, concealing the same from Walgreens, with the

specific intent to artificially inflate the purchase price for the Clearwater Property and prevent Walgreens from exercising its ROFR. When L2 Defendants prepared the LOI, signed by Dan Marotta, they (1) knew the statements contained therein, specifically regarding the purchase price, were false; (2) knew that the LOI would be submitted to Walgreens through the use of United States Postal Service or other interstate commercial carrier, as was required by the lease; and (3) intended to defraud Walgreens into waiving its ROFR.

124.    Based on the representations in the LOI, Walgreens did not exercise its ROFR.

125.    On October 28, 2020, L2 Partners organized Clearwater Assets LLC as an Investor Entity, with the investor Erik Abrahamson serving as its manager or member. L2 Partners negotiated acquisition of the Clearwater Property on Abrahamson's behalf, and ultimately the Partial Refund was paid to the Abrahamson Investor Entity, concealing the same from Walgreens.

126.    L2 Partners disclosed the Partial Refund to Erik Abrahamson in the pitch-deck Peters prepared for that property emailed on or around October 27, 2020. Upon information and belief, given that L2 Partners had a contractual obligation to convey all terms of the acquisition for his approval pursuant to the Consulting Agreement, Erik Abrahamson was likewise advised that the Partial Refund was omitted from the LOI delivered to Walgreens by FedEx. Nevertheless, based on his purchase history and other documentation, Erik Abrahamson executed the Consulting Agreement and approved the terms of the Clearwater Property acquisition. Erik Abrahamson therefore engaged in mail and wire fraud violations, along with L2 Partners.

127.    As a result of the undisclosed Partial Refund, L2 Partners was able to purchase the Clearwater Property on behalf of Erik Abrahamson, closing on December 28, 2020, for $4,000,000—$100,000 less than what was advertised to Walgreens in the LOI. Walgreens relied

on the fraudulent LOI L2 Partners and Erik Abrahamson provided and therefore did not exercise its ROFR.

<span>v.</span> <u>Store No. 5459, 9909 Loomis Rd., Franklin, WI ("Loomis Property")</u>

128.    L2 Defendants began negotiations to purchase the Loomis Property from Franklin WG, LLC, in or around June 2020. Doug Holder, one of L2 Partners' own investors, was manager and sole member of Franklin WG, LLC. On June 26, 2020, Doug Holder agreed to sell the Loomis Property to Named Investor Peter Neary for $3,812,400, and issue Peter Neary a $181,542 Partial Refund at closing.

129.    On June 27, 2020, Walgreens received a PSA for the Loomis Property by FedEx. The letter, dated June 26, 2020, identified that L2 Partners intended to purchase the Loomis Property for $3,812,400. (Loomis Property PSA, attached hereto as Exhibit 30). The Loomis Property PSA omitted the $181,542 refund that Peter Neary would receive at closing. (*Id.*).

130.    L2 Defendants drafted the material terms of the Loomis Property PSA. L2 Defendants intentionally omitted the $181,542 refund, concealing the same from Walgreens, with the specific intent to artificially inflate the purchase price for the Loomis Property and prevent Walgreens from exercising its ROFR. When L2 Defendants prepared the PSA, authorized by Lance Lazarus, they (1) knew the statements contained therein, specifically regarding the purchase price, were false; (2) knew that the PSA would be submitted to Walgreens through the use of United States Postal Service or other interstate commercial carrier, as was required by the lease; and (3) intended to defraud Walgreens into waiving its ROFR.

131.    Based on the language as represented in the PSA, Walgreens, acting in good faith and exercising its business judgment, decided to not exercise its ROFR.

132.    On July 22, 2020, prior to closing, L2 Partners organized 9909 Franklin WI, LLC as an Investor Entity, with Peter Neary as a member. L2 Partners negotiated acquisition of the

Loomis Property on Neary's behalf, and ultimately the Partial Refund was paid to the Neary Investor Entity, concealing the same from Walgreens. (*See* Estimated Seller's Statement, attached hereto as Exhibit 31).

133.    Prior to closing, upon information and belief, given that L2 Partners had a contractual obligation to convey all terms of the acquisition to Peter Neary for his approval pursuant to the Consulting Agreement, Peter Neary knew that the Partial Refund for the Loomis Property was omitted from the PSA delivered to Walgreens by FedEx Corporation. Nevertheless, based on his purchasing history and other documents, Peter Neary executed the Consulting Agreement and approved the terms of the Loomis Property acquisition. Peter Neary therefore engaged in mail and wire fraud violations, along with L2 Partners.

134.    As a result of the undisclosed Partial Refund, on October 7, 2020, L2 Partners was able to purchase the Loomis Property on behalf of Peter Neary for $3,630,858—$181,542 less than what was advertised to Walgreens in the PSA. Walgreens relied on the fraudulent PSA that L2 Partners and Peter Neary provided and therefore did not exercise its ROFR for the Loomis Property.

      vi.   <u>Store No. 3668, 7101 Hefner Road, Oklahoma City, Oklahoma (the "Oklahoma Property")</u>

135.    L2 Defendants began negotiations to purchase the Oklahoma Property from OKC Hefner, LLC (hereinafter, "OKC") on behalf of Named Investor Ari Haseotes in November 2020. Naaman Abdullah, one of L2 Partners' own investors, was OKC's principal owner. Before December 2, 2020, Abdullah agreed to sell the Oklahoma Property to Ari Haseotes for $4,436,363, and issue Ari Haseotes a $369,697 Partial Refund at closing.

136.    On December 8, 2020, Walgreens received an LOI for the Oklahoma Property by FedEx. The LOI, dated December 2, 2020, advised that "Oklahoma Pharmacy Holdings, LLC"

("OPH") intended to purchase the Oklahoma Property for $4,436,363. (Oklahoma Property LOI, Attached hereto as Exhibit 32). The Oklahoma Property LOI omitted the $369,697 Partial Refund that Ari Haseotes would receive at closing. (*Id.*).

137.    L2 Defendants drafted the material terms of the Oklahoma Property LOI. L2 Defendants intentionally omitted the $369,697 refund, concealing the same from Walgreens, with the specific intent to artificially inflate the purchase price for the Oklahoma Property and prevent Walgreens from exercising its ROFR. When L2 Defendants prepared the Oklahoma Property LOI, signed by Dan Marotta, they (1) knew the statements contained therein, specifically regarding the purchase price, were false; (2) knew that the LOI would be submitted to Walgreens through the use of United States Postal Service or other interstate commercial carrier, as was required by the lease; and (3) intended to defraud Walgreens into waiving its ROFR.

138.    Based on the language as represented in the LOI, Walgreens did not exercise its ROFR. Specifically, at $4,436,363, the potential profit margin was too thin to justify the purchase. Had L2 Partners disclosed the $369,697 refund, Walgreens would have exercised its ROFR and purchased the Oklahoma Property.

139.    On December 18, 2020, L2 Defendants organized 7101 W Hefner OK LLC ("Hefner"), naming Ari Haseotes as its manager or member. L2 Partners thus negotiated acquisition of the Oklahoma Property on Ari Haseotes' behalf, and ultimately the Partial Refund was paid to the Ari Haseotes Investor Entity, concealing the same from Walgreens.

