## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

WALGREEN CO.,
                    Plaintiff

            v.

AARON PETERS, *et. al*,
                    Defendants

No. 21 CV 2522

Judge Jeremy C. Daniel

## MEMORANDUM OPINION AND ORDER

Walgreen Co. ("Walgreens") filed suit against certain of its former senior employees,[1] L2 Partners, LLC ("L2 Partners") and its affiliates (together, the "L2 Defendants");[2] L2's broker, Bill Pederson, and his entity, Matthews Real Estate Investment Services ("REIS") (together, the "Matthews Defendants"); and L2's investors, namely, James Lambert, Aristedes Haseotes, Byron Haseotes, and Peter Neary (together, the "Named Investors"). (R. 231.)[3] The second amended complaint alleges that all of the defendants violated the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b)(3) (count I), and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c), (d) (counts II and III, respectively). Walgreens also asserts a tortious interference claim against the L2 Defendants, A.

---

[1] Daniel Marotta, Jeff Richards, and Aaron Peters.

[2] The L2 Defendants can be further divided into four subgroups: first, Aaron Peters; second, Lance Lazarus, Tad Galin, Daniel Marotta, and Jeff Richards; third, LJL Management Holdings, LLC, TKG Equity, LLC, Erlanger Dixie, LLC, Louisville Hikes Lane, LLC, (together, "the Member-Entities"), and fourth, OKC Hefner, LLC, Apollo Development, LLC, and Viking Real Estate, LLC (together with the Member-Entities, "the LLCs").

[3] For ECF filings, the Court cites to the page number(s) set forth in the document's ECF header unless citing to a particular paragraph or other page designation is more appropriate.

Haseotes, and Neary, (count IV), a breach of fiduciary duty claim against former Walgreens employee and current L2 employee Aaron Peters, (count V), and an aiding and abetting breach of fiduciary duty claim against the L2 Defendants (count VI).

The L2 and Matthews Defendants have moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (R. 289; R. 294; R. 296; R. 297; R. 298.) The Named Investors have moved to dismiss counts I and IV-VI pursuant to Federal Rules of Civil Procedure 12(b)(2) and counts II and III pursuant to Rule12(b)(6). (R. 285; R. 290.)[4] For the following reasons, the L2 and Matthews Defendants' motions to dismiss are denied; Lambert's motion to dismiss is granted in part and denied in part; and Neary's, B. Haseotes', and A. Haseotes' motions to dismiss are granted.

## BACKGROUND[5]

Walgreens is an Illinois corporation that owns pharmacies throughout the United States. (R. 231 ¶ 8.) Walgreens leases many of its stores, and its leases contain a Right of First Refusal ("ROFR") provision requiring landlords to provide Walgreens notice and opportunity to bid on the property following an offer for sale before it may be sold to a new owner. (*Id.* ¶¶ 2, 83.) A landlord of a Walgreens-leased property who receives an offer to sell must give Walgreens a copy of any third-party offer before it is accepted. (*Id.* ¶ 83.) Walgreens alleges that the defendants engaged in a scheme to

---

[4] Absent viable RICO claims (counts II and III), the Named Investors argue that Walgreens' remaining claims against them should be dismissed for want of personal jurisdiction. (R. 285-1 at 10; R. 291 at 13 n.8.) The Court accordingly begins its analysis below by examining whether Walgreens has stated a RICO claim as to each defendant.

[5] As this is a motion to dismiss, the Court accepts all well-pleaded facts as true and construes all inferences in favor of the plaintiff. *Flores v. United Airlines*, 426 F. Supp. 3d 520, 526 (N.D. Ill. 2019).

enrich themselves at Walgreens' expense by buying and selling Walgreens-leased properties and preventing Walgreens from exercising its ROFR. (*Id.* ¶ 2.)

According to the complaint, former Walgreens employee, Defendant Aaron Peters, was a key participant in the scheme. (*Id.* ¶ 38.) From 2003 until December 2019, Peters worked as a Senior Director of Walgreens' Market Planning and Research Department. (*Id.* ¶ 39.) Peters was also responsible for using this information to analyze, track, predict, and make recommendations about individual Walgreens-leased properties. (*Id.* ¶ 40.) Peters was further entrusted with access to highly-sensitive confidential data, including sales figures for all of Walgreens-leased stores nationwide. (*Id.*)

Walgreens protected this data by adopting and implementing confidentiality policies that all employees, including Peters, were required to review and acknowledge. (*Id.* ¶ 41.) Peters' team also received annual training about confidentiality and protecting trade secrets. (*Id.*) Peters was responsible for ensuring that his subordinates were apprised of and complied with these policies. (*Id.* ¶ 42.)

In November 2019, a month before his departure from Walgreens, Peters accepted a position with Defendant L2 Partners,[6] a Miami-based commercial real estate investment company. (*Id.* ¶¶ 2, 9, 29, 43.) At L2 Partners' instruction, from the

---

[6] L2 Partners is an LLC whose members are four separate LLCs, Defendants LJL Management Holdings, Apollo Development, TKG Equity, and Viking Real Estate (collectively, the "Member-Entities"). (*Id.* ¶¶ 9-10, 12-14.) The members of these four Member-Entities are Defendants Lance Lazarus, Dan Marotta, Tad Galin, and Jeff Richards, respectively. (*Id.*) Lazarus additionally is a member of Defendants Erlanger Dixie, Louisville Hikes Lane, and OKC Hefner, and acted on their behalf in his affairs with L2 Partners. (*Id.* ¶ 172.)

day he accepted his position with L2 Partners until his last day at Walgreens, Peters surreptitiously downloaded large quantities of Walgreens' data from his company laptop directly to an unauthorized external hard drive. (*Id.* ¶¶ 43-44, 169, 242.) The data obtained included Walgreens' Trailing Twelve-Month Report, which contained the total sales, itemized prescription sales, profit margins, operating expenses, and adjusted operating income for every individual Walgreens-leased store in the United States. (*Id.* ¶¶ 40, 44.) Adjusted operating income is one of the primary metrics that Walgreens uses to assess store performance. (*Id.* ¶ 44.) Peters additionally obtained Walgreens' process for evaluating whether to exercise its ROFR. (*Id.* ¶¶ 45-46.) None of this information is publicly available and is subject to Walgreens' confidentiality policies. (*Id.* ¶ 44.)

Walgreens alleges that Peters was not the first person affiliated with L2 Partners to steal this kind of information from them. (*Id.* ¶ 62.) Sometime in 2015, another former Walgreens employee, Defendant Richards, joined L2 Partners. (*Id.* ¶ 63.) Around September that year, Richards supplied L2 Partners with non-public information regarding a store's actual sales and prescription information. (*Id.*) Walgreens also alleges that years later, in a February 2018 email, the Matthews Defendants acknowledged that L2 Partners had Walgreens information that "most don't have access to" that was "better than the reported store sales[.]" (*Id.* ¶ 179.)

When Peters joined L2 Partners in December 2019, he was assigned to their Acquisition Team, which was led by Richards and another former Walgreens employee, Defendant Marotta. (*Id.* ¶ 49.) This team was responsible for identifying

and obtaining properties that had high-performing Walgreens-leased stores. (*Id.*) In pursuit of this effort, Peters created pitch-decks for these properties to be presented to the Named Investors describing the store's performance using the information he obtained. (*Id.* ¶¶ 36, 67; *see, e.g.*, R. 231-4 at 1-14.) If the Named Investors agreed to purchase the targeted stores, then the Matthews Defendants, L2 Partners' broker, would contact local Walgreens' landlords and encourage them to sell to the defendants. (*Id.* ¶¶ 85-89.) Walgreens alleges that the Named Investors were told in meetings with the L2 Defendants that the store performance information was stolen. (*Id.* ¶ 49.)

