UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WALGREEN CO., <br>     Plaintiff <br><br> v. <br><br> AARON PETERS *et al.*, <br>     Defendants | No. 21-cv-02522 <br><br> Judge Jeremy C. Daniel |

### ORDER

Walgreen Co.'s motion to dismiss L2 Partners, LLC's counterclaims [456] is granted as to Counts IV and V and denied as to Counts I, II, and III. Noble and Martinez's motion to dismiss L2 Partners, LLC's counterclaims [458], Flores and Cardinal's motion to dismiss L2 Partners, LLC's counterclaims [481], and Swanson and Swanson Development Group LLC's motion to dismiss L2 Partners, LLC's counterclaims [491] are denied as to Counts I, II, and III; because the Court granted Walgreens' motion to dismiss Count V, it did not reach the additional arguments presented by these defendants concerning Counts V. Shtulman and STREAM's motion to dismiss [488] is granted as to Counts I, II, and III. L2 has until March 31, 2025, to file an amended counterclaim consistent with this order. L2 may not add new substantive counterclaims; however, it may amend its existing claims to address any pleading deficiencies identified in this order. The remaining Counterclaim Defendants have until April 21, 2025, to respond to any amended counterclaims or, if no amendment is filed, answer the existing counterclaims.

### STATEMENT

<u>Legal standard</u>. The Court applies the same standard to a Rule 12(b)(6) motion to dismiss a counterclaim as it does on a motion to dismiss a complaint for failure to state a claim. *See Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc.*, 250 F.3d 570, 574 (7th Cir. 2001). To survive a Rule 12(b)(6) motion to dismiss, a pleading must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A counterclaim satisfies this standard when its factual allegations "raise a right to relief above the speculative level." *See Twombly*, 550 U.S. at 555–56 (citations omitted). When deciding a motion to dismiss under Rule 12(b)(6), the court takes all facts alleged by the pleader as true and draws all reasonable inferences from those facts in the pleader's favor, although conclusory allegations that merely recite the

elements of a claim are not entitled to this presumption of truth. *Katz-Crank v. Haskett*, 843 F.3d 641, 646 (7th Cir. 2016).

Civil RICO. L2 Partners, LLC filed counterclaims under 18 U.S.C. § 1962(c) and 1962(d) against Walgreen Co., Christopher Noble, Haidee Martinez, Steven M. Swanson II, Swanson Development Group LLC, Yvette Flores, Cardinal Green Investments LLC, Jordan Shtulman, and STREAM Capital Partners, LLC (collectively, the "Counterclaim Defendants"). According to L2, the Counterclaim Defendants formed an enterprise that unlawfully manipulated the market for Walgreens-leased properties through Walgreens' Shared Savings Program. L2 alleges four types of predicate acts: commercial bribery in violation 720 ILCS 5/29A-1; honest services fraud in violation of 18 U.S.C. § 1346; mail fraud in violation of 18 U.S.C. § 1341; and wire fraud in violation of 18 U.S.C. § 1343.

Generally, L2 alleges that: Walgreens, Noble and Martinez misled existing landlords of Walgreens-leased stores to believe that stores were not performing well, which caused landlords to sell properties for less than market value; Swanson, Swanson Development, Flores, and Cardinal arranged to purchase properties from misled landlords for less than market value; after purchase, Walgreens, Noble, and Martinez, along with Swanson, Swanson Development, Flores, and Cardinal increased the value of the lease, which increased the value of properties before selling them at a profit; Swanson, Swanson Development, Flores, and Cardinal "kicked back" a significant portion of the profit to Walgreens, with Noble and Martinez receiving bonuses tied to the revenue generated by the scheme; and Shtulman and STREAM brokered many of these transactions. Each Counterclaim Defendant has moved to dismiss L2's Civil RICO claims.

Standing. "RICO provides a private cause of action for '[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter.'" *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 6 (2010) (quoting 18 U.S.C. § 1964(c)). Here, L2 alleges harm in two forms: "lost profit on [L2's] sale of Walgreens properties to entities owned or controlled by . . . Walgreens, Swanson, Swanson Development, Flores, or Cardinal; [and] lost opportunities to purchase Walgreens-leased properties at fair market value." (R. 440 at 119.)