140.    L2 Partners disclosed the Partial Refund to Ari Haseotes on December 2, 2020 in the pitch-deck for the Oklahoma Property. (Oklahoma Property Pitch-Deck, attached hereto as Exhibit 33). The Oklahoma Property pitch-deck showed a purchase price of $4,066,666, $369,697 less than the price advertised to Walgreens in the Oklahoma Property LOI. (*Id.*). Given that L2

Partners had a contractual obligation to convey all terms of the acquisition for his approval pursuant to the Consulting Agreement, Ari Haseotes was likewise advised that the Partial Refund was omitted from the LOI delivered to Walgreens by FedEx. Nevertheless, based on the purchasing history and other documents, Ari Haseotes approved the terms of the Oklahoma Property acquisition. Ari Haseotes therefore engaged in mail and wire fraud violations, along with L2 Partners.

141.    As a result of the undisclosed Partial Refund, on December 29, 2020, L2 Partners was able to purchase the Oklahoma Property on behalf of Ari Haseotes for $4,066,666, $369,697 less than the price advertised to Walgreens in the LOI. Walgreens relied on the fraudulent LOI that L2 Partners and Ari Haseotes provided and therefore did not exercise its ROFR for the Oklahoma Property.

142.    Upon information and belief, there are numerous other instances of Defendants' Partial Refund scheme.

### b. *L2 Defendants' and Ari Haseotes' PSAs and Unreasonable Deadlines*

143.    In addition to misrepresenting the purchase price in the LOI and PSA for multiple Walgreens properties, L2 Defendants also sought to prevent Walgreens from exercising its ROFR by having landlords execute PSAs, thereby accepting the offer, before Walgreens received notice of a Bona Fide Offer. L2 Defendants also set closing dates that fell immediately after Walgreens' ROFR period, preventing Walgreens from purchasing the property on the same terms as contained in the Bona Fide Offer. Indeed, L2 Defendants, through its broker Anthony D'Ambrosia, represented to landlords that L2 Partners had "a special form of LOI that makes it less likely for Walgreens to buy the site back." (*See* Sept. 4, 2020 Email from Anthony D'Ambrosia, attached hereto as Exhibit 34).

144.     By executing the PSA and setting the closing date immediately after the ROFR period expired, L2 Defendants intended to make it more difficult for Walgreens to exercise its ROFR.  (Jan. 29, 2021 Email from Richards to Peters, attached hereto as Exhibit 35).

145.     Such actions prevented Walgreens from taking advantage of the same terms provided to L2 Partners in the Bona Fide Offer.

146.     By engaging in this conduct, L2 Defendants tortiously interfered with Walgreens' contractual relationship with its landlords, including but not limited to the following examples described in sections i-ii:

i.     Store No. 11356, 96th St., Papillion, NE ( "Papillion Property")

147.     L2 Partners approached Papillion Ventures IV, LLC ("Papillion Ventures") to purchase the Papillion Property.

148.     The Papillion Property lease provides:

RIGHT OF FIRST REFUSAL

25.     (a)     In the event that Landlord shall receive a Bona Fide Offer to purchase the Leased Premises at any time . . . Landlord shall so notify Tenant . . . together with a true and correct copy of said Bona Fide Offer. For purposes hereof, a "Bona Fide Offer" shall be deemed to be one made in writing by a person or entity that is not related or affiliated with Landlord which Landlord intends to accept (subject to this Article 25). . . . Tenant may, at Tenant's option and within twenty-one (21) days after receipt of Landlord's notice of said Bona Fide Offer and receipt of a copy thereof, offer to purchase the Leased Premises, or the applicable portion thereof, at the price and upon the terms and conditions as are contained in said Bona Fide Offer. . . . Failure of Tenant to so notify Landlord within said twenty-one (21) days shall be deemed a waiver thereof as to that particular Bona Fide Offer. . . . Landlord covenants that it shall accept no such Bona Fide Offer or convey the premises until it has complied with the terms of this Article 25.  Any conveyance of the Leased Premises, or portion thereof, made in absence of full satisfaction of this Article 25 **shall be void**.

(Emphasis added).

149.     Thus, under the Papillion Property lease, Walgreens was entitled to notice before Papillion Ventures accepted a Bona Fide Offer.  Nevertheless, on September 11, 2020, before Walgreens received any notice of Papillion Ventures intent to sell the Papillion Property—much less a Bona Fide Offer as required by the Papillion Lease—Papillion Ventures executed a PSA for the Papillion Property.  By signing the PSA, Papillion Ventures accepted L2 Partners' offer to purchase the Papillion Property.  (Papillion Property PSA, attached hereto as Exhibit 36).  By accepting L2 Partners' offer before providing Walgreens "with a true and correct copy of said Bona Fide Offer," Papillion Ventures, induced by L2 Defendants, breached Article 25 of the Papillion Property lease.

150.     L2 Defendants had a copy of the Papillion Property lease before September 11, 2020.  Despite knowing Papillion Ventures' obligations under Article 25, L2 Defendants encouraged Papillion Ventures to execute the PSA to prevent Walgreens from exercising its ROFR.

151.     Because Papillion Ventures improperly executed the Papillion PSA prior to giving Walgreens notice of a Bona Fide Purchase, Walgreens was unable to exercise its ROFR right in the time frame permitted under the Papillion Property lease.

152.     L2 Defendants purchased the Papillion Property on behalf of L2 Investor, Ari Haseotes, for whom L2 Partners negotiated acquisition of the Papillion Property, including executing the PSA before Walgreens received notice of the same.

153.     Upon information and belief, given that L2 Partners had a contractual obligation to convey all terms of the acquisition to Ari Haseotes for his approval pursuant to the Consulting Agreement, Ari Haseotes knew the landlord executed the PSA before Walgreens received notice of the same.  Nevertheless, Ari Haseotes approved the terms of the Papillon acquisition.

ii.   <u>2045 Fieldstone Pkwy, Franklin, TN ("Franklin Property")</u>

154.   On January 27, 2021, L2 Defendants began negotiations to purchase the Franklin Property from Premier Hotel-Motel Two, Inc. ("Premier"). L2 Defendants bragged through their broker that, based on their "experience" with Walgreens, L2 Partners "pay[s] the absolute highest and best price the market will bear; without triggering a ROFR." (Marcus & Millichap February 3, 2021 Email, attached hereto as Exhibit 37).

155.   The Franklin Property lease provides:

<u>RIGHT OF FIRST REFUSAL</u>

25.   (a)   In the event that Landlord shall receive a Bona Fide Offer to purchase the Leased Premises at any time and from the time to time on or after the date hereof and during the Term of this Lease or any extensions thereof from any person or entity, Landlord shall so notify Tenant . . . together with a true and correct copy of said Bona Fide Offer.  For purposes hereof, a "Bona Fide Offer" shall be deemed to be an offer made in writing by a person or entity that is not related to or affiliated with Landlord which Landlord intends to accept (subject to this Article 25). . . . Tenant may, at Tenant's option and within thirty (30) days after receipt of Landlord's notice of said Bona Fide Offer and receipt of a copy thereof, offer to purchase the Leased Premises at the price and upon the terms and conditions as are contained in said Bona Fide Offer, in which event, Landlord shall sell the Leased Premises to Tenant. . . .  Landlord covenants that it **shall accept no such Bona Fide Offer** or convey the premises **until it has complied with the terms of this Article 25**.

(Franklin Property Lease, attached hereto as Exhibit 38 (emphasis supplied)).