The L2 Defendants were also aware that Walgreens' leases were subject to ROFRs obligating landlords to inform Walgreens of any potential offer to purchase the properties and give Walgreens the opportunity to outbid any prospective buyers. (*Id.* ¶¶ 36, 44-46,60, 80; R. 231-2 at 2.) Concerned that Walgreens might exercise its ROFRs after being notified of L2 Partners' offers on the properties, the L2 Defendants allegedly devised a scheme to artificially inflate their bids with so-called "maintenance credits" to deter Walgreens from exercising its options to purchase the properties. (R. 231 ¶ 60.) The L2 Defendants used the stolen data Peters obtained to adjust their bid amounts to be higher than what Walgreens would be willing to bid, given the information Peters obtained. (*Id.* ¶ 84.) Instead of actually paying the full amount of the bid at closing, however, L2 Partners would be refunded a maintenance credit. (*Id.* ¶¶ 85-86.) For instance, L2 Partners orchestrated a $200,000.00 refund for one of the acquired properties, increasing the total sale price by four percent to

5

$4,858,097. (*See, e.g.*, *id.* ¶ 87.) While ostensibly related to "out of pocket capital expenditures" that would be incurred if Walgreens vacated the property, Walgreens alleges that the refunded amounts had no connection to the property's actual condition and were never disclosed in the LOIs and PSAs it received. (*Id.* ¶¶ 88, 91.) The L2 Defendants and the Matthews Defendants instructed the landlords to wait to refund the maintenance credits until after Walgreens' ROFR period had ended. (*Id.* ¶ 86.) The credits were described to the Named Investors during the pitch-deck meetings as "discount[s] to the purchase price" on the properties at closing. (*Id.* ¶ 91.)

For several months after Peters' employment with Walgreens ended, he, on fifty-three separate occasions, gained unauthorized access to Walgreens' online portal and stole information that was later used to accomplish these real estate transactions. For at least two years, L2 Partners acquired a number of Walgreens-leased properties in multiple states. (*Id.* ¶ 37.) Walgreens learned about the defendants' actions when it filed suit in Tennessee state court against L2 Partners in March 2021 seeking injunctive relief to enforce its ROFR to purchase a Tennessee property, which L2 Partners was in the process of acquiring. (*Id.* at 11 n.1.) Walgreens voluntarily dismissed the Tennessee action without prejudice and filed the instant suit in this district (*Id.*)

After filing suit, Walgreens sought and obtained a preliminary injunction barring Peters from further sharing or relying upon Walgreens' data. (*See* R. 68 (original); R. 85 (revised).) All of the defendants have moved for dismissal. The Court now considers the merits of those motions.

6

## LEGAL STANDARD

"A motion to dismiss under Rule 12(b)(2) challenges the Court's jurisdiction over a party." *Reynolds v. Skyline Real Est. Invs.*, No. 22 C 1241, 2022 WL 16947939, at *3 (N.D. Ill. Nov. 15, 2022) (citing Fed. R. Civ. P. 12(b)(2)). "When a defendant raises a Rule 12(b)(2) challenge, 'the plaintiff bears the burden of demonstrating the existence of jurisdiction.'" *Id.* (citation omitted). "Where, as here, the Court rules on the Rule 12(b)(2) motion without an evidentiary hearing, the plaintiff need only establish a *prima facie* case of personal jurisdiction." *Id.* In deciding this issue, "the Court accepts all well-pleaded facts alleged in the complaint and "reads the complaint liberally with every inference drawn in favor of [the] plaintiff." *Id.* (citations omitted).

"[T]o survive a Rule 12(b)(6) motion to dismiss," a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 853 (7th Cir. 2013) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 639 (7th Cir. 2015). "'Plausibility' is not a synonym for 'probability' in this context, but the plausibility standard does 'ask[ ] for more than a sheer possibility that a defendant has acted unlawfully.'" *Walgreen Co.*, 719 F.3d at 853. At this stage of the proceedings, as with its consideration of the parties 12(b)(2) arguments, the Court "must 'accept all well-pleaded facts from the [complaint] as true and view them

7

in the light most favorable to the plaintiff.'" *Smart Mortg. Centers, Inc. v. Noe*, No. 21-CV-3606, 2022 WL 832663, at *5 (N.D. Ill. Mar. 21, 2022).

Ordinarily, "a court may not consider matters outside the pleadings when deciding a [Rule 12(b)(6)] motion to dismiss." *Haddad v. Am. Home Mortg. Servicing, Inc.*, No. 18 C 00731, 2019 WL 1425835, at *2 (N.D. Ill. Mar. 29, 2019). However, "[a] court may also consider documents attached to a motion to dismiss without transforming it into a motion for summary judgment if the documents are "referred to in the plaintiff's complaint and are central to his claim." *Id.*

## ANALYSIS

### I.   RICO ALLEGATIONS

#### A.   18 U.S.C. § 1962(c)

Walgreens asserts that all of the defendants (1) participated in an enterprise that was involved in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) and (2) conspired together to do so, in violation of 18 U.S.C. §§ 1962(d) (counts II and III, respectively). "Establishing a RICO violation requires proof by a preponderance of the evidence of "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. It follows that a plaintiff must plead these elements to state a claim." *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 336 (7th Cir. 2019). To survive the defendants' motion to dismiss, Walgreens must "allege sufficient facts to support each element of its RICO claims," *Starfish Inv. Corp. v. Hansen*, 370 F. Supp. 2d 759, 768 (N.D. Ill. 2005), including proximate cause. *Hemi Grp., LLC v. N.Y.C.*, 559 U.S. 1, 9 (2010).

In assessing Walgreens' RICO allegations, the Court begins by determining whether Walgreens has alleged sufficient facts to support the existence of an enterprise with respect to each defendant. Next, the Court decides whether Walgreens has alleged sufficient facts to show that the enterprise's members carried out its affairs through a pattern of racketeering activity. The Court additionally considers whether Walgreens' theory of causation supports an inference that the defendants proximately caused Walgreens' injuries. After resolving whether Walgreens has plausibly alleged a RICO violation, the Court turns to Walgreens' conspiracy allegations. Finally, the Court considers whether the complaint supports Walgreens' recovery of equitable relief.

### 1.      Existence of an Enterprise

"An enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct.' *Haddad, Inc.*, 2019 WL 1425835, at *9 (citation omitted). Although what constitutes an enterprise "is to be interpreted broadly," its definition is not limitless. *Walgreen Co.*, 719 F.3d 849 at 853. Walgreens alleges this enterprise was an "association-in-fact," which the Supreme Court has clarified "need not have any structural features beyond 'a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.'" *Id.* (quoting *Boyle v. United States*, 556 U.S. 938, 944 (2009)).