As to the former, L2 alleges that it "has been directly deprived of the fair market value of one or more of its Walgreens-leased properties, where L2 Partners was owning and/or managing the property and Walgreens sent a 'poor performance' letter, forcing the owner to sell the property . . . below fair market value in reliance on Walgreen's representations that the store was not performing up to par, could not afford its current rent, and was potentially at risk of being shuttered." (R. 440 at 118.) According to L2, one such instance involved a property in El Paso, Texas. (*Id.*) Reading paragraphs 68 through 76 of L2's counterclaim in conjunction with paragraph 137, L2 alleges that it either owned or managed the El Paso property until a poor performance letter caused the owner to sell for less than market value. (*See id.*

2

at 103-5 and 118.) This allegation is sufficient to establish standing as the poor performance letter allegedly misled the owner of the El Paso store, which caused L2 to lose whatever interest it had in the ownership or management of the store.

The same is not true for L2's alleged "lost opportunities" harm. "To state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense 'not only was a 'but for' cause of his injury, but was the proximate cause as well.'" *Hemi Grp.*, 559 U.S. at 9. There has to be "some direct relation between the injury asserted and the injurious conduct alleged," and that link cannot be "too remote," "purely contingent," or "indirect." *Id.* As a threshold matter, this alleged harm is inherently speculative as it depends on several variables, e.g. whether a store would have been listed for sale, whether it would have been in a market L2 was interested in, whether the price would have been one L2 would have been willing to pay, whether L2 would have had the necessary funding to purchase the property, etc., which render any alleged harm uncertain. Further, given all these unknown variables, this alleged harm is too far removed from the alleged predicate offenses. *See, e.g., id.* at 10 ("Because the City's theory of causation requires us to move well beyond the first step, that theory cannot meet RICO's direct relationship requirement.").

Predicate acts. The counterclaim includes four types of predicate acts. Under 720 ILCS 5/29A-1, "[a] person commits commercial bribery when he confers, or offers or agrees to confer, any benefit upon any employee, agent or fiduciary without the consent of the latter's employer or principal, with intent to influence his conduct in relation to his employer's or principal's affairs." L2's allegations fail to state a violation of this statute. The counterclaim alleges that Walgreens accepted a bribe from Swanson, Flores, and their respective organizations without the consent of Walgreens' board of directors. (R. 440 at 112-113.) But L2 does nothing to show that Walgreens is "an employee, agent, or fiduciary" of Walgreen's board of directors. In other words, it has failed to allege an element of the offense.

In its brief, L2 takes a broad view of its commercial bribery allegations. (*See, e.g.*, R. 493 at 13 "Instead, the Counterclaim alleges multiple forms of bribery used to get everyone to buy in to the Enterprise."). But nowhere does the counterclaim sufficiently allege a violation of the statute. Swanson is the managing partner of Swanson Development. It is hard to imagine how any payment from Walgreens to Swanson occurred without the consent of Swanson's employer or principal. The same is true for Flores, who was the principal of Cardinal. The counterclaim alleges that Noble and Martinez worked for Walgreens. It also alleges that Walgreens was in on the scheme, which means that Noble and Martinez acted with Walgreens' consent. As such, L2's commercial bribery allegations fail.

The counterclaim also alleges honest services fraud based on the alleged bribery or kickback scheme. Given the preceding paragraphs, the Court will focus on the alleged kickback scheme. The allegations describe the SSP and how the profits from the SSP flowed to the Counterclaim Defendants. According to the counterclaim, Swanson and

3

Flores returned, i.e. kicked back, a portion of proceeds from flipped properties to Walgreens. L2 further alleges that the increased rents, which inflated the values of the flipped properties, were to the detriment of Walgreens' board of directors and shareholders. At this stage in the case, the Court must make all reasonable inferences in L2's favor. One could reasonably infer that, through the SSP, the Counterclaim Defendants locked Walgreens into long-term, unfavorable leases to increase short term profits to the detriment of shareholders. Given this inference, L2 has alleged a kickback scheme that supports an honest services fraud allegation. In other words, L2 has alleged honest services fraud as a predicate act.

The same is true for mail and wire fraud. A key part of L2's allegations concern misrepresentations about store performance. According to the counterclaim, these misrepresentations set in motion a series of events that led to landlords selling properties below market value. L2 has alleged mail and wire fraud as predicate acts.