156.   Thus, under the Franklin Property lease, Walgreens was entitled to notice before Premier accepted a Bona Fide Offer.  Nevertheless, on February 9, 2021, Premier executed a PSA for the Franklin Property.  Through the Franklin PSA, Premier accepted L2 Partners' offer and agreed to sell the Franklin Property to L2 Partners.  (Franklin PSA, attached hereto as Exhibit 39). By accepting L2 Partners' offer before providing Walgreens "with a true and correct copy of said Bona Fide Offer," Premier, induced by L2 Defendants, breached Article 25 of the Franklin Lease.

157.     L2 Defendants had a copy of the Franklin Lease and actual knowledge of Article 25.  Thus, under Tennessee law, L2 Defendants had a duty to learn whether L2 Partners' obtaining Premier's execution of the Franklin PSA prior to giving notice to Walgreens would cause Premier to breach the Franklin Lease, which it clearly did.

158.     Walgreens received the Franklin PSA on February 12, 2021—two days after Premier executed the PSA.  Although the executed PSA was void under the terms of the Franklin Lease, Walgreens exercised its ROFR to purchase the Franklin Property on March 8, 2021 to preserve its rights under the lease.

159.     The Franklin PSA provided L2 Partners with a 20-day Inspection Period, ending March 15, 2021.  However, after Walgreens exercised its ROFR on March 8, 2021, Premier refused to provide the 20-day inspection period and advised that closing would take place on March 15, 2021, pursuant to the Franklin PSA.  Premier reported that it was "between a rock and a hard place" with respect to Walgreens and L2 Partners because L2 Defendants pressured Premier to sell the Franklin Property to L2 Partners by March 15, 2021, and they refused to provide Walgreens the 20-day Inspection Period to which Walgreens was entitled under Article 25.

160.     As a result of L2 Defendants' procurement of Premier's breach of the Franklin Lease, Walgreens was forced to initiate litigation and obtain injunctive relief, requiring Premier to comply with the Lease and sell the Franklin Property to Walgreens, which the court granted on March 17, 2021.  Walgreens is entitled to recover all the costs it incurred in seeking this injunctive relief from L2 Partners.

## V.  CAUSES OF ACTION

### COUNT ONE
### MISAPPROPRIATION OF TRADE SECRETS, 18 U.S.C. § 1836
**(Against All Defendants)**

161.  Walgreens realleges each of the allegations in Paragraphs 29-82 of this Amended Complaint as if set forth herein.

162.  The Illegally Obtained Data is gathered, developed, and owned by Walgreens.

163.  The Illegally Obtained Data is comprised of highly confidential business and financial documents and information, including without limitation profit and loss information, store performance and revenue information, and compilations of such information.

164.  As more fully set forth above, Walgreens takes reasonable efforts to keep the Illegally Obtained Data secret by, without limitation, requiring Walgreens employees to be bound by the Walgreens Policies, restricting access to only those limited Walgreens employees with a Walgreens-related need for the information and documents, and permitting access for only Walgreens-related purposes.  Walgreens employees, like Peters, also received annual training from Walgreens' legal and/or compliance departments on the importance of maintaining confidentiality of Walgreens' confidential data, documents, and trade secrets and their obligations to maintain that confidentiality as Walgreens employees under the Walgreens Policies.

165.  The Illegally Obtained Data is not publicly available and is not readily ascertainable by anyone outside of Walgreens' employ.

166.  The confidentiality of the Illegally Obtained Data provides independent economic value because Walgreens uses it to analyze and make business decisions throughout the United States, including decisions relating to operations, commercial property purchasing, negotiation of lease terms, and whether to exercise Walgreens' ROFR in its leases, among other decisions.

167.    If an outsider or other entity obtained the trade secret and confidential information in the Illegally Obtained Data, such entity could use it to determine precisely how to make an offer to purchase the leased property that would effectively price Walgreens out of exercising its ROFR.

168.    Walgreens has never consented to any of the Defendants acquiring, using, or disclosing the Illegally Obtained Data outside of their Walgreens employment.

### Aaron Peters

169.    Peters willfully and maliciously misappropriated the Illegally Obtained Data by downloading more than 30,000 emails and documents, including the highly sensitive TTM Report, directly to his unauthorized hard drive in violation of the Walgreens Policies.

170.    Aaron Peters further willfully and maliciously misappropriated the Illegally Obtained Data by disclosing it to the L2 Members and using the Illegally Obtained Data in the course of his work for L2 Partners, without Walgreens' consent.

171.    Peters further willfully and maliciously misappropriated the Illegally Obtained Data by continuing to access the Portal after his employment with Walgreens was terminated.  In the course of his work for L2 Partners, Aaron Peters unlawfully accessed the Portal and used the data contained therein on fifty-three separate occasions.

### L2 Defendants

172.    L2 Defendants willfully and maliciously misappropriated the Illegally Obtained Data by improper means, including by ratifying Peters' unauthorized downloading and storing the Illegally Obtained Data on his hard drive in violation of Walgreens Policies.  After being informed that Peters acquired Illegally Obtained Data through improper means (*i.e.*, theft and breach of his duty to maintain secrecy through electronic means), Marotta, Richards, Lazarus, and Galin, acting

on behalf of L2 Partners and their respective LLCs, acquired, disclosed and used the Illegally Obtained Data. By accepting the benefit of Peters' conduct, L2 Defendants ratified Peters' theft.

173. L2 Defendants further willfully and maliciously misappropriated the Illegally Obtained Data by using the information contained therein to identify the highest-performing Walgreens stores, which L2 Defendants then sought to acquire on behalf of L2 Partners, L2 Landlords, and the Named Investors. Specifically, Peters, Richards, Marotta, and Lazarus exchanged multiple emails confirming that a targeted Walgreens-leased property was a strong performer, based on the Illegally Obtained Data. Galin, who discussed these stores with investors along with Lazarus, was at all times aware of L2 Defendants' use of the Illegally Obtained Data to identify Walgreens properties.

174. L2 Defendants further willfully and maliciously misappropriated the Illegally Obtained Data by disclosing the same to the Named Investors—including the profit, AOI, total sales, daily prescription counts, and store ranking in the course of acquiring Walgreens properties on their behalf. Specifically, Peters used the Illegally Obtained Data to create pitch-decks for specific Walgreens properties. Marotta and Richards reviewed these pitch-decks before they were submitted to Lazarus and Galin. Lazarus and Galin then presented pitch-decks to the Named Investors. With the certainty provided by the Illegally Obtained Data, L2 Defendants were able to secure investing to purchase Walgreens properties by guaranteeing the success of those properties.

175. L2 Defendants further willfully and maliciously misappropriated the Illegally Obtained Data by using the same to make offers to purchase at least six different Walgreens properties in separate states in amounts that were, on average, slightly less than 10% higher than the amount at which Walgreens would have purchased the properties, based on Walgreens' independent market and store-performance analysis. The consistency of these purchases above

what Walgreens would have paid reflects L2 Defendants' use of the Illegally Obtained Data to circumvent Walgreens' ROFR. Thus, as a result of L2 Defendants' use of Walgreens' trade secrets and confidential information and documents, L2 Partners was able to price Walgreens out of these purchase transactions, and Walgreens was unable to exercise its ROFR fairly. Marotta, Richards, and Lazarus were each responsible for using the Illegally Obtained Data to inform L2 Partners' offers. Tad Galin likewise agreed to use the Illegally Obtained Data, knowing it would allow L2 Partners to better predict when Walgreens would exercise its ROFR.