Walgreens alleges that the enterprise's purpose was identifying and purchasing as many high-performing Walgreens-leased properties as possible by deterring Walgreens from exercising its ROFR. (R. 310 at 26.) The issue is whether

Walgreens has alleged facts showing that each defendant "conducted or participated in the conduct of the 'enterprise's affairs,' not just [its] own affairs." *Walgreen Co.*, 719 F.3d at 854. "[A] person conducts or participates in the conduct of the affairs of an enterprise only if that person uses his position in, or association with, the enterprise to perform acts which are involved in some way in the operation or management of the enterprise, directly or indirectly, or if the person causes another to do so." *Menzies v. Seyfarth Shaw LLP*, 197 F. Supp. 3d 1076, 1102 (N.D. Ill. 2016). In essence, to survive the motion to dismiss, the complaint must plausibly allege that the defendants were engaged in a "truly joint enterprise where each individual entity act[ed] in concert with the others to pursue a common interest." *Haddad*, 2019 WL 1425835, at *9. If the Court concludes that the allegations only support an inference of nothing more than a "run-of-the-mill-commercial relationship where each entity act[ed] in its individual capacity to pursue its individual self-interest," Walgreens will have failed to plausibly allege an enterprise with respect to that defendant. *Id.*

### a. The L2 and Matthews Defendants

The defendants claim that Walgreens' RICO allegations fail as to the L2 Defendants and the Matthews Defendants because the complaint contains "scant allegations of what these Defendants actually did to conduct or participate in any supposed criminal enterprise apart from their normal operations of acquiring properties for clients or themselves." (R. 289 at 22.)[7] This is not a fair characterization

---

[7] Because all defendants have adopted the arguments presented in L2 Partners' brief, (R. 291 at 11, 18; R. 294 at 2 n.1; R. 296 at 2 n.1; R. 298 at 2 n.1), the Court, at times, cites only to L2 Partners' brief when referring to all defendants.

of the allegations, however. Separate from L2 Partner's legitimate affairs as a real estate investment company purchasing a variety of properties, the complaint describes an enterprise with a multi-tiered structure and a distinct purpose to discourage Walgreens from exercising its ROFRs, in which each tier of actors had a different role in the scheme. First, Walgreens identifies the L2 Defendants as being responsible for obtaining Walgreen's information, creating fraudulent LOIs or PSAs, and serving as consultants to the next tier of participants, the brokers. (R. 310 at 27, 29.) The brokers were responsible for "us[ing] the stolen information to target specific landlords to sell to the Enterprise." (*Id.*)

These allegations go beyond identifying individuals who "merely touch[ed]" L2 Partners for legitimate real estate referrals because they describe actions taken in furtherance of the enterprise's goals of manufacturing offers that bested Walgreens' ROFRs, not simply their own self-interest. (R. 289 at 21.) For instance, the complaint alleges that L2 Partners, through its Member-Entities acting via Lazarus, Marotta, Richards, and Galin, knew it had no right to use Walgreens' information, but nonetheless relied on the information to create pitch-decks for the Named Investors with Peters. (R. 231 ¶ 172.) These pitch-decks were an integral part of the enterprise's operations because the L2 Defendants used Walgreens' proprietary information to make the properties attractive to the Named Investors. (*Id.* ¶¶ 195-97.) Lazarus, Marotta, Richards, and Galin further used their positions on behalf of L2 Partners and their LLCs to operate the enterprise by directing the Matthews Defendants to contact prospective landlords of Walgreens-leased properties. (R. 310 at 21.) Lazarus,

Marotta, Richards, and Galin also coordinated with these prospective landlords to create LOIs or PSAs that did not disclose the partial refund they would ultimately return to the Named Investors after Walgreens' ROFR period closed. (R. 231 ¶¶ 85-90.) The Matthews Defendants also would convince the prospective landlords to sell to L2 Partners and instruct them to omit the refund credit from their LOIs or PSA sent to Walgreens. (*Id.* ¶¶ 4, 56, 85, 179-82, 195.)

Because these allegations show that the L2 Defendants and the Matthews Defendants "joined together to enrich themselves and further the common interests of the group as a whole" through actions aimed at discouraging Walgreens from exercising its ROFRs, the complaint has alleged "much more than 'parallel uncoordinated fraud.'" *Menzies*, 943 F.3d at 337 (citing *Walgreen Co.*, 719 F.3d at 1094).

At this juncture, it is prudent to address the defendants' argument that the refund credits were for legitimate routine maintenance costs and so their omission from the LOIs or PSAs cannot support the existence of any overarching scheme. At the pleading stage this Court cannot accept the defendants' fact-based contention that the maintenance credits were legitimate. (*Compare* R. 289 at 13 n.1, 28, *with* R. 231 ¶ 87 ("In an effort to conceal their true purpose, L2 Defendants framed the Partial Refund as a maintenance credit, even though the condition of the property had nothing to do with the size of the Partial Refund.").) Indeed, Walgreens alleges that full disclosure was necessary to accurately assess L2 Partners' offer to purchase the Walgreens-leased property. (R. 231 ¶ 87.) And in support of its allegation that the

partial refund credits were pretextual, Walgreens attached an email to its complaint in which Richard's personal broker stated that L2 Partners wanted "to increase the price in an attempt to discourage" Walgreens from executing its ROFR. (*Id.* ¶ 88.) The credit, at L2 Partners' direction, was merely "*termed* a 'Maintenance Credit'" to "ensure[] the buyer is even more locked in." (*Id.* (emphasis added.)) The Court is bound to accept these well-pleaded factual allegations at this stage. *Flores*, 426 F. Supp. 3d at 526. The complaint thus plausibly alleges that the L2 Defendants operated the enterprise by instructing the landlords of Walgreens-leased properties to send and preparing LOIs or PSAs that did not disclose the refund credit.

Walgreens has also plausibly alleged that the Matthews Defendants participated in the operation of the enterprise. The Matthews Defendants, on behalf of L2 Partners and pursuant to the enterprise's mission, instructed the landlords of Walgreens-leased properties to omit details about the maintenance credits in the LOIs and PSAs that they were contractually obligated to send to Walgreens, and to then delay issuing the refunds until after Walgreen's ROFR period had ended. (R. 231 ¶¶ 85-89.)

### b. The Named Investors

The Court reaches a different conclusion with respect to the Named Investors, however. Recall that Walgreens alleges that the Named Investors' role in the enterprise was "provid[ing] criteria for the locations to be targeted." (R. 310 at 27.) Yet, Walgreens never specifies what criteria the Named Investors allegedly provided. The example Consulting Agreement attached to the complaint shows that L2 Partners only agreed to "conduct[] a search of available WALGREENS locations to

obtain one or more choices that match the Client's criteria." (R. 231-1 ¶ 2.) Absent detail about what criteria the Named Investors provided, this allegation does not support an inference that the Named Investors involved themselves in L2 Partners' affairs. Rather, the allegation describes nothing more than a feature of the Named Investors business agreement with L2 Partners to provide services. *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 728 (7th Cir. 1998) (explaining that "simply performing services for an enterprise, even with knowledge of the enterprise's illicit nature" is insufficient for liability under § 1962(c)).

Similarly, Walgreens alleges that the other defendants could not have operated the enterprise without their active participation, *i.e.*, their investments. (R. 312 at 3, 9, 18.) Yet, merely paying for L2 Partners for its services and funding the real estate transactions does not show that the Named Investors operated the enterprise's affairs. *See, e.g.*, *Saleh*, 2018 WL 287748, at *5 (holding that allegations showing the defendant "merely . . . paid . . . [another defendant] to perform an illegal service" were "insufficient to establish that the defendant conducted the affairs of an association-in-fact enterprise"); *see also Walgreen Co.*, 719 F.3d at 854 (reasoning that "allegations of illegal conduct" by the co-defendants could not alone support inferring they "conducted the affairs of an enterprise"). In essence, Walgreens has alleged that the Named Investors contracted with L2 Partners and paid for those services; this is nothing more than a "business-to-business" relationship lacking "the type of close relationships and purpose required for an enterprise." *Haddad, Inc.*, 2019 WL 1425835, at *9.