Counterclaim Defendants Noble and Martinez argue that the counterclaim does not allege that they themselves committed any predicate acts. This argument fails to appreciate that mail fraud and wire fraud are schemes that do not require participants to personally send or cause to be sent the mailing or wire at issue. *See*, *e.g.*, *United States v. Giovenco*, 773 F.3d 866, 869 (7th Cir. 2014) ("a mail fraud conviction does not require proof that a defendant personally mailed the letters at issue"); *see also United States v. Chanu*, 40 F.4th 528, 539 (7th Cir. 2022) ("To convict on wire fraud, the government must prove three elements: '(1) the defendant participated in a scheme to defraud; (2) the defendant intended to defraud; and (3) a use of an interstate wire in furtherance of the fraudulent scheme.'"). The counterclaim sufficiently alleges that Noble and Martinez were part of the SSP, which the counterclaim alleges was the scheme to defraud. This overcomes Noble and Martinez's argument.

Counterclaim Defendants Flores and Cardinal, as well as Swanson and Swanson Development Group LLC, make similar arguments. But, like mail and wire fraud, honest services fraud "includes a scheme or artifice to deprive another of the intangible right of honest services." By alleging that these Counterclaim Defendants were participants in the scheme to deprive Walgreens' Board of Directors and shareholders of honest services, which allegedly involved kickbacks on multiple properties, L2 has alleged that Flores, Cardinal, Swanson, and Swanson Development each committed at least two predicate acts.

Counterclaim Defendants Shtulman and STREAM are in a different position. L2 alleges that Shtulman and STREAM were preferred brokers who took a commission on sales of properties purchased below market value and then sold at a higher price based on increased rent terms. (R. 440 at 90.) The counterclaim notes that STREAM "employs the family member of at least one former Walgreens' employee" and "Shtulman and STREAM are likewise part of and benefit from the Enterprise." (*Id.* at 96.) Nowhere does the counterclaim explain the significance of the former or

4

provide more than a conclusory assertion on the latter. Nowhere does the counterclaim allege that Shtulman or STREAM knew about the SSP or the inflated prices. Absent allegations that Shtulman or STREAM knew about the fraud, the counterclaim fails to allege an essential element—that Shtulman or STREAM intended to defraud. Therefore, Counts I and II are dismissed as to Shtulman or STREAM.

Pattern. L2 has alleged a pattern of racketeering activity. The counterclaim alleges a series of predicate acts spanning a substantial period of time. Specifically, the counterclaim alleges that the SSP started in or around 2019 and continued through at least December 2021. The counterclaim further alleges that throughout that period the Counterclaim Defendants misled landlords to purchase Walgreens-leased stores at below market value, inflated the value of those stores through revised leases, and then sold those properties, which generated kickbacks for the Counterclaim Defendants.

For the foregoing reasons, the Court finds that L2 has stated a Civil RICO claim for lost profits tied to properties owned or operated by L2 against all Counterclaim Defendants other than Shtulman and STREAM.

RICO conspiracy. The Counterclaim Defendants' motion to dismiss the RICO conspiracy counterclaim is denied. As discussed above, L2 has sufficiently alleged a pattern of racketeering activity. Further, it is not hard to infer that the Counterclaim Defendants' alleged participation in the enterprise and various predicate acts evinces their agreement to participate in the unlawful endeavor.

Tortious interference. The motions to dismiss the tortious interference counter claim filed by Walgreens, Noble, Martinez, Swanson, Swanson Development, Flores, and Cardinal are denied. "To state a claim under Illinois law for intentional interference with prospective economic advantage 'a plaintiff must allege (1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference.'" *Foster v. Principal Life Ins. Co.*, 806 F.3d 967, 971 (7th Cir. 2015). Here, L2 alleges that it had relationships with several landlords of Walgreens-leased stores, that it expected to enter real estate transactions based on those relationships, that most of the Counterclaim Defendants knew about those relationships, and that these Counterclaim Defendants interfered with those relationships and expected transactions to L2's detriment.