176. L2 Defendants further willfully and maliciously misappropriated the Illegally Obtained Data by using the same to negotiate longer lease-terms and higher rental rates from Walgreens.

177. L2 Defendants further willfully and maliciously misappropriated the Illegally Obtained Data by disclosing the same to its closest brokers, specifically the Matthews Defendants.

178. Further, L2 Defendants' misappropriation of Walgreens' trade secrets and confidential information may be imputed to any corporate entity in which L2 Defendants maintained an interest which used the Illegally Obtained Data, like the L2 Landlords.

**The Matthews Defendants**

179. The Matthews Defendants willfully and maliciously misappropriated the Illegally Obtained Data by disclosing the information contained therein to prospective buyers of L2 Partners investor-owned Walgreens properties. Since 2015, Matthews Defendants were aware that the information was acquired by improper means. Pedersen even acknowledged that "most don't have access to" the Illegally Obtained Data, which he recognized was "better than the reported store sales[.]" Nevertheless, Matthews Defendants continued to use the Illegally Obtained Data to advertise investor-owned properties. (*See, e.g.*, Ex. 10, Feb. 14, 2018 Email).

180.     Matthews Defendants further willfully and maliciously misappropriated the Illegally Obtained Data by using the Top Walgreens List, which L2 Partners created by comparing the AOI and rent for each store, to convince landlords to sell Walgreens properties to L2 Partners and its investors.  Between 2020 and 2021, Matthews Defendants, using the Top Walgreens List, convinced the owners of the Colorado Springs, Louisville, and Broken Arrow Properties, identified in Figure 1, to sell to members of the Enterprise.  When Matthews Defendants received the Top Walgreens List, they knew that L2 Partners had a history of misappropriating Walgreens' trade secrets, recently hired Aaron Peters, and intended to purchase a large number of Walgreens properties in the first quarter of 2020.

181.     Pedersen is a Market Leader for Matthews REIS and is a member of its Executive Leadership team.  Pedersen has worked for Matthews REIS since its inception in 2015, and, upon information and belief is one of Matthews REIS' founding members.  Based on his position in the company, Pedersen has authority to act on Matthews REIS' behalf.  Accordingly, Matthews REIS is directly liable for Pedersen's misconduct.

182.     Alternatively, Matthews REIS is vicariously liable for Pedersen's misappropriation of the Illegally Obtained Data.  Pedersen is a Market Manager for Matthews REIS and is charged with "acqui[ring] . . . single-tenant net-leased properties and drug stores[.]"  (Ex. 2, Matthews REIS Website).  Because Bill Pedersen misappropriated the Illegally Obtained Data in the scope of his employment with Matthews REIS, Matthews REIS is vicariously liable for his conduct.

## The Named Investors

183.     The Named Investors were aware or were willfully blind to the fact that the Illegally Obtained Data contained in the pitch-decks was derived by improper means.  The Named Investors knew that L2 Partners' entire Acquisition Team was comprised of former Walgreens employees.

Further, as sophisticated investors that had purchased dozens of pharmacies, the Named Investors were familiar with customs and practices in the pharmacy real estate industry—particularly, the secrecy of Walgreens store-performance data, such as store-by-store profit, total sales, store ranking, and especially the amount and type of prescription medications sold at an individual store. The Named Investors were likewise made aware of the Illegally Obtained Data when L2 Partners guaranteed through the Consulting Agreements that Walgreens would renew its lease. Such a guarantee is unusual, and the Named Investors would have known that L2 Partners would not risk its consultation fee without insider information. Upon information and belief, Lazarus and Galin informed the Named Investors of the improper acquisition of the Illegally Obtained Data during their pitch-deck meetings. The Named Investors misappropriated Walgreens' trade secrets by using the Illegally Obtained Data contained in the pitch-decks to decide whether to purchase the Walgreens property.

184. Alternatively, the Named Investors are vicariously liable for L2 Partners' misappropriation of the Illegally Obtained Data. The Named Investors retained L2 Partners to acquire multiple Walgreens properties pursuant to separate Consulting Agreements. Pursuant to the Consulting Agreements, L2 Partners agreed to provide data regarding Walgreens stores (including the Illegally Obtained Data) and to search for and provide information regarding additional Walgreens properties that matched the Named Investors' criteria. L2 Partners then used the Illegally Obtained Data to identify properties that matched those criteria, specifically identifying each of the Named Investors in multiple emails in connection to specific Walgreens properties. As L2 Partners misappropriated the Illegally Obtained Data in the course of the very business that the Named Investors appointed L2 Partners to perform, the Named Investors are vicariously liable for L2 Partners' misappropriation.

**Damages**

185.     As a direct and proximate result of Defendants' misappropriation of Walgreens' trade secrets, Walgreens has suffered damages in an amount to be determined at trial including, but not limited to, the lost opportunity to purchase properties under its ROFR rights, costing Walgreens at least $23,000,000.  Walgreens is entitled to double the actual damages and attorneys' fees for the willful and malicious misappropriation of Walgreens' trade secrets pursuant to 18 U.S.C. § 1836(b)(3)(C) and (D), from Defendants, as well as any entity in which any defendant maintains an interest.

186.     In the alternative, Walgreens is entitled to a reasonable royalty for the unauthorized use and disclosure of Walgreens' trade secrets by Defendants, as well as any entity in which any defendant maintains an interest.  Specifically, Walgreens is entitled to the compensation L2 Partners paid Peters and the Matthews Defendants, along with any compensation L2 Defendants received from its investors by acquiring Walgreens properties.  Walgreens is likewise entitled to any profit that L2 Defendants and the Named Investors received from the operation of Walgreens properties acquired through the misappropriation of Walgreens' trade secrets.

## COUNT TWO
## VIOLATION OF RICO ACT, 18 U.S.C. § 1962(c)
### (Against All Defendants)

187.     Walgreens realleges each of the allegations in Paragraphs 29-142 of this Amended Complaint as if set forth herein.

188.     The RICO Act provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).

## The Enterprise

189.    As set forth above, the Enterprise, which has been ongoing since at least 2019, is comprised of L2 Defendants, Peters, the investors (including the Named Investors), the Investor Entities, and L2 Defendants' brokers (including the Matthews Defendants).  The Enterprise is associated for the shared purpose of acquiring high-performing commercial properties leased to drug and grocery stores.  In the Enterprise, investors provide L2 Defendants with specific criteria for the commercial properties they want to acquire and brokers advise L2 Defendants of the properties that are currently on the market.

190.    After identifying a property that L2 Defendants believe matches the investor's criteria, L2 Defendants and Peters prepare a business presentation or "pitch-deck" describing the property's investment potential.  The investors (including the Named Investors) then review the pitch-deck, discuss the property with L2 Defendants, and decide whether the property matches the investor's criteria.  If so, the investor provides funding for the purchase and reviews and approves the terms of the purchase.  L2 Defendants then acquire the property though a single-purpose entity to take title on behalf of the investors.  The investors pay L2 Defendants a consulting fee for their services, which is a percentage of the property's purchase price.