14

Walgreens further alleges that the Named Investors "approv[ed] the fraudulent maintenance scheme." (R. 310 at 27.) But allegations of fraud are subject to Federal Rule of Civil Procedure 9(b), which requires that "[c]omplaints alleging fraudulent conduct . . . describe the 'who, what, when, where, and how' of the fraud." *Hounen Solar, Inc.*, 2023 WL 2933054, at \*5 (citation omitted). Here, Walgreens' suggestion that the Named Investors operated or approved the scheme is purely speculative. The complaint does not describe the Named Investors' participation in the alleged fraud with sufficient detail. Indeed, the complaint is devoid of factual allegations that the Named Investors were even *aware* of Walgreens' ROFR or that the maintenance credits were not legitimate. There are no allegations that the Named Investors received copies of Walgreens' original leases containing the ROFR, were told about the ROFR, or otherwise had reason to know about the ROFR. Absent such allegations, the complaint suggest only that the Named Investors approved of the maintenance credits. Because the allegations are consistent with the Named Investors paying L2 Partners for real estate investment services, they do not support concluding that the Named Investors operated a distinct, unlawful enterprise with the L2 and Matthews Defendants.

In sum, the complaint describes only a "run-of-the-mill commercial relationship" in which the Named Investors contracted with L2 Partners for their own self-interest, and did not operate the affairs of a distinct entity aimed at discouraging Walgreens from exercising its contractual rights. *Haddad*, 2019 WL

1425835, at *9. Because the complaint does not plausibly allege that the Named Investors operated the enterprise's affairs, count II against them is dismissed.

### 2. Pattern of Racketeering Activity

The Court now considers whether the newly defined enterprise's members carried out its affairs through a pattern of criminal racketeering activity. A pattern of racketeering is simply "a series of criminal acts as defined by the [RICO] statute." *Haddad*, 2019 WL 1425835, at *7. To make this showing, Walgreens must plausibly allege the commission of two or more predicate acts. 18 U.S.C. § 1961(5). Walgreens must additionally "'demonstrate a relationship between the predicate acts as well as a threat of continuing activity'—a standard known as the 'continuity plus relationship' test." *Menzies*, 943 F.3d at 337 (quoting *DeGuelle v. Camilli*, 664 F.3d 192, 199 (7th Cir. 2011)). Because, with one exception addressed *infra* Section I(A)(2)(a)(ii), the defendants do not contest the relationship element, the remaining issue is whether Walgreens has "adequately pleaded the continuity dimension of the continuity-plus-relationship test." *Menzies*, 943 F.3d at 337.

Here, Walgreens has alleged the predicate acts of trade secret theft, in violation of 18 U.S.C. § 1832, and mail and wire fraud, in violation of 18 U.S.C. §§ 1341, 1343. The defendants argue that Walgreens' allegations are insufficient to plausibly establish any of these predicate acts or, alternatively, that its allegations fail to establish continuity. (R. 289 at 24.) The Court addresses each argument in turn.[8]

---

[8] The defendants also assert that that the complaint fails to allege predicate acts because it relies upon group pleading. (*See* R. 289 at 31.) The Court disagrees. There is no group

### a.    Predicate Acts

### i.    Theft of Trade Secrets

The theft of trade secrets, 18 U.S.C. § 1832, constitutes a RICO predicate act.

18 U.S.C. § 1961(1). 18 U.S.C. § 1832 is violated when:

> Whoever, with intent to convert a trade secret . . . to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly—
> (1) steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information;
> (2) without authorization copies, duplicates, sketches, draws, photographs, downloads, upload, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys such information;
> (3) receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization[.]

Here, the allegations support an inference that Peters stole Walgreens' information intending to convert it when he downloaded the information onto his external hard-drive and then communicated the information to the L2 Defendants and the Matthews Defendants. (*See* R. 231 ¶ 172.) Indeed, the complaint describes Peters gaining unauthorized access to Walgreens' online portal fifty-three times to steal information that was later used in real estate transactions. (*Id.* ¶ 52.) The complaint also alleges that Peters and the L2 Defendants routinely used the stolen data to create over fifty pitch-decks for the Named Investors. (*Id.* ¶¶ 66, 73-76.) The complaint also plausibly alleges that the Matthews Defendants received Walgreens'

---

pleading doctrine. *Robles v. City of Chi.*, 354 F. Supp. 3d 873, 875 (N.D. Ill. 2019). Here, the allegations satisfy Rule 8 because they contain sufficient detail to put the defendants on notice of the claims.

information with intent to convert it for their own benefit. (*Id.* ¶ 56.) The allegations support an inference that all of these defendants knew Walgreens would be injured by their misappropriation because they used it to manufacture offers that bested Walgreens' right of first refusal. Walgreens' allegations of DTSA violations are sufficient to satisfy the predicate acts element.

### ii.    Mail or Wire Fraud

The defendants also assert that Walgreens has not plausibly alleged mail or wire fraud. (R. 324 at 21-22.) "Each use of the wires can be an . . . individual RICO predicate for the purpose of establishing two predicate acts." *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 827 (7th Cir. 2016). "Allegations of mail and wire fraud in a civil RICO claim require the showing of the following elements: '(1) the defendant has participated in a scheme to defraud and (2) the defendant has mailed or has knowingly caused another to mail a letter [or use a wire] for the purpose of executing the scheme.'" *Fund Recovery Servs., LLC v. RBC Cap. Mkts.*, LLC, No. 20 C 5730, 2022 WL 142404, at *8 (N.D. Ill. Jan. 17, 2022). "Mail and wire communications need not be fraudulent in and of themselves; rather, they simply need to further or carry out the scheme to defraud." *Id.* A scheme to defraud is also shown by "some sort of fraudulent misrepresentation or omissions calculated to deceive persons of ordinary prudence and comprehension." *United States v. Weimert*, 819 F.3d 351, 367 (7th Cir. 2016). As stated above, allegations of fraudulent conduct must comport with Rule 9(b)'s heightened pleading requirements. *Hounen Solar, Inc.*, 2023 WL 2933054, at *5.

18

Here, the complaint alleges numerous instances of mail and wire fraud. The first instance of mail or wire fraud described in the complaint occurred on February 15, 2019, when a landlord sent Walgreens a PSA via mail that did not identify the partial refund, despite being part of the deal. (R. 231 ¶ 97.) In the defendants' view, this instance is too remote from when Peters stole the data in December 2019 and the other real estate transactions, which occurred in March 2020, a few months after Peters joined L2 Partners, to constitute a pattern. (R. 289 at 25.) This argument is unavailing because the February 2019 transaction is alleged to have been perpetrated against the same victim, Walgreens, and similarly involved omitting the refund credit and exploiting Walgreens' data. *See, e.g.*, *Guar. Residential Lending, Inc. v. Int'l Mortg. Ctr., Inc.*, 305 F. Supp. 2d 846, 859-60 (N.D. Ill. 2004) (concluding that the relationship prong was "clearly" satisfied by allegations that the loans were "sold to a single victim on four different dates and involved similar misrepresentations"); *see also United States v. Maloney*, 71 F.3d 645, 661 (7th Cir. 1995) (ruling that a three-year gap between predicate events did not foreclose a civil RICO plaintiff from showing a pattern of activity).