As with L2's fraud allegations with respect to Shtulman and STREAM, however, L2's tortious interference claim as to these defendants also fall short. Nothing in the counterclaim suggests an intentional and unjustified interference by Shtulman or

STREAM. These defendants earned commissions on property transactions. Therefore, Count III is dismissed as to Shtulman and STREAM.

Illinois Consumer Fraud Act. The Counterclaim Defendants' motion to dismiss the Illinois Consumer Fraud Act counterclaim is granted. "[A] plaintiff may pursue a private cause of action under the Consumer Fraud Act if the circumstances that relate to the disputed transaction occur primarily and substantially in Illinois." *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 187, 835 N.E.2d 801, 853–54 (2005). L2 argues that the "SSP scheme was organized, conducted, and executed from Illinois and directed, at least in part, to market participants in Illinois." This is one factor relevant to whether L2 may pursue its ICFA counterclaim. *See id.* ("We agree with the appellate court that the place where a company policy is created or where a form document is drafted may be a relevant factor to consider in determining the location of a consumer transaction."). But it is not enough on its own. *Id.* at 189 ("The appellate court's conclusion that a scheme to defraud was "disseminated" from [Illinois] is insufficient."). Here, many of the properties at issue were outside Illinois, and the individuals allegedly deceived by the Poor Performance Letters were outside Illinois.

Further, L2 has not alleged a nexus between the Counterclaim Defendants alleged conduct and Illinois consumers. "[A] business plaintiff under the ICFA must show a 'nexus between the complained of conduct and consumer protection concerns." *Cmty. Bank of Trenton v. Schnuck Markets, Inc.*, 887 F.3d 803, 823 (7th Cir. 2018); *see also Sabrina Roppo v. Travelers Com. Ins. Co.*, 869 F.3d 568, 595 (7th Cir. 2017)("the state courts have held [the IFCA] applies to consumer transactions or those having a consumer nexus"). While L2 argues that landlords of Walgreens-leased properties were harmed by the Counterclaim Defendants, (R. 493 at 36), nothing in the counterclaim points to consumer protection concerns within the meaning of the IFCA. Therefore, L2 has failed to state a claim under the ICFA.

Illinois Uniform Deceptive Trade Practices Act. L2 alleges that the Counterclaim Defendants caused a likelihood of confusion as to the source, sponsorship, approval, or certification of goods or services under 815 ILCS 510/2(2), caused a likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another under 815 ILCS 510/2(3), and disparaged the goods, services, or business of another by false or misleading representations of fact under 815 ILCS 510/2(8). The parties agree that, like the ICFA, the disputed transaction in a claim under the IUDTPA must occur primarily and substantially in Illinois. The transactions that give rise to L2's IUDTPA claim are the same as those that give rise to L2's ICFA claim. As a result, L2's IUDTPA must meet the same fate. L2 cannot pursue its IUDTPA because the disputed transactions did not primarily and substantially occur in Illinois.

Statute of limitations. Counterclaim Defendants Noble, Martinez, Flores, and Cardinal argued that L2's RICO counterclaims are time-barred. "[B]ecause affirmative defenses frequently 'turn on facts not before the court at [the pleading]

stage,' dismissal is appropriate only when the factual allegations in the complaint unambiguously establish all the elements of the defense." *Hyson USA, Inc. v. Hyson 2U, Ltd.*, 821 F.3d 935, 939 (7th Cir. 2016) (citations omitted). According to Noble and Martinez, L2 alleged that it learned of the SSP in 2019. (R. 459 at 5-6.) But, as L2 argues, the allegations do not show that L2 learned about all aspects of the SSP. While paragraphs 64 and 65 of the counterclaim indicate that Walgreens told L2 something about the "kickback scheme at the heart of the flipped sale," there is no indication in the counterclaim that L2 knew about the poor performance letters that allegedly drove the scheme. Further, Noble and Martinez fail to address when L2 learned of its injury. "A plaintiff does not need to know that his injury is actionable to trigger the statute of limitations—the focus is on the discovery of the harm itself, not the discovery of the elements that make up a claim." *Cancer Found., Inc. v. Cerberus Cap. Mgmt., LP*, 559 F.3d 671, 674–75 (7th Cir. 2009). For these reasons, the motions to dismiss the RICO claims as time-barred are denied.

Date: March 10, 2025

JEREMY C. DANIEL
United States District Judge