191.    The investors also helped solicit additional members.  For example, James Lambert introduced Ari and Byron Haseotes to the L2 Defendants and agreed to serve as trustee for the Haseotes' purchases of Walgreens properties in Mocksville, North Carolina; Abilene, Texas; and Wichita, Kansas, furthering the Enterprise's goals.  L2 Partners acquired these properties on behalf of the Haseotes' by appropriating the Illegally Obtained Data.

## Pattern of Racketeering Activity

192.    For years, Defendants conducted the Enterprise through a pattern of racketeering activity, including:

## A.    The Trade Secrets Predicate Acts

193.    Since at least 2019, Defendants knowingly appropriated, received, disclosed, and converted the Illegally Obtained Data to acquire high-performing Walgreens properties and circumvent Walgreens' ROFR, violating 18 U.S.C. §§ 1832(a)(1), (2), and (3) in multiple separate transactions.

194.    L2 Defendants and Peters further conducted and participated in the Enterprise by knowingly stealing, appropriating, and receiving the Illegally Obtained Data, violating 18 U.S.C. §§ 1832(a)(1), (2), and (3) in multiple separate transactions between 2019 and 2021.  First, Peters knowingly stole more than 30,000 emails and documents, including the highly sensitive TTM Report, by downloading the same to an unauthorized hard drive and refusing to return that information upon the termination of his employment.  Peters then knowingly disclosed the Illegally Obtained Data to L2 Members. Despite knowing its improper acquisition, L2 Defendants then knowingly received, appropriated and disclosed the Illegally Obtained Data.  In executing the Trade Secret Predicate Acts, Peters, Richards, Marotta, and Lazarus exchanged multiple emails containing the Illegally Obtained Data, confirming that the targeted Walgreens property was a high-performing store and matched the Named Investors' criteria.  Peters then used the Illegally Obtained Data to create pitch-decks for the Named Investors, which Richards and Marotta reviewed before submitting to Galin and Lazarus.  Galin and Lazarus then used Illegally Obtained Data in pitch-decks to describe the Walgreens property to the Named Investor.  Thus, L2 Defendants and Peters are liable for conducting and participating in the Enterprise through the Trade Secret Predicates.

195.    Matthews Defendants conducted and participated in the Enterprise by knowingly receiving, appropriating, converting, and disclosing the Illegally Obtained Data, violating 18

U.S.C. §§ 1832(a)(2) and (3) in multiple separate transactions. Since 2015, Matthews Defendants were aware that the information they received from L2 Partners was comprised of the Illegally Obtained Data. Nevertheless, Matthews Defendants disclosed the Illegally Obtained Data to third parties to solicit prospective buyers for L2 Partners investor-owned Walgreens properties. Thus, Matthews Defendants are liable for conducting and participating in the Enterprise through the Trade Secret Predicates.

196.    Matthews Defendants likewise conducted and participated in the Enterprise by knowingly receiving, appropriating, converting, and disclosing the Illegally Obtained Data, violating 18 U.S.C. §§ 1832(a)(2) and (3), when they used the Top Walgreens List, which was created with the Illegally Obtained Data. Between 2020 and 2021, Matthews Defendants used the Top Walgreens List, derived from the Illegally Obtained Data, and convinced the owners of the Colorado Springs, Louisville, and Broken Arrow Properties to sell to L2 Partners. When Matthews Defendants received the Top Walgreens List, they knew that L2 Partners had a history of misappropriating Walgreens' trade secrets. Matthews Defendants further knew that L2 Partners intended to purchase a large number of Walgreens properties in the first quarter of 2020, right after hiring Peters from Walgreens. Matthews Defendants were either aware of the Enterprise's use of misappropriated trade secrets to create the Top Walgreens List or were willfully blind to the same. Thus, Matthews Defendants are liable for conducting and participating in the Enterprise through the Trade Secret Predicates.

197.    Matthews Defendants likewise conducted and participated in the Enterprise by knowingly conspiring to appropriate and convert the Illegally Obtained Data, violating 18 U.S.C. § 1832(a)(5). Since 2015, Matthews Defendants were aware that L2 Partners converted the Illegally Obtained Data in the course of acquiring Walgreens properties. Nevertheless, Matthews

Defendants continued to support L2 Partners' efforts to acquire additional Walgreens properties. By agreeing to help L2 Partners acquire Walgreens properties with the Illegally Obtained Data, Matthews Defendants conspired to receive, appropriate and disclose the Illegally Obtained Data. Thus, Matthews Defendants are liable for conducting and participating in the Enterprise through the Trade Secret Predicates.

198.     Pedersen is a Market Leader for Matthews REIS and is a member of its Executive Leadership team.  Pedersen has worked for Matthews REIS since its inception in 2015 and, upon information and belief, is one of Matthews REIS' founding members.  Based on his position in the company, Pedersen has authority to act on Matthews REIS' behalf.  Accordingly, Matthews REIS is directly liable for Pedersen's misconduct in conducting and participating in the Enterprise through the Trade Secret Predicates.

199.     Alternatively, Matthews REIS is vicariously liable for Pedersen's actions in conducting and participating in the Enterprise through the Trade Secret Predicates.  Pedersen's job at Matthew REIS was to help its clients "acqui[re] . . . single-tenant net-leased properties and drug stores[.]"  (Ex. 2, Matthews REIS Website).  Pedersen carried out the Trade Secret Predicates on behalf of the Enterprise in the course of this very work.  Matthews REIS profited from Pedersen's actions by receiving commissions for multiple properties.  Because Pedersen conducted the Enterprise through the Trade Secret Predicates in the scope of his employment with Matthews REIS and Matthews REIS profited from the same, Matthews REIS is vicariously liable for those actions.

200.     The Named Investors are likewise directly liable for conducting and participating in the Enterprise through the Trade Secret Predicates.  As shown above, the Named Investors were aware of the Enterprise's use of misappropriated trade secrets, or they were willfully blind to that

use.  Nevertheless, the Named Investors knowingly participated in the Enterprise.  Pursuant to the Consulting Agreements, the Named Investors directed L2 Defendants to identify Walgreens properties they believed met the Named Investors' predefined criteria.  Relying on the Illegally Obtained Data in the pitch-deck, the Named Investors then decided whether to purchase the proposed property.  By repeatedly agreeing to retain and pay L2 Partners to acquire multiple Walgreens properties with the Illegally Obtained Data, the Named Investors furthered the Enterprise's ultimate goal – acquiring high-performing Walgreens properties – and allowed the Enterprise to continue.

201.    Alternatively, the Named Investors are vicariously liable for L2 Defendants' actions.  In carrying out the Trade Secret Predicates on behalf of the Enterprise, L2 Defendants were acting pursuant to the express authority conferred upon them by the Named Investors.  As shown in multiple email exchanges, L2 Defendants used the Illegally Obtained Data to identify Walgreens properties, specifically mentioning each of the Named Investors.  As a result of L2 Defendants' misappropriation, the Named Investors acquired a combined total of more than sixty Walgreens properties.  (*See, e.g.*, Figure 1).  Because L2 Defendants conducted the Enterprise through the Trade Secret Predicates in the course of the very business that the Named Investors appointed L2 Defendants to perform and the Named Investors profited from that scheme, the Named Investors are vicariously liable for L2 Defendants' conducting the Enterprise through the Trade Secret Predicates.

202.    The Named Investors likewise authorized and ratified L2 Partners' criminal theft.  Specifically, by executing the Consulting Agreement, the Named Investors authorized L2 Defendants to provide the Named Investors with the Illegally Obtained Data in the form of site-specific reports including pictorial and demographic information (*i.e.*, the pitch-decks).