The complaint alleges many additional instances in which the L2 Defendants mailed or caused Walgreens' landlords to mail LOIs or PSAs that omitted the fake refund credit. (*See, e.g.*, R. 231 ¶¶ 96-102.) Each mailing plausibly constitutes part of the scheme to defraud because the complaint asserts that the LOIs and PSAs omitted the refund credit to discourage Walgreens from exercising its ROFR. These allegations are pled with adequate specificity because Walgreens has supplied the

dates, places, content of the communications, and attributed each to specific defendants by name. For example, the complaint alleges that the L2 Defendants caused Walgreens to receive a PSA on February 12, 2021, from a landlord of a Walgreens-leased property by executing the agreement with them on February 9, 2021. (*Id.* ¶¶ 154-160.) This communication was in furtherance of the scheme to defraud because it also did not disclose the refund credit despite the defendants' knowledge that the refund would be material to Walgreens. (*Id.* ¶¶ 154-160.) The complaint contains similar allegations against the Matthews Defendants. (*Id.* ¶¶ 85-89.) The complaint accordingly supports concluding that Walgreens has plausibly alleged more than two RICO predicates.

### b. Continuity

Having confirmed the complaint contains allegations to support predicate acts occurring between February 2019 (the earliest date of alleged mail or wire fraud) and February 12, 2021 (the latest date of alleged mail or wire fraud), the Court next evaluates whether these allegations are sufficiently continuous to support a pattern. "Continuity is 'both a closed- and open-ended concept.'" *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1022 (7th Cir. 1992). Continuity requires allegations: "(1) demonstrating a closed-ended series of conduct that existed for such an extended period of time that a threat of future harm is implicit, or (2) an open-ended series of conduct that, while short-lived, shows clear signs of threatening to continue into the future.'" *Menzies*, 943 F.3d at 337. There is no "bright-line rule for how long a closed period must be to satisfy continuity[.]" *Whitmore's Auto. Servs., Inc. v. Lake Cnty.,*

*Ill.*, 424 F.3d 659, 673 (7th Cir. 2005). "The big question," rather, is whether Walgreens has "adequately alleged that the challenged conduct occurred and went on long enough and with enough of a relationship with itself to constitute a pattern." *Mobimeds, Inc. v. E-Medrx Sols., Inc.*, No. 19-CV-3224, 2020 WL 13615926, at *16 (C.D. Ill. Aug. 17, 2020).

"[A] 'closed-ended' period of racketeering activity involves a course of criminal conduct which has come to a close. To satisfy the continuity element in a closed-ended case, the plaintiff must prove (1) a series of related predicates (2) enduring a 'substantial period of time.'" *Midwest Grinding Co.*, 976 F.2d at 1022-23. In this case, the Court has already concluded the predicate acts were plausibly related, *supra* Section I(A)(2)(a)(ii). With respect to the second element, "'a few weeks or months'" is generally considered insubstantial. *Id.* at 1024 (citation omitted). The focus is "the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries." *Mobimeds, Inc.*, 2020 WL 13615926, at *16. Yet, "[t]he mere fact that the predicate acts relate to the same overall scheme or involve the same victim does not mean that the acts automatically fail to satisfy the pattern requirement." *Jennings v. Auto Meter Prod., Inc.*, 495 F.3d 466, 473 (7th Cir. 2007).

Here, the defendants argue that the longest period of activity Walgreens may establish is less than a year, which "is too short a period to demonstrate closed-end continuity." (R. 289 at 26.) This argument fails, however, because Walgreens alleges that for about two years the defendants acquired a number of Walgreens-leased

properties in multiple states. (R. 231 ¶ 37.) The complaint alleges conduct over a sufficient period of time.

Walgreens also has set forth allegations sufficient to support an inference of open-ended continuity. "[A] plaintiff may show open-ended continuity when: '(1) a specific threat of repetition exists; (2) the predicates are a regular way of conducting an ongoing legitimate business; or (3) the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes.'" *Inteliquent, Inc. v. Free Conferencing Corp.*, 503 F. Supp. 3d 608, 631 (N.D. Ill. 2020).

Here, Walgreens has alleged many instances of misappropriation of its data in L2 Partners' business affairs. Walgreens' allegations that Peters stole its data, saved it directly on to an unauthorized external hard drive, and thereafter cultivated a business model with the other L2 Defendants using such data to target valuable Walgreens-leased properties supports a reasonable inference that a threat of repetition remains. (*See* R. 231 ¶¶ 66, 73-76.)

The defendants argue that Walgreens cannot show open-ended continuity because there are not "clear signs of threatening to continue into the future since Peters was temporarily enjoined by this Court in this matter from further disclosing any trade secrets." (R. 289 at 28.) But "the threat of repetition must be viewed 'at the time the racketeering activity occurred" and "[s]ubsequent events," like the preliminary injunction, "'are irrelevant.'" *Inteliquent, Inc.*, 503 F. Supp. 3d at 631 (citation omitted). The defendants further claim that there is no specific threat of repetition because the purported value of the store-specific data Peters stole

necessarily diminishes over time. (R. 289 at 28.) This is yet another inherently factual question not properly resolved at the pleading stage. *See, e.g.*, *Nilssen v. Motorola, Inc.*, 963 F. Supp. 664, 676 (N.D. Ill. 1997) (declining to resolve whether the plaintiff's "alleged trade secrets were of sufficient 'secrecy' to be of 'value' under the Act"). Because it is not unreasonable to conclude that Walgreens' sales information for all of its stores nationwide remains valuable less than five years after it was stolen, the complaint supports an inference that it could be used again to perpetuate the scheme.

### 3.    Proximate Cause

A RICO plaintiff must also allege that the defendant proximately caused his injury. *Hemi Grp., LLC*, 559 U.S. at 9. "Proximate cause for RICO purposes . . . should be evaluated in light of its common-law foundations; proximate cause thus requires some direct relation between the injury asserted and the injurious conduct alleged. A link that is too remote, purely contingent, or indirect is insufficient." *Id.* (cleaned up). "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006).

Here, the defendants urge that Walgreens has not plausibly alleged proximate cause because a lost opportunity is not a redressable injury. (R. 289 at 40-44; R. 324 at 19-21.)[9] The Court is not persuaded. Courts in this district have allowed plaintiffs

---

[9] The defendants assert a similar argument in their Notice of Supplemental authority. (R. 349.) They rely upon on *Ciminelli v. United States*, 143 S. Ct. 1121 (2023), for the proposition that Walgreens fails to allege a "property interest" within the meaning of the federal mail and wire fraud statutes. (*Id.* at 1.) The Court is not convinced that Walgreens' ROFR was only "economic information"; the Seventh Circuit has described a ROFR as a "preemptive right," which "can be a powerful instrument." *Pincus v. Pabst Brewing Co.*, 893 F.2d 1544,

to recover under RICO for lost business opportunities. *See, e.g., Cement-Lock v. Gas Tech. Inst.*, No. 05 C 0018, 2007 WL 4246888, at *26 (N.D. Ill. Nov. 29, 2007), *as amended* (Nov. 30, 2007). This is precisely the harm Walgreens has alleged. Walgreens' complaint alleges that "the lost opportunity to purchase properties under its ROFR rights[] cost[ed] Walgreens at least $23,000,000." (R. 231 ¶¶ 31, 185.) The Court is permitted to accept Walgreens' allegations that the defendants' actions caused damages equal to the value of the lost properties, a harm that was directly caused by the defendants' RICO scheme to prevent Walgreens from exercising its ROFRs. *See, e.g., Starboard With Cheese, LLC v. Barry View, Inc.*, No. 19 C 3269, 2023 WL 5437445, at *4 (C.D. Ill. Aug. 21, 2023).