**B. The Partial Refund Mail Fraud Predicate Acts**

203.   L2 Defendants further conducted and participated in the Enterprise by misrepresenting the purchase price contained in multiple LOIs and PSAs by intentionally omitting that they bargained to receive a Partial Refund from the landlord at closing.   This artificially inflated the purchase price and deprived Walgreens of the right to exercise its ROFR.   This scheme began at least as early as January 2019, in response to Walgreens exercising its bargained-for rights pursuant to its ROFR, and continued until at least March 11, 2021.   This scheme was executed through interstate telephone or email communications and the use of the United States Postal Service and interstate commercial carriers, and thus, it entailed multiple acts of mail and wire fraud, violating 18 U.S.C. §§ 1341 & 1343.   Accordingly, L2 Defendants are liable for conducting and participating in the Enterprise through the Partial Refund Predicate Acts.

204.   Named Investors Ari Haseotes and Peter Neary are directly liable for conducting the Enterprise through the Partial Refund Predicates.   As set forth above, before closing, L2 Defendants informed Neary that he would receive an undisclosed Partial Refund for at least the El Paso and Loomis Properties in the pitch-decks describing those properties.   Ari Haseotes was similarly apprised of the undisclosed Partial Refunds he would receive for the Wichita, Racine, and Oklahoma Properties.   Given that L2 Partners had a contractual obligation to convey all terms of the acquisition to the Named Investors for approval under the Consulting Agreement, Neary and Ari Haseotes knew or were willfully blind to the fact that the Partial Refunds were omitted from the LOI and PSA delivered to Walgreens by certified mail and by FedEx, an interstate commercial carrier.   Further, Neary and Ari Haseotes would discover that omission in the course of ordinary due diligence at closing.   This is especially true for those properties Neary and Ari Haseotes acquired from other L2 Partners investors – the Loomis and Oklahoma Properties.

Nevertheless, Neary and Ari Haseotes authorized the Partial Refunds for those Walgreens properties and the transmission of fraudulent LOIs and PSAs to Walgreens by US Mail or other commercial carrier. Neary and Ari Haseotes further knowingly participated in the Enterprise by dictating the terms that Walgreens' landlords would ultimately execute in the amended PSAs containing the Partial Refunds. These amended PSAs were not disclosed to Walgreens and were sent to landlords by email. Neary and Ari Haseotes' acquisition of the Walgreens properties through Partial Refunds and, consequently paying a consulting fee to L2 Partners, furthered the Enterprise's goal of acquiring additional Walgreens properties through fraud.

205. Alternatively, Peter Neary and Ari Haseotes are vicariously liable for L2 Defendants' conduct. The Consulting Agreements gave L2 Defendants express authority to act on Neary and Ari Haseotes' behalf in soliciting the Partial Refunds and concealing the same from Walgreens. As a result, Neary and Ari Haseotes received Partial Refunds for their respective purchases, including at least the El Paso, Wichita, Racine, Loomis, and Oklahoma Properties. Because L2 Defendants' fraud occurred in the course of the very business that Neary and Ari Haseotes appointed L2 Defendants to perform and Neary and Ari Haseotes profited from the same, Neary and Ari Haseotes are vicariously liable for L2 Defendants' conducting the Enterprise through the Partial Refund Predicate Acts.

**<u>Injury to Walgreens</u>**

206. Through the Trade Secret and Partial Refund Predicate Acts, L2 Defendants, Aaron Peters, the Matthews Defendants, and the Named Investors have conducted the Enterprise through a pattern of "racketeering activity," which is defined by 18 U.S.C. § 1961(1) to mean "any act which is indictable under . . . section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), . . . [and] section[] . . . 1832 (relating to . . . theft of trade secrets)."

207. Defendants have acted at all times with malice toward Walgreens in Defendants' effort to defraud Walgreens and acquire Walgreens properties. Defendants, through the Enterprise, have acquired at least $177,371,138 worth of Walgreens properties in the last two years alone.

208. As a direct and proximate result of Defendants' conducting the Enterprise through a Pattern of Racketeering Activity, Walgreens has suffered damages in an amount to be determined at trial including, but not limited to, the lost opportunity to purchase properties under its ROFR rights – at least $23,000,000. Walgreens is entitled to treble damages and attorneys' fees for Defendants' actions pursuant to 18 U.S.C. § 1964(c).

209. Walgreens is further entitled to disgorgement of all profits Defendants obtained by conducting the Enterprise through a Pattern of Racketeering Activity. Specifically, Walgreens is entitled to any compensation L2 Partners paid Peters and the Matthews Defendants, along with any compensation L2 Defendants received from its investors by acquiring Walgreens properties. Walgreens is likewise entitled to any profit Defendants received from the Walgreens properties acquired through the Pattern of Racketeering Activity.

210. Walgreens is further entitled to a constructive trust, allowing Walgreens to recover any Walgreens property that Defendants obtained by conducting the Enterprise through a Pattern of Racketeering Activity.[4]

## COUNT THREE
## RICO CONSPIRACY, 18 U.S.C. § 1962(d)
### (Against All Defendants)

211. Walgreens realleges each of the allegations in Paragraphs 29-142 of this Amended Complaint as if set forth herein.

---

[4] The properties possessed by the investors and Investor Entities who have not yet been named may likewise be subject to a constructive trust.

212.     Section 1962(d) of the RICO Act provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

213.     After learning about Peters' Illegally Obtained Data, Peters and L2 Defendants agreed to join, participate in, or conduct the Enterprise through the acquisition, use, and disclosure of the Illegally Obtained Data in or around December 2019.  Peters and L2 Defendants knew they had no right to use the Illegally Obtained Data, but agreed to use the same to identify high-performing Walgreens properties, purchase Walgreens properties on behalf of the Named Investors, circumvent Walgreens' ROFR rights, and secure additional investors.  Peters and the L2 Defendants knew of and agreed to their respective roles in carrying out the Trade Secret Predicate Acts.  Accordingly, Peters and L2 Partners conspired to join, participate in, or conduct the Enterprise through the Trade Secret Predicate Acts, amounting to a pattern of racketeering activity.

214.     Matthews Defendants agreed to join, participate in, or conduct the Enterprise to acquire Walgreens properties by using the Illegally Obtained Data.  Indeed, Matthews Defendants have worked with L2 Partners since at least 2015 and have advertised L2 Partners' access to the Illegally Obtained Data in the course of their work.  Matthews Defendants were likewise aware that L2 Partners had no right to use the Illegally Obtained Data.  Nevertheless, Matthews Defendants continued to work for L2 Partners and thereby agreed to their role in carrying out the Trade Secret Predicates on behalf of the Enterprise.  Accordingly, Matthews Defendants conspired with L2 Partners to conduct the Enterprise through the Trade Secret Predicate Acts, amounting to a pattern of racketeering activity.