### 4. Equitable Relief

Lastly, the defendants argue that Walgreens "fails to state a claim upon which relief can be granted because it seeks a constructive trust[.]" (R. 289 at 57.) However, "a constructive trust is a remedy, not a cause of action." *Nat'l. Union Fire Ins. Co. of Pittsburgh v. DiMucci*, 34 N.E.3d 1023, 1045 (Ill. App. 1st Dist. 2015). At this stage, the issue is "simply whether there are sufficient facts alleged to state a plausible claim for relief on some legal theory." *McInerney v. CareerBuilder, LLC*, No. 18 C 4073, 2019 WL 6497369, at *4 (N.D. Ill. Dec. 3, 2019).

This Court, accordingly, need not determine whether Walgreens has sufficiently alleged entitlement to a particular remedy, only whether its RICO

---

1549 (7th Cir. 1990). "Furthermore, the value of a right of first refusal is not undermined by its conditional nature." *BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.*, 900 F.3d 529, 538 (7th Cir. 2018), *abrogated on other grounds by Schmees v. HC1.COM, Inc.*, 77 F.4th 483 (7th Cir. 2023).

allegations plausibly support entitlement to some relief at all. For the foregoing reasons, the complaint does so with respect to the L2 Defendants and the Matthews Defendants.

### B.    18 U.S.C. § 1962(d)

The Court now considers Walgreens RICO conspiracy allegations. Unlike a RICO violation, a RICO conspiracy only requires a plaintiff to allege that the defendants (1) agreed to maintain, control, or participate in an enterprise and (2) "agreed that someone would commit at least two predicate acts to accomplish those goals." *Haddad*, 2019 WL 1425835, at *7.

Here, Walgreens plausibly alleges the L2 Defendants told Peters to take the data, Peters did so, and then they coordinated with the Matthew Defendants in identifying properties for acquisition and pitching the acquisitions to the Named Investors. (R. 231 ¶¶ 211-22.) Because these allegations support an inference that the L2 Defendants and the Matthews Defendants agreed to violate RICO, their motions to dismiss count III are denied.

Regarding the Named Investors, there is no allegation that these defendants agreed to maintain, conduct, or control an enterprise. Accordingly, the complaint does not support an inference that they agreed to violate RICO; count III against them is dismissed.

### II.    DTSA ALLEGATIONS

In count I, Walgreens asserts that the defendants committed civil trade secret misappropriation, 18 U.S.C. § 1836(b)(3). To state a cognizable misappropriation of trade secrets claim under the DTSA, Walgreens must allege: "(1) existence of a trade

secret; (2) that a Defendant misappropriated; and (3) used in the Defendant's business." *Sonrai Sys., LLC v. Waste Connections, Inc.,* No. 21 C 2575, __ F. Supp. 3d __, 2023 WL 2266147, at *5 (N.D. Ill. Feb. 28, 2023). A trade secret is "business-related information that the owner of which has taken reasonable measures to keep secret and from which the owner derives economic value from the information not being generally known or readily ascertainable by others who could gain an economic advantage from the information." *Id.* (quoting *Busey Bank v. Turney*, No. 21 C 2900, 2022 WL 92940, at *15 (N.D. Ill. Jan. 10, 2022) (paraphrasing 18 U.S.C. § 1839(3)). A trade secret owner is obligated "to make reasonable efforts to maintain [the] secrecy" of its information and can forfeit protection if it fails to take adequate precautions. *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 177 (7th Cir. 1991). The misappropriation element may be supported by allegations showing the defendant either "(1) acquired a trade secret knowing or with reason to know that it was acquired by improper means; or (2) disclosed or used the trade secret without express or implied consent." *Sonrai Sys., LLC*, 2023 WL 2266147, at *5 (citing 18 U.S.C. § 1839(5)(A)-(B)).

### A. Peters and the Matthews Defendants

The Court first addresses Walgreens' DTSA allegations against Peters and the Matthews Defendants. Here, the complaint describes several trade secrets that were misappropriated by Peters, including Walgreen's nationwide store-by-store adjusted operating income, prescription sales, and its process for evaluating whether to exercise its ROFR. (R. 231 ¶¶ 44-46, 164.) These allegations are sufficient to plausibly allege the first element of Walgreens' DTSA claim. The defendants nonetheless argue

26

that dismissal is appropriate because "even assuming L2 used the data, Walgreens did not protect that information." (R. 289 at 9-10, 15-19.)

In the defendants' view, none of the protective measures that Walgreens describes in its complaint were reasonable protections under the law. (*Id.* at 16.) However, "[c]ourts generally acknowledge that determining the reasonableness of a given confidentiality measure requires a fact-based inquiry dependent on the specific circumstances." *Sonrai Sys., LLC*, 2023 WL 2266147, at *7. "Indeed, only in an extreme case can what is a reasonable precaution be determined as a matter of law, because the answer depends on a balancing of costs and benefits that will vary from case to case," *id.*, and so, such questions are appropriately answered at summary judgment, not the pleading stage. *See, e.g.*, *Covenant Aviation Sec., LLC v. Berry*, 15 F. Supp. 3d 813, 818 (N.D. Ill. 2014) ("The existence of a trade secret ordinarily is a question of fact . . . best resolved by a fact finder after full presentation of evidence from each side."). Accordingly, at this stage, the Court accepts Walgreens' well-pleaded allegations that it employed reasonable confidentiality measures to protect its alleged trade secrets by, namely, restricting access to its adjusted operating income, prescription sales, and Shared Saving Program information to high-level employees, requiring all employees to confirm their understanding of Walgreens' confidentiality policies, and mandating that its employees attend annual internal confidentiality trainings. (R. 231 ¶ 164.)

Walgreens plausibly alleges that Peters—contrary to its policies—misappropriated this information by downloading it onto his external hard drive

during the final days of his employment and then accessing Walgreens' internal systems at least fifty-three times in the following months. (*Id.* ¶¶ 169, 171.) Walgreens further alleges that Peters went on to share that information with L2 Partners and aided their efforts to use the information by creating pitch-decks for the Named Investors, without Walgreens' consent and in violation of Walgreens' confidentiality policies. (*Id.* ¶¶ 43, 48, 50.)

Similarly, the complaint plausibly alleges that the Matthews Defendants misappropriated Walgreens' trade secrets by knowingly relying on Walgreens' information to identify prospective landlords and then convincing at least three landlords to sell to L2 Partners. (*Id.* ¶ 56.) Indeed, the complaint asserts that the Matthews Defendants openly advocated for landlords to sell to L2 Partners by representing that L2 Partners "has access to information that most don't have access to [] looking at store performance." (R. 310 at 29.)

### B.    The LLCs

The LLCs argue for dismissal of Walgreens' DTSA allegations against them by claiming that Walgreens seeks to hold them vicariously liable for L2 Partners' or its employees' alleged misappropriation, which is not supported by the plain language of the DTSA. (R. 296 at 9.) Even if the DTSA supports vicarious liability, the LLCs further assert that Walgreens' claim fails because "there are no allegations whatsoever to show that [the LLCs] are 'principals' or 'employers[.]'" (*Id.*) Moreover, even if Walgreens had alleged that the LLCs were principals, the LLCs argue that "Walgreens has not alleged that any of these Defendants had any requisite knowledge

of the alleged misconduct, nor did they do anything specific that would justify piercing a veil or making a plausible claim for secondary liability[.]" (*Id.*)

Walgreens argues in response that it does not rely on a theory of vicarious liability because the LLCs are directly liable for their own DTSA violations. (R. 314 at 8.) Walgreens argues that it has adequately alleged these LLCs possessed the requisite knowledge because knowledge may be imputed to an LLC through its members. (*Id.*) The Court agrees.