215.     The Named Investors agreed to join, participate in, or conduct the Enterprise to acquire Walgreens properties by using the Illegally Obtained Data.  The Named Investors are L2

Partners' largest clients and have repeatedly retained L2 Partners to provide information regarding and help acquiring a combined total of more than sixty Walgreens properties. The Named Investors were likewise aware that L2 Partners' Acquisition Team was comprised of former Walgreens employees and that L2 Partners made recommendations based on information that was not publicly available, including store-by-store profit, total sales, prescription figures, and store ranking. Nevertheless, the Named Investors agreed to continue to retain L2 Partners and provide compensation for each Walgreens property acquired on the Named Investor's behalf. Accordingly, the Named Investors conspired with L2 Partners to join, participate in, or conduct the Enterprise through the Trade Secret Predicate Acts, amounting to a pattern of racketeering activity.

216.     Peters and L2 Defendants likewise agreed to conduct the Enterprise through the Partial Refund Predicate Acts, misrepresenting the purchase price of Walgreens properties by omitting Partial Refunds from the LOIs and PSAs. Peters and L2 Defendants knew the fraudulent LOIs and PSAs would be bargained through the use of interstate telephone and email communications and delivered to Walgreens by United States Postal Service or other interstate commercial carrier. Peters and L2 Defendants agreed to carry out the Partial Refund Predicate Acts, intending to defraud Walgreens into waiving its ROFR. Marotta and Richards, after conferring with Lazarus, bargained for Peter Neary and Ari Haseotes, among other investors, to receive these Partial Refunds from landlords and drafted the fraudulent LOIs. Those LOIs were approved by Lazarus and Galin, who advertised the Walgreens properties to the Named Investors in pitch-decks that Aaron Peters prepared. Accordingly, Peters and L2 Defendants conspired to join, participate in, or conduct the Enterprise through the Partial Refund Predicate Acts, amounting to a pattern of racketeering activity.

217. The Named Investors, including at least Peter Neary and Ari Haseotes, likewise conspired to join, participate in, or conduct the Enterprise through the Partial Refund Predicate Acts to acquire Walgreens properties. Neary and Ari Haseotes were aware that Partial Refunds were bargained for through the use of interstate telephone and email communications and that L2 Partners delivered fraudulent LOIs and PSAs to Walgreens through the United States Postal Service or other interstate commercial carrier. Neary and Ari Haseotes were likewise aware that the Partial Refunds artificially inflated the purchase price of Walgreens properties and prevented Walgreens from exercising its ROFR. Nevertheless, Neary and Ari Haseotes agreed to provide the funding necessary to carry out these fraudulent transactions for at least the El Paso, Wichita, Racine, Loomis, and Oklahoma Properties. Accordingly, Neary and Ari Haseotes conspired with L2 Partners to join, participate in, or conduct the Enterprise through the Partial Refund Predicate Acts, amounting to a pattern of racketeering activity.

218. Defendants agreed that the predicate acts alleged in Paragraphs 29-142 would be performed on behalf of the Enterprise. Moreover, Matthews Defendants and the Named Investors knew or were willfully blind to the fact the Predicate Acts would be committed on behalf of the Enterprise and used to cause damage to Walgreens.

219. The object of the conspiracy was to acquire high-value Walgreens properties at below-market prices and circumvent Walgreens' ROFR through the previously described Pattern of Racketeering Activity.

220. As a direct and proximate result of the predicate acts committed by Defendants, or others acting on their behalf, Walgreens was injured by being deprived of its right to exercise its ROFR fairly in an amount which will be determined at trial but not less than $23,000,000.

Walgreens is entitled to treble damages and attorneys' fees for Defendants' actions pursuant to 18 U.S.C. § 1964(d).

221.    Walgreens is further entitled to disgorge all profits Defendants obtained by conspiring to conduct the Enterprise through a pattern of racketeering activity.  Specifically, Walgreens is entitled to any compensation L2 Partners paid Peters and the Matthews Defendants, along with any compensation L2 Defendants received from its investors for any Walgreens properties acquired by conspiring to conduct the Enterprise through the Pattern of Racketeering Activity. Walgreens is further entitled to any profit that L2 Defendants and the Named Investors received from the Walgreens properties they acquired by conspiring to conduct the Enterprise through the Pattern of Racketeering Activity.

222.    Walgreens is further entitled to a constructive trust, allowing Walgreens to recover any Walgreens-leased property L2 Defendants and the Named Investors obtained by conspiring to conduct the Enterprise through a Pattern of Racketeering Activity.[5]

## COUNT FOUR
## TORTIOUS INTERFERENCE
### (L2 Defendants, Ari Haseotes, and Peter Neary)

223.    Walgreens realleges each of the allegations in Paragraphs 29-160 of this Amended Complaint as if set forth herein.

224.    Pursuant to the lease agreement with the landlords, Walgreens had a right to purchase Walgreens properties on the same terms as those contained in the Bona Fide Offers. Moreover, landlords were prohibited from accepting a Bona Fide Offer without first giving Walgreens a true and correct copy of the Bona Fide Offer and allowing Walgreens the time to which it was entitled to decide whether to exercise its ROFR.

---

[5] The properties possessed by the investors and Investor Entities who have not yet been named may likewise be subject to a constructive trust.

225.    At all relevant times, L2 Defendants, who received a copy of the lease before executing a PSA or preparing a LOI, were aware of Walgreens' rights under its lease agreements.

226.    L2 Defendants have acted with malicious intent to induce landlords' breach of their lease with Walgreens, as evidenced by at least the following actions:

A.  For at least the Franklin and Papillion Properties, having express knowledge that landlords were required to give Walgreens notice of a Bona Fide Offer before accepting any offer and, nevertheless, obtaining those landlords' execution of the PSA before providing Walgreens with notice of the same;

B.  Targeting high-performing Walgreens properties and structuring offers to prevent Walgreens from exercising its ROFR through the use of the Illegally Obtained Data;

C.  Setting closing dates immediately after the anticipated expiration of Walgreens' ROFR;

D.  For at least the Clearwater, Racine, Wichita, El Paso, Oklahoma, and Loomis Properties, artificially increasing the purchase price of Walgreens properties by intentionally omitting Partial Refunds from the LOIs and PSAs that L2 Defendants prepared and thereby preventing Walgreens from purchasing the property on the same terms contained in the Bona Fide Offer; and

E.  For the Franklin Property, insisting that the landlord immediately sell the Property and deny Walgreens the inspection period provided in the Franklin PSA to which Walgreens was entitled.

227.    L2 Defendants' actions proximately caused the landlords to breach their respective lease agreements with Walgreens by inducing the landlords' execution of PSAs before complying

with the ROFR Article, concealing materials terms of the Bona Fide Offer, and, in the case of the Franklin Property, insisting that Premier immediately sell the Property and refuse to provide Walgreens the inspection period provided in the Franklin PSA to which Walgreens was entitled. L2 Defendants are therefore liable to for tortious interference in acquiring the Clearwater, Racine, Wichita, and El Paso Properties, Oklahoma, Loomis, and Papillion Properties, and in attempting to acquire the Franklin Property.

228.    Ari Haseotes and Peter Neary are likewise liable for tortious interference in acquiring Walgreens properties.  As set forth above, before closing, L2 Defendants informed Ari Haseotes and Peter Neary that they would receive undisclosed Partial Refunds for their respective purchases through pitch-decks, and that the Papillion PSA was executed before Walgreens received a bona fide offer. Peter Neary and Ari Haseotes' knowledge may also be inferred through L2 Partners' contractual obligation to disclose all terms of each acquisition.  By providing funding for these transactions, Peter Near and Ari Haseotes are liable for tortious interference in acquiring, respectively, the Racine, Wichita, Oklahoma and Papillion and El Paso and Loomis Properties.