An LLC "can act only through 'its officers and directors and is bound by their actions when performed within the scope of their authority[.]'" *Wells Fargo Bus. Credit v. Hindman*, 734 F.3d 657, 667 (7th Cir. 2013) (citation omitted). Relatedly, knowledge or awareness of facts is imputed to the LLC through its agents. *See United States v. One Parcel of Land Located at 7326 Highway 45 N., Three Lakes, Oneida Cnty., Wis.*, 965 F.2d 311, 316 (7th Cir. 1992) ("Where a corporate agent obtains knowledge while acting in the scope of his agency, he presumably reports that knowledge to his corporate principal, so the court imputes such knowledge to a corporation."). Whether an individual is an agent with authority to impute knowledge to a principal-LLC is a highly fact-intensive inquiry unfit for resolution at the pleadings stage. *Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 731 (7th Cir. 2014) ("Agency is a notoriously fact-bound question[.]"); *see, e.g.*, *Hounen Solar, Inc. v. UL LLC*, No. 22 CV 3240, 2023 WL 2933054, at *6 (N.D. Ill. Apr. 13, 2023) (explaining that questions concerning agent's authority and LLC's knowledge are more "amenable to resolution in discovery").

Here, the complaint alleges that LJL Management Holdings, Apollo Development, TKG Equity, and Viking Real Estate are members of L2 Partners. (R. 231 ¶¶ 9-10, 12-14.) Walgreens alleges that these Member-Entities acted through their members, Lance Lazarus, Dan Marotta, Tad Galin, and Jeff Richards, respectively. (*Id.*) Although Lazarus, Marotta, Galin, and Richards are not "agent[s] solely by reason of being [] member[s]," of their LLCs, a member *usually* is (although they need not be) an agent of their LLC. Karambelas, *§ 9:5. Management by Managers—Duties and Decision Making by Managers*. It is therefore reasonable to conclude that the complaint plausibly alleges that Lazarus, Marotta, Galin, and Richards were agents of their respective LLCs.

The defendants challenge the veracity of Walgreens' allegation that L2 Partners directed Peters to take the data. (R. 289 at 55.) Once again, this Court cannot accept contradictory characterizations of Walgreens' factual assertions at this stage. These defendants' knowledge may accordingly be imputed to their LLCs. Further, despite knowing that the information was impermissibly obtained, the complaint alleges that Lazarus, Marotta, Richards, and Galin acted on behalf of their LLCs when they relied on the information to create pitch-decks for the investors because their knowledge and actions are properly imputed to and extend liability to their entities. *Wells Fargo Bus. Credit*, 734 F.3d at 667. (R. 231 ¶ 172.) The complaint thus supports an inference that Walgreens' alleged trade secrets were knowingly "used in [the LLCs'] business[es]." *See generally* 18 U.S.C. § 1832(a)(2).

### C.    The Named Investors

### 1.    Personal Jurisdiction

While RICO authorizes nationwide service of process, the DTSA does not. *Smietana v. Stephens*, No. 22 C 708, 2023 WL 3737720, at *5 (N.D. Ill. May 30, 2023). Having dismissed the RICO claims against the Named Investors, it is necessary to determine whether Walgreens has established a *prima facie* case of personal jurisdiction over the Named Investors for their remaining claims.

Illinois law allows courts to exercise jurisdiction over defendants consistent with federal principles of due process. *Rogers v. City of Hobart*, 996 F.3d 812, 818 (7th Cir. 2021). Federal due process allows a plaintiff to hale a defendant into court only if the court can exercise either general or specific personal jurisdiction over the defendant. *See id*. "For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014). General personal jurisdiction exists over a defendant who has "continuous and systematic" contacts with the forum state and is "essentially at home" there. *Daimler AG v. Bauman*, 571 U.S. 117, 119 (2014). By contrast, specific personal jurisdiction may be exercised only when (1) the defendant purposefully directs its activities at the forum state or conducts business in that state, and (2) the alleged injury "arise[s] out of or relate[s] to the defendant's contacts" with the forum. *Tamburo v. Dworkin*, 601 F.3d 693, 702 (7th Cir. 2010). Here, the parties do not dispute that the Named Investors lack a sufficient relationship with Illinois to permit general jurisdiction. The relevant question is whether the Named Investors purposefully directed their activities toward Illinois

and whether Walgreens' alleged injury arose out of or related to the Named Investors' contact with the forum state.

First, Walgreens has established a *prima facie* case to allow this Court to exercise personal jurisdiction over Lambert. In response to L2 Partners' dismissal motion, Walgreens attached a copy of the LLC's Electronic Articles of Organization to its counsel's unrebutted declaration as an exhibit. (R. 310-2 at 23.) This exhibit shows that Lambert is the sole manager of an LLC that owns a Walgreens-leased property in Illinois that was allegedly purchased using the misappropriated data. (R. 231 ¶ 37; R. 310-1 ¶¶ 22-23.) Because Walgreens alleges that Lambert performed suit-related conduct directed at Illinois by managing an LLC that allegedly derived economic value from misappropriated trade secrets, the Court may exercise personal jurisdiction over him.

That does not necessarily mean that the same is true for the other investors; rather, the Court must consider their contacts with the forum individually. *Calder v. Jones*, 465 U.S. 783, 790 (1984). With respect to Neary, B. Haseotes, and A. Haseotes, Walgreens asserts that it has, at a minimum, provided allegations warranting jurisdictional discovery for these defendants. (R. 312 at 24 n.16.) "In order to obtain jurisdiction discovery, a plaintiff must first make a 'colorable' showing of personal jurisdiction." *Dale v. Deutsche Telekom AG*, No. 22 C 3189, 2023 WL 7220054, at *8 (N.D. Ill. Nov. 2, 2023). "Generally[,] courts grant jurisdictional discovery if the factual record is ambiguous or unclear on the issue, but when a lack of personal

jurisdiction is clear, jurisdictional discovery would serve no purpose and should not be permitted." *Id.*

Walgreens does not argue that the factual record is ambiguous or unclear as to personal jurisdiction. Rightfully so; Walgreens concedes that it combed through numerous public filings on Secretary of State websites to determine if any of the Named Investors had an interest in properties listed in Figure 1 of the complaint that were allegedly obtained using misappropriated information. (*See generally* R. 310-1.) Despite this search, Walgreens was not able to verify that any of the Named Investors besides Lambert owned any of the properties listed in Figure 1. (*See id.*) Instead, in a footnote, Walgreens argues that jurisdictional discovery is warranted because the Named Investors actions were (1) directed at an Illinois corporation and (2) involved Peters' theft of Walgreens data while in Illinois. (R. 312 at 24 n.16.) These underdeveloped arguments fail to carry Walgreens' burden of making a colorable showing that personal jurisdiction exists over Neary, B. Haseotes, and A. Haseotes.

First, absent allegations of suit-related conduct, it is insufficient to allege that these defendants simply knew that Walgreens was an Illinois corporation. *See Walden*, 571 U.S. at 284 ("[T]he plaintiff cannot be the only link between the defendant and the forum. Rather, it is the *defendant's conduct* that must form the necessary connection with the forum State that is the basis for its jurisdiction over him.") (emphasis added). With the exception of Lambert, Walgreens does not present information showing that any of the Named Investors purchased property in Illinois or were aware that Peters' alleged misappropriation of trade secrets occurred in the

state. All said, the Court is not persuaded that Walgreens has made a colorable showing of personal jurisdiction to warrant affording them jurisdictional discovery on this issue. Walgreens' remaining claims against Neary, B. Haseotes, and A. Haseotes are therefore dismissed.