229.    Alternatively, Ari Haseotes and Peter Neary are vicariously liable for L2 Defendants' tortious interference.  L2 Defendants' actions in concealing the Partial Refunds from Walgreens were taken on behalf of Ari Haseotes and Peter Neary, both of whom retained L2 Partners to "negotiate acquisition" of Walgreens properties.  Ari Haseotes and Peter Neary are therefore liable for L2 Defendants' tortious interference in acquiring, respectively, the Racine, Wichita, and Oklahoma and El Paso and Loomis Properties.

230.    Similarly, L2 Defendants' actions in executing the Papillion PSA before Walgreens received notice of the same were taken on behalf of Ari Haseotes, to whom L2 Partners promised

to "negotiate acquisition" of the Papillion Property. Ari Haseotes is therefore liable for L2 Defendants' tortious interference in acquiring the Papillion Property.

231.    As a direct result of L2 Defendants, Ari Haseotes, and Peter Neary's actions, Walgreens has been damaged in an amount to be proven at trial.

232.    For the Franklin Property, Walgreens is entitled to treble damages for the costs it incurred pursuing injunctive relief in the Franklin Action pursuant to Tenn. Code Ann. § 47-50-109.

233.    Walgreens is likewise entitled to injunctive relief to recover all properties conveyed to L2 Partners, its related entities, or the Investor Entities in violation of Walgreens' rights under its lease agreements, as any such conveyance is void.

**COUNT FIVE**
**<u>BREACH OF THE FIDUCIARY DUTY OF LOYALTY</u>**
**(Aaron Peters)**

234.    Walgreens realleges each of the allegations in in Paragraphs 29-82 of this Amended Complaint as if set forth herein.

235.    Walgreens placed Peters in a position of trust and confidence by providing him with access to Walgreens' confidential and proprietary information that is not known or accessible outside of Walgreens.

236.    Peters accepted this position of trust and confidence and promised to act in Walgreens' best interest by, among other things, agreeing not to use or disclose Walgreens' confidential and proprietary information for anyone else's benefit.

237.    Peters abused Walgreens' trust, failed to act in Walgreens' best interests, and breached his duty of loyalty and fiduciary duties to Walgreens by, including without limitation: (a) downloading the Illegally Obtained Data onto an unauthorized, personal external hard drive; (b); disclosing the Illegally Obtained Data to L2 Defendants, the Named Investors, and the

Matthews Defendants, none of whom were authorized to receive that information; and (c) accessing the Portal after his employment with Walgreens terminated and in the course of his work for L2 Partners.

238.   As a direct and proximate result of Peters' breach of his duty of loyalty, Walgreens has suffered damages in an amount to be determined at trial but not less than $23,000,000. Walgreens is entitled to any compensation L2 Partners paid Aaron Peters, the damages caused by Peters' disclosure, and attorneys' fees.

### COUNT SIX
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY OF LOYALTY
#### (L2 Defendants)

239.   Walgreens realleges each of the allegations in in Paragraphs 29-82 of this Amended Complaint as if set forth herein.

240.   Walgreens placed Peters in a position of trust and confidence by providing him with access to Walgreens' confidential and proprietary information that are not known or accessible outside of Walgreens.

241.   Peters accepted this position of trust and confidence and promised to act in Walgreens' best interest by, among other things, agreeing not to use or disclose Walgreens' confidential and proprietary information for anyone else's benefit.

242.   L2 Defendants, which are comprised of multiple former Walgreens employees, were aware of Peters' obligations to Walgreens.  Nevertheless, L2 Defendants encouraged Peters to breach his fiduciary duty to Walgreens by downloading the Illegally Obtained Data onto an unauthorized, personal external hard drive.  Indeed, while Aaron Peters was actively stealing from Walgreens, L2 Defendants made arrangements to appropriate the Illegally Obtained Data by buying a large number of Walgreens properties.  Further, upon information and belief, L2

Defendants instructed Peters to download the Illegally Obtained Data before leaving Walgreens. L2 Defendants are therefore liable for aiding and abetting Peters' breach of his fiduciary duty to Walgreens.

243. L2 Defendants further aided and abetted Peters' breach of his fiduciary duty to Walgreens by soliciting the Illegally Obtained Data. L2 Defendants knew they had no right to the Illegally Obtained Data "[b]ecause it was Walgreens' information," but still solicited that information.

244. As a direct and proximate result of L2 Defendants intentional misconduct in aiding and abetting Peters' breach of his duty of loyalty, Walgreens has suffered damages in an amount to be determined at trial but not less than $23,000,000. Walgreens is further entitled to any compensation L2 Defendants received from its investors for any Walgreens properties acquired by aiding and abetting Peters' breach of his fiduciary duty to Walgreens. Walgreens is further entitled to any profit derived from Walgreens properties L2 Defendants acquired by aiding and abetting Peters' breach of his fiduciary duty to Walgreens.

245. Additionally, as Walgreens' injury arises from L2 Defendants' intentional misconduct in aiding and abetting Peters' breach of his fiduciary duty to Walgreens, Walgreens is entitled to recover punitive damages.

246. Walgreens is further entitled to a constructive trust, allowing Walgreens to recover any Walgreens-leased property L2 Defendants obtained by aiding and abetting Peters' breach of his fiduciary duty to Walgreens.

## **DEMAND FOR JURY TRIAL**

239. Walgreens demands a jury trial on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Walgreens respectfully requests this Court to:

a.     Award Walgreens a judgment against Defendants in the amount to be proven at trial;

b.     Award Walgreens double the actual damages and attorneys' fees for Defendants' willful and malicious misappropriation of Walgreens' trade secrets pursuant to 18 U.S.C. § 1836(3)(C) and (D);

c.     Award Walgreens treble the actual damages and attorneys' fees, pursuant to 18 U.S.C. § 1964, for Defendants' violations of 18 U.S.C. § 1962 (c) and (d);

d.     Award equitable relief, including but not limited to:

   i.     Disgorging all profits that Defendants obtained through the improper use and disclosure of the Illegally Obtained Data, or by conducting an Enterprise through a Pattern of Racketeering Activity;

   ii.     Imposition of a constructive trust over any Walgreens-leased property that was acquired by L2 Landlords through the use and disclosure of the Illegally Obtained Data, or by conducting an Enterprise through a Pattern of Racketeering Activity; and

   iii.     Injunctive relief unwinding any conveyance where any landlord failed to comply with the terms of its lease with Walgreens.

e.     Award Walgreens pre-judgment and post-judgment interest as permitted by any applicable law; and

f.     Award Walgreens such other and further relief as the Court may deem just and equitable.

Respectfully submitted this 15th day of July, 2022.

/s/ David M. Pernini
Joseph D. Wargo, *admitted pro hac vice*
David M. Pernini, *admitted pro hac vice*
WARGO, FRENCH & SINGER LLP
999 Peachtree Street, NE, Suite 1120
Atlanta, Georgia 30308
Telephone: (404) 853-1575
Facsimile: (404) 853-1501

Victor P. Henderson
Christopher W. Carmichael
HENDERSON PARKS, LLC
140 S. Dearborn St., Suite 1020
Chicago, Illinois 60603
Tel: (312) 262-2900
Fax: (312) 262-2901

*Counsel for Plaintiff Walgreen Co.*