### 2.     The Complaint States a Misappropriation of Trade Secrets Claim Against Lambert.

The Court now considers Walgreens' misappropriation of trade secrets allegations against Lambert. Here, the complaint plausibly alleges that he saw pitch decks containing Walgreens' stolen information and had reason to know that the information was illegally obtained. First, the complaint alleges the L2 Defendants told Lambert that the information was obtained illegally during their pitch deck meetings. (R. 231 ¶¶ 68, 81.) Second, the complaint asserts that Lambert had reason to know from "purchas[ing] dozens of pharmacies" that Walgreens' "store-by-store profit, total sales, store ranking, and . . . type of prescription medications" was non-public information. (*Id.* ¶ 183; R. 312 at 5.) Accepted as true, these allegations support an inference that Lambert either knew or had reason to know that the information the L2 Defendants relied on in the pitch decks was improperly obtained. The complaint thus supports a conclusion that Lambert received information he knew had been obtained improperly and then relied upon that information in his course of business by using the information to fund real estate purchases. Lambert's motion to dismiss count I is accordingly denied.

### III.   TORTIOUS INTERFERENCE

Count IV alleges that the L2 Defendants and two of the Named Investors, A. Haseotes and Neary, tortiously interfered with Walgreens' contractual and business relationships. (R. 231 ¶¶ 234-38.) Because the Court cannot exercise personal jurisdiction over A. Haseotes and Neary, count IV is dismissed as to these defendants.

Turning to the plaintiffs' allegations against the L2 Defendants, "[t]o state a claim for tortious interference with contract, [Walgreens] must allege enough facts to establish: '(1) a valid contract, (2) defendant's knowledge of the contract, (3) defendant's intentional and unjustified inducement of a breach of contract, (4) a subsequent breach of contract caused by defendant's wrongful conduct, and (5) damages.'" *Gen. Elec. Co. v. Uptake Techs., Inc.*, 394 F. Supp. 3d 815, 834 (N.D. Ill. 2019) (citation omitted). Here, the L2 Defendants do not explain how Walgreens has failed to allege tortious inference as to them. Their only argument regarding this claim is that Walgreens should not receive an injunction as a remedy. (R. 289 at 53.) However, as explained in Section I(A)(4) *supra*, this is an issue for another day. The complaint plausibly alleges that Walgreens had a contractual ROFR, the L2 Defendants knew it, and yet acted to prevent Walgreens from exercising it. (R. 231 ¶ 36.)

### IV.   BREACH OF FIDUCIARY DUTY

Walgreens next alleges that Peters breached his fiduciary duty to Walgreens (count V) and that the L2 Defendants aided and abetted Peters in committing this breach (count VI). "To state a claim for breach of fiduciary duty under Illinois law, a plaintiff must plead: (1) the existence of a fiduciary duty; (2) breach of that duty; and

(3) damages to the plaintiff as a result of that breach." *McLaughlin v. Chi. Transit Auth.*, 243 F. Supp. 2d 778, 779 (N.D. Ill. 2003). To state a claim against the L2 Defendants for aiding or abetting Peters, Walgreens must plausibly allege that the L2 Defendants provided assistance, and knowingly and substantially assisted in the violation. *See Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006).

"Under Illinois law, employees as well as officers and directors owe a duty of loyalty to their employer[.]" *Beltran v. Brentwood N. Healthcare Ctr., LLC*, 426 F. Supp. 2d 827, 831 (N.D. Ill. 2006). "Because of the duty of loyalty, 'a fiduciary cannot act inconsistently with his agency or trust[.]'" *Id.* (citation omitted). "Courts applying Illinois law have construed the duty of loyalty to prohibit officers or employees from improperly . . . engaging in self-dealing and/or otherwise misappropriating the employer's property or funds." *Id.* Walgreens alleges that Peters misappropriated its property when he stole confidential information from the company. These allegations support an inference that Peters breached his duty of loyalty to Walgreens.

The defendants argue that Walgreens fails to state a claim because Peters shared the information after his employment with Walgreens ended, *i.e.,* when he no longer owed any duty to Walgreens. (R. 289 at 54.) Although the defendants are correct that an employee does not owe fiduciary duties to a former employer, *see Jostens, Inc. v. Kauffman*, 842 F. Supp. 352, 354 (C.D. Ill. 1994), Walgreens alleges Peters misappropriated its data during his final month of employment as a Senior Director of Walgreens' Market Planning and Research Department. (R. 231 ¶ 43.)

The L2 Defendants assert that they cannot be liable for aiding or abetting Peters' breach because Marotta's stated in a deposition that L2 Partners did not learn of Peters' theft until after he began his employment with the company. (R. 289 at 55.) While the deposition is attached as an exhibit to Walgreens' complaint, an exhibit controls over well-pled allegations only if the exhibit "incontrovertibly contradicts the allegations in the complaint." *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013).

Here, unlike "an attached exhibit of unquestioned veracity," Marotta's testimony does not incontrovertibly contradict Walgreens' allegation that the L2 Defendants knowingly and substantially assisted Peters' violation. *Ruebe v. PartnerRe Ireland Ins. DAC*, 470 F. Supp. 3d 829, 840 (N.D. Ill. 2020); *see, e.g.*, *Artis v. Wexford Health Sources, Inc.*, No. 18 C 4476, 2021 WL 3930106, at *5 n.2 (N.D. Ill. Sept. 2, 2021) (disregarding deposition testimony contradicted by the complaint). This is so because Marotta's testimony is subject to credibility determinations that have not been made, and is inconsistent with Walgreens' allegations that L2 Partners instructed Peters to download the data while he was employed specifically because of his access to proprietary information that would further their real estate investment scheme. (R. 231 ¶¶ 239-44.) It is not unreasonable to conclude from these allegations that Peters downloaded the information because L2 Partners instructed him to do so. The L2 Defendants' motions to dismiss counts V and VI are denied.

## V.    LEAVE TO AMEND

Finally, the Court considers Walgreens' request for leave to amend. (R. 310 at 57.) Because the time period for amendment as of right has expired, Walgreens may only do so with written consent or the Court's leave. Fed. R. Civ. P. 15(a). "The court

should freely give leave to amend when justice so requires." *Runnion ex rel. v. Girl Scouts of Greater Chi. and Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015) (citation omitted). Leave to amend is properly denied, however, where amendment would be futile, *id.* at 520, or would cause "undue prejudice to the opposing party by virtue of allowance of the amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962). Walgreens does not raise any substantive arguments in support of amendment and states only that it could provide "greater specificity" if leave were granted. (R. 310 at 57.)

Because it is unclear whether Walgreens can allege that the Named Investors operated the enterprise or knew about Walgreens' ROFRs the Court will grant Walgreens twenty-one days to file a motion for leave to amend. Walgreens should explain in the motion why a third amended complaint would not be futile for the dismissed claims against the Named Investors. If Walgreens seeks leave to amend, it must also attach a red-lined proposed amended complaint as an exhibit to its motion.

## CONCLUSION

The L2 Defendants' and Matthews Defendants' motions to dismiss (R. 289; R. 294; R. 296; R. 297; R. 298) are denied. Lambert and Neary's motion to dismiss (R. 285) is denied in part and granted in part. As to Lambert, the motion is denied with respect to count I and granted with respect to counts II and III. The motion is granted as to Neary. The Haseotes' motion to dismiss (R. 290) is granted. Walgreens will have twenty-one days from the date of this order to file an amended complaint.

Date: <u>1/4/2024</u>

_____
JEREMY C. DANIEL
United States District Judge

38