# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| WALGREEN CO., <br> Plaintiff <br><br> v. <br><br> AARON PETERS, *et al.*, <br> Defendants | No. 21 CV 2522 <br><br> Judge Jeremy C. Daniel |

## MEMORANDUM OPINION AND ORDER

This case is before the Court on the counterclaim defendant's motion to dismiss the amended counterclaim. (R. 663; R. 664.) The amended counterclaim alleges claims under the Racketeer Influenced and Corrupt Organizations Act, Illinois state law for tortious interference with prospective economic advantage, the Illinois Consumer Fraud and Deceptive Business Practices Act, and the Illinois Uniform Deceptive Trade Practices Act. (R. 641.) For the reasons discussed in this order, the Court grants-in-part and denies-in-part the motion.

## BACKGROUND

This case is before the Court on counterclaim defendants Walgreen Co. ("Walgreens"), Christoper Noble, Haidee Martinez, Steven M. Swanson II, Swanson Development Group LLC ("Swanson"), Yvette Flores, and Cardinal Green Investments LLC's ("Cardinal") motion to dismiss counterclaim plaintiff L2 Partners LLC's ("L2") amended counterclaim. (R. 663; R. 664.)[1] L2 filed its first counterclaim

---

[1] For ECF filings, the Court cites to the page number(s) set forth in the document's ECF header unless citing to a particular paragraph or other page designation is more appropriate.

bringing claims against all counterclaim defendants[2] under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)–(d), (Counts I & II), Illinois state law for tortious interference with prospective economic advantage (Count III), and the Illinois Uniform Deceptive Trade Practices Act ("IDTPA"), 815 ILCS 510/1 *et seq.*, (Count V); L2 also brought a claim under the Illinois Consumer Fraud and Deceptive Business Practices Act, ("ICFA") 815 ILCS 505/1 *et seq.*, (Count IV) against Walgreens. (R. 440 at 110, 119, 120, 123–24.) The Court denied the counterclaim defendants' motions to dismiss Counts I–III of L2's first counterclaim but granted the motions with respect to Counts IV and V. (R. 613.) L2 has since filed an amended counterclaim alleging the same five counts. (*See generally* R. 640; R. 641.)

Generally, L2 alleges the counterclaim defendants developed a kickback scheme called the Shared Savings Program ("SSP") to generate quick cash at the expense of landlords who owned Walgreens-leased properties. (R. 640 ¶¶ 2–3.) Under the alleged scheme, Walgreens first sent landlords "poor performance" letters falsely stating that their stores were at risk of closing. (*Id.* ¶ 22.) This frightened landlords into selling their properties below fair market value. (*Id.*) On behalf of Walgreens, Noble and Martinez recruited Swanson, controlled by Steven M. Swanson II, and

---

For documents filed under seal, the Court cites the sealed version of the documents while attempting not to reveal any information that could be reasonably deemed confidential. Confidential information is discussed to the extent necessary to explain the path of the Court's reasoning. *See In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010); *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000).

[2] The original counterclaim also named several other counterclaim defendants who were dismissed and not re-named in the amended counterclaim.

2

Cardinal, controlled by Flores, to purchase the properties. (*Id.* ¶ 2.) Walgreens would also, in some cases, exercise its right of first refusal to match other offers and then assign the purchases to Swanson or Cardinal. (*Id.* ¶ 8.) Walgreens would then negotiate more valuable rental agreements with Swanson and Cardinal, increasing the properties' values; Swanson and Cardinal would sell the properties at a profit and kickback a portion of those profits to Walgreens. (*Id.* ¶ 4.) This scheme put L2 at a competitive disadvantage in the market for Walgreens-leased properties. (*Id.* ¶ 26.)

## LEGAL STANDARD

The counterclaim defendants move to dismiss L2's amended counterclaim under Rules 12(b)(1), 12(b)(6), and 9(b) of the Federal Rules of Civil Procedure. (R. 663 at 1.)

"Rule 12(b)(1) is the means by which a defendant raises a defense that the court lacks subject-matter jurisdiction." *Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 279 (7th Cir. 2020). A motion under Rule 12(b)(1) may be either a facial challenge or a factual challenge. "A facial attack tests whether the allegations, taken as true, support an inference that the elements of standing exist." *Id.* In a factual challenge, "the [C]ourt may consider and weigh evidence outside the pleadings to determine whether it has power to adjudicate the action." *Id.* (citing *Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 173 (2017)).

The Court applies the same standard on a Rule 12(b)(6) motion to dismiss a counterclaim as it does on a motion to dismiss a complaint for failure to state a claim. *See Cozzi Iron & Metal, Inc. v. U.S. Off. Equip., Inc.*, 250 F.3d 570, 574 (7th Cir. 2001).

3

To survive under Rule 12(b)(6), a pleading must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A counterclaim satisfies this standard when its factual allegations "raise a right to relief above the speculative level." *See Twombly*, 550 U.S. at 555–56 (citations omitted). The Court "accept[s] the allegations in the complaint as true unless they are 'threadbare recitals of a cause of action's elements, supported by mere conclusory statements.'" *Katz-Crank v. Haskett*, 843 F.3d 641, 646 (7th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 663).

Additionally, "under Rule 9(b), a [pleading] 'alleging fraud or mistake . . . must state with particularity the circumstances constituting fraud or mistake.'" *United States ex rel. Presser v. Acacia Mental Health Clinic*, 836 F.3d 770, 776 (7th Cir. 2016) (second alteration in original) (quoting Fed. R. Civ. P. 9(b)). The pleading "ordinarily must describe the 'who, what, when, where, and how' of the fraud—'the first paragraph of any newspaper story.'" *Id.* (quoting *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009)).

## ANALYSIS

### I. DOCUMENTS ATTACHED TO THE MOTION

The counterclaim defendants first argue that the Court should review and consider exhibits attached to their motion (R. 663-2 to R. 663-9; R. 664-7 to R. 664-11) to resolve whether L2 has standing to bring its RICO and tortious interference claims. They argue the Court may consider these exhibits as (1) "necessary for the Court to resolve the jurisdiction issue of standing," or (2) because they "are central to

4

L2's claims" or "are cited or incorporated by reference in L2's Amended Counterclaim." (R. 663-1 at 7 n.5.) The Court will address each of these arguments in turn.

First, the Court does not agree that it may consider these exhibits to resolve the jurisdictional issue. The counterclaim defendants are correct in stating that the Court may consider extrinsic evidence to resolve the issue when a party brings a factual challenge to the Court's jurisdiction under Rule 12(b)(1). However, "where a challenge to the [C]ourt's jurisdiction is also a challenge to the existence of a federal cause of action"—or, in other words, "also an element of [the] plaintiff's federal cause of action"—"the Supreme Court has stated that jurisdiction cannot be defeated by the possibility that [the] plaintiff may not have stated a cause of action." *Malak v. Associated Physicians, Inc.*, 784 F.2d 277, 279 (7th Cir. 1986) (citing *Bell v. Hood*, 327 U.S. 678, 682 (1946)).

The counterclaim defendants' jurisdictional argument is that L2 lacks standing because the counterclaim defendants never harmed L2. (*See* R. 663-1 at 14–20, 24–26.) To establish standing, "a litigant must show [among other things] . . . that she 'suffered a concrete and particularized injury that is either actual or imminent'" and "that the injury is fairly traceable to the defendant." *Milwaukee Police Ass'n v. Flynn*, 863 F.3d 636, 639 (7th Cir. 2017) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007)). However, L2 must also prove this as part of its RICO and tortious interference claims. To succeed on its a tortious interference claim under Illinois law, L2 must prove "damage . . . resulting from the defendant's interference." *Borsellino*

5

*v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 508 (7th Cir. 2006) (quoting *Voyles v. Sandia Mortg. Corp.*, 751 N.E.2d 1126, 1133–34 (2001)). Likewise, L2's RICO claims require proof that L2 was a "person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. 1964(c). Though this "has been interpreted as a standing requirement, rather than an element of the cause of action," *Vazquez v. Cent. State Joint Bd.*, 547 F. Supp. 2d 833, 856 (N.D. Ill. 2008), it is a statutory standing requirement, *see Sidney Hillman Health Ctr. of Rochester v. Abbott Laboratories*, 192 F. Supp. 3d 963, 967 (N.D. Ill. 2016) (citing *DeGuelle v. Camilli*, 664 F.3d 192, 199 (7th Cir. 2011)).

> Statutory standing specifically asks whether a party can obtain relief under the [applicable law], which means that, despite its name, it does not actually implicate standing or subject matter jurisdiction at all. Statutory standing instead addresses whether there is a valid cause of action under which to proceed and thus requires a court to conduct its analysis with the same latitude afforded to the plaintiffs as in an analysis for dismissal under Rule 12(b)(6).

*Orthopediatrics Corp. v. Wishbone Med., Inc.*, No. 20 C 929, 2021 WL 3887243, at *4 (N.D. Ind. Aug. 31, 2021) (citations omitted). Because § 1964(c) is a statutory standing requirement, it goes to the existence of a cause of action rather than the Court's jurisdiction. Accordingly, "the factual dispute[s] about injury-in-fact here present[] a distinct problem because [they are] inherently intertwined with the merits" of L2's claims. *Id.* at *5 (collecting cases and noting "[p]rior courts confronted with similar situations of intertwined standing and merits decisions at the motion to dismiss stage have held that dismissal for lack of standing is not appropriate"). The Court therefore finds resolving the counterclaim defendants' jurisdictional argument as a factual

6

challenge would be inappropriate at this stage; consequently, reviewing the counterclaim defendants' exhibits on that basis would be inappropriate. Specifically, the Court does not consider Exhibits A–F, L and M, which the counterclaim defendants argue prove L2 lacks standing. (R. 702 at 3.)

Second, the Court disagrees that it may consider the counterclaim defendants' exhibits, except for Exhibit H, because they are central to or referenced in L2's Amended Counterclaim. "In general, a court may only consider the . . . complaint when ruling on a Rule 12(b)(6) motion." *Burke v. 401 N. Wabash Venture, LLC*, 714 F.3d 501, 505 (7th Cir. 2013). However, "[d]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim." *Id.* (quoting *McCready v. eBay, Inc.* 453 F.3d 882, 891 (7th Cir. 2006)). The purpose of this is "to prevent parties from surviving a motion to dismiss by artful pleading or by failing to attach relevant documents." *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002). This rule "seeks to avoid the misleading impression created by taking matters out of context" in the same way the rule of completeness under Fed. R. Evid. 106 does. *Magellan Int'l Corp. v. Salzgitter Handel GmbH*, 76 F. Supp. 2d 919, 923 (N.D. Ill. 1999) (citation modified). However, much authority "cautions against inclusion of tenuously connected materials supplied by [d]efendants." *Polley v. Nw. Univ.*, 560 F. Supp. 3d 1197, 1205–06 (N.D. Ill. 2021) (collecting cases). Though the exact scope of the exception is uncertain, it does include "cases in which the suit is on a contract or the plaintiff, if he has not attached, has at

7

least quoted from, the document later submitted by the defendant." *Tierney v. Vahle*, 304 F.3d 734, 739 (7th Cir. 2002).

The counterclaim defendants argue Exhibits I, J, and K form the basis for L2's allegation that the counterclaim defendants caused L2 damage in the form of lost opportunities. (R. 702 at 3.) These exhibits include contracts and email communications. (*See* R. 664-9 to 664-11.) Though this suit does involve contracts, contracts do not form the basis of these claims as they would in a breach of contract case. Outside that context, the exhibits are like any other evidence and do not receive special status at this stage. The counterclaim defendants make the additional argument that "L2 identifies [Exhibit K] by name in its pleading," (R. 702 at 3), but these mere mentions are insufficient. (*See* 640 ¶¶ 267, 281.)

Regarding Exhibit G, the counterclaim defendants argue "L2 *explicitly* identifie[d] [the exhibit] in its Amended Counterclaim, and [the exhibit] provides the basis for its central allegation about 'consumer confusion' in Count IV," the ICFA claim. (R. 702 at 3.) Exhibit G is an email chain, with certain portions redacted, where Walgreens said it was exercising its right of first refusal. (R. 664-7.) Though the exhibit may be relevant to Count IV, it is not so clearly central in the way that a contract is central to a breach of contract claim. Nor does the amended counterclaim include so much of the email chain's substance that the Court must review its entirety for the sake of completeness. (*See* R. 640 ¶ 272.)

The Court, however, agrees that it may review Exhibit H in considering the counterclaim defendants' motion to dismiss. Exhibit H is an email chain, a portion of

8

which L2 quoted in the amended counterclaim and attached as an exhibit. (R. 664-8; R. 640 ¶ 273.) Exhibit H provides the complete document and is therefore appropriate for the Court to review at the motion to dismiss stage.

## II. RICO Claims (Counts I & II)

The Court already declined to consider the counterclaim defendants' factual challenge to L2's standing to bring its RICO claims.[3] However, the Court must also evaluate the defendants' facial standing challenge. (*See* R. 663-1 at 13 (describing its challenge as "partially facial and partially factual").)

First, the counterclaim defendants argue L2 failed to cure its "lost opportunities" theory: that the alleged scheme deprived L2 "of management fees, consulting fees, and any appreciation in the value of the properties, as well as the lost opportunity to flip the properties as [the counterclaim d]efendants themselves did." (R. 640 ¶ 232.) The Court's order on the counterclaim defendants first motion to dismiss found this alleged harm was

> inherently speculative as it depends on several variables, e.g. whether a store would have been listed for sale, whether it would have been in a market L2 was interested in, whether the price would have been one L2 would have been willing to pay, whether L2 would have had the

---

[3] The counterclaim defendants argue L2 lacks standing to bring its RICO claims and that the new allegations in the amended counterclaim foreclose L2's pleading honest services fraud as a RICO predicate. (R. 663-1 at 14–24.) Specifically, the counterclaim defendants argue their exhibits disprove L2's standing theory for certain properties: the El Paso and Circle Pines properties. (R. 663-1 at 14–17.) The Court rejects these arguments because they rely solely on exhibits the Court cannot consider at this stage. (*See id.* (citing counterclaim defendants' Exhibits C–E, L–M).) The Court also rejects the counterclaim defendants' arguments opposing L2's "lost opportunities" theory to the extent they rely on extrinsic documents. (*See id.* at 19 (citing counterclaim defendants' Exhibits A–B, J–K).)

9

> necessary funding to purchase the property, etc., which render any alleged harm uncertain.

(R. 613 at 3.) The amended counterclaim remedies these deficiencies; it lists 25 properties which the counterclaim defendants allegedly flipped and L2 offered to purchase. (R. 640 ¶¶ 106–204.) L2 has therefore "alleged concrete, compensable damages flowing directly from [the] alleged scheme." *Cement-Lock v. Gas Tech. Inst.* No. 05 C 0018, 2006 WL 3147700, at *4 (N.D. Ill. Nov. 1, 2006).

Second, the counterclaim defendants argue the additional allegations in the amended counterclaim foreclose L2's claim of honest services fraud as a RICO predicate act. (R. 663-1 at 20–24.) "The breach of a fiduciary duty is a required element of . . . honest-services fraud . . . ." *United States v. Nayak*, 769 F.3d 978, 979 n.1 (7th Cir. 2014). The amended counterclaim alleges the kickback scheme violated the Walgreens Code of Conduct for Suppliers (R. 640 ¶¶ 209–10), which is sufficient to allege a breach of fiduciary duty. *See SEC v. Steffes*, 805 F. Supp. 2d 601, 614–16 (N.D. Ill. 2011) (holding allegations that employees violated a company code of conduct sufficiently alleged a breach of fiduciary duty). The counterclaim defendants point to documents attached to the amended counterclaim showing that the counterclaim defendants disclosed and received authorization for these transactions. (R. 663-1 at 21.) However, reading the amended counterclaim in a light most favorable to L2, which the Court must do even when Rule 9(b)'s heightened pleading standard applies, this at best presents a factual issue to be resolved at a later point. *See, e.g.*, *Sloan v. Anker Innovations Ltd.*, 711 F. Supp. 3d 946, 965 (N.D. Ill. 2024)

10

(concluding a complaint, reviewed in the light most favorable to the plaintiffs, met the Rule 9(b) particularity standard).

For these reasons, the counterclaim defendants' motion to dismiss is denied with respect to Counts I and II.

### III.　INTERFERENCE CLAIM (COUNT III)

"To state a claim under Illinois law for intentional interference with prospective economic advantage 'a plaintiff must allege (1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference.'" *Foster v. Principal Life Ins. Co.*, 806 F.3d 967, 971 (7th Cir. 2015) (quoting *Voyles*, 751 N.E.2d at 1133).

The counterclaim defendants argue L2 lacks standing to bring its tortious interference with prospective economic advantage claim because "L2's business expectancy . . . was solely based on the *submission* of a letter of intent," and because "L2's allegations indicate that the sole proximate cause of its harm was being outbid by a competing open offer." (R. 663-1 at 24–25 (emphasis in original).) This "standing" argument is a repackaged version of arguments in Walgreens' first motion to dismiss (*See* R. 457 at 29–33.) There, Walgreens argued L2's tortious interference claim was barred by the privilege of lawful competition, and that L2 did not have a reasonable expectation of a prospective business advantage because L2 only submitted an offer to purchase. (*Id.*)

11

The lawful competition privilege is an affirmative defense; L2 does not need to plead around it, and the amended counterclaim does not plead facts that show it applies. *See ATC Healthcare Servs. Inc. v. RCM Techs. Inc.*, 282 F. Supp. 3d 1043, 1053 (N.D. Ill. 2017) (citing *U.S. Gypsum Co. v. Ind. Gas Co.*, 350 F.3d 623, 626 (7th Cir. 2003)) ("[T]he Illinois Supreme Court classifies the competitor's privilege as an affirmative defense. [A complaint] is generally not required to plead around an affirmative defense to survive a motion to dismiss."). However, L2 is required to plead "a reasonable expectancy of entering into a valid business relationship." *Foster*, 806 F.3d at 971. The amended counterclaim achieves this. "Under Illinois [l]aw, [p]laintiffs can successfully allege a reasonable expectancy of entering into a business relation by alleging prospective business with specific companies." *Pittsfield Dev., LLC v. Lynd*, No. 19 C 01321, 2021 WL 3618275, at *5 (N.D. Ill. Aug. 16, 2021) (citing *Schuler v. Abbott Laboratories*, 639 N.E.2d 144 (Ill. App. Ct. 1993)) (finding reasonable expectation adequately pled based on letters of intent). The amended counterclaim alleges L2 had this reasonable expectation based on letters of intent submitted to the owners of various Walgreens-leased properties. (R. 640 ¶¶ 88, 98–101, 246.)

The counterclaim defendants also argue the amended counterclaim does not allege intentional and unjustified interference. (R. 663-1 at 25–26.) "Examples [of such interference] include 'fraud, deceit, intimidation, or deliberate disparagement." *Brinley Holdings Inc. v. RSH Aviation, Inc.*, 580 F. Supp. 3d 520, 557 (N.D. Ill. 2022) (quoting *Soderlund Bros., Inc. v. Carrier Corp.*, 663 N.E.2d 1, 8 (Ill. App. Ct. 1995)).

12

It is "confined to cases in which the defendant employed unlawful means to stiff a competitor." *Speakers of Sport, Inc. v. ProServ, Inc.* 178 F.3d 862, 867 (7th Cir. 1999). Because the Court previously found L2 sufficiently alleged RICO predicates of various types of fraud (*see supra*; R. 613 at 3–4), the Court finds the amended complaint alleges intentional and unjustified interference.

For these reasons, the counterclaim defendants' motion to dismiss is denied with respect to Count III.

## IV.  ICFA AND IDTPA CLAIMS (COUNTS IV & V)

The Court previously dismissed L2's claim under the ICFA because L2 failed to allege a nexus between the alleged conduct and Illinois consumers. (R. 613 at 6.) The Court also dismissed its claim under the IDTPA because "the disputed transactions did not primarily and substantially occur in Illinois." (*Id.*) The counterclaim defendants argue that these two claims continue to be deficient in these respects. (R. 663-1 at 2.)

"[A] plaintiff may pursue a private cause of action under the [ICFA or the IDTPA] if the circumstances that relate to the disputed transaction occur primarily and substantially in Illinois." *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 853–54 (Ill. 2005) (discussing the ICFA); *accord Ipox Schuster, LLC v. Nikko Asset Mgmt. Co., Ltd.*, 191 F. Supp. 3d 790, 807–08 (N.D. Ill. 2016) (citing *Avery*, 835 N.E.2d at 854) (discussing the IDTPA). In its response brief, L2 identifies allegations in the amended counterclaim identifying the parties' connections to Illinois. (R. 686 at 28–29.) These are the same allegations the Court previously concluded were not sufficient. (*See* R. 493 at 35 (citing the counterclaim defendants' locations in Illinois,

13

communications originating from Illinois, and proceeds from the transactions flowing back to Illinois).) L2's amended counterclaim merely breaks these same allegations into smaller pieces; doing so does not increase the sum of the parts.

L2 also argues that the amended counterclaim alleges "[t]he agreements . . . to deceptively execute new leases, and to allocate and distribute proceeds from the SSP transactions, were executed in and governed by the laws of Illinois," (R 686 at 29), but the amended counterclaim tells a different story. It only alleges that agreements between certain counterclaim defendants "to execute new leases and allocate and distribute sales proceeds were governed by the laws of Illinois" (R. 640 ¶ 277); this says nothing about where the disputed transactions, *i.e.*, the underlying property flips, occurred. However, L2 does allege that it failed to purchase two properties located in Illinois, the Sycamore and Sterling properties. (*Id.* ¶ 59.) With respect to these properties, L2 sufficiently alleged that the ICFA and IDTPA apply.

### A. ICFA Claim (Count IV)

The counterclaim defendants argue that the Sycamore and Sterling properties are not actionable under the ICFA because the counterclaim defendants did not allege the required elements. (R. 663-1 at 26–27.) "The elements of a claim under ICFA are: (1) a deceptive or unfair act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; and (3) the unfair or deceptive practice occurred during a course of conduct involving trade or commerce." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 934 (7th Cir. 2010) (citing *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (2002)).

L2's ICFA claim fails on the intent element. The intent element requires that the defendant intended for the plaintiff to rely on the deceptive or unfair practice, even if the defendant did not directly engage in the deceptive or unfair practice with the plaintiff. *See Clark v. Receivables Mgmt. Partners, LLC*, No. 21 C 00298, 2022 WL 767149, at *3 (citing *Capiccioni v. Brennan Naperville*, 791 N.E.2d 553, 558 (Ill. App. Ct. 2003)). L2 argues it "has pleaded facts showing that Walgreens specifically sought to exercise its [right of first refusal] to take opportunities from L2 . . . even where Walgreens had previously rejected the deals." (R. 686 at 32.) But this means that Walgreens intended to cause damage to L2; it does not mean that Walgreens also intended for L2 to rely on any deceptive or unfair practice. Indeed, if Walgreens' goal was to exercise its contractual right of first refusal, as L2 alleges, it is unclear in what way Walgreens expected L2 to rely on that misrepresentation; whether L2 pressed forward with its attempted purchase or not would have made no difference to Walgreens. Walgreens' lack of intent for specifically L2 to rely on any deceptive or unfair practice is underscored by an email in the amended complaint where Walgreens said it would decline to exercise its right of first refusal. (*See* R. 640 ¶ 270; R. 641-3.) L2 received this information through a listing agent, not Walgreens. (*Id.*) There is no indication that Walgreens even intended L2 to receive this alleged misrepresentation.

For these reasons, the counterclaim defendants' motion to dismiss is granted with respect to Count IV.

### B. IDTPA Claim (Count V)

Moving to L2's IDTPA claim, the counterclaim defendants argue L2 failed to allege consumer confusion or deception. (R. 663-1 at 27.) As relevant here, the IDTPA defines a "deceptive trade practice" as one that "(2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;" "(3) causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another;" or "(8) disparages the goods, services, or business of another by false or misleading representation of fact." 815 ILCS 510/2(2), (3), (8). L2 alleges the counterclaim defendants misrepresented that stores were in danger of closing through "poor performance" letters, "misrepresenting to new buyers that they are dealing with Swanson Development or Cardinal . . . when in truth Walgreens is behind the transaction," and "failing to disclose the truth of the SSP scheme to potential buyers and sellers." (R. 640 ¶ 287.) Only the latter two theories are applicable because L2 does not allege that poor performance letters were used in either the Sycamore or Sterling properties' sales. (*See* R. 640 ¶¶ 125–28, 165–68.) According to the counterclaim defendants, an email exchange between defendant Flores and the Sycamore property's landlord proves a lack of deception because "the landlord was aware of the material aspects of the transaction *after* Walgreens exercised the [right of first refusal]."[4] (R. 663-1 at 27–28 (alteration in original) (citing R. 664-8).) Though this may cut against L2's allegations, it does not definitively show a lack of deception.

---

[4] The counterclaim defendants also cite Exhibit G as support. (*See* R. 663-1 at 27.) For the reasons stated *supra*, the Court does not consider this argument.

16

The counterclaim defendants also argue that the amended counterclaim does not allege trademark infringement, false advertising, or an effect on a good or service as required by the IDTPA. (R. 663-1 at 27 n.20.) Though the text of the IDTPA does not clearly limit itself to trademark or false advertising cases, *see generally* 815 ILCS 510, the counterclaim defendants correctly point out that the amended counterclaim fails to allege the "goods or services" element. The amended counterclaim does not identify any good or service, the source of which the counterclaim defendants caused confusion, under subsection (2). (*See generally* R. 640 ¶¶ 283–92.) At best, it alleges deception about the identity of the *purchasers*,[5] not "the source, sponsorship, approval, or certification of goods or services." (*See id.* ¶ 287); 815 ILCS 510/2(2). The counterclaim defendants are similarly correct regarding L2's claim under subsection (8); the amended counterclaim does not allege the counterclaim defendants disparaged the quality of any goods or services concerning the Sycamore and Sterling properties' purchases. *See Kole v. Village of Norridge*, 941 F. Supp. 2d 933, 964 (N.D. Ill. 2013) (citing *Am. Wheel & Eng'g Co. v. Dana Molded Prods.*, 476 N.E.2d 1291, 1295–96 (Ill. App. Ct. 1985)) ("To state a claim under the IDTPA, a plaintiff must allege that the defendant disparaged the quality of its goods or services."). Subsection (3), on the other hand, does not contain a "goods or services" requirement. *See* 815 ILCS 510/2(3). Count V may proceed under that section.

---

[5] The amended counterclaim does allege, "In effect, Walgreens was both the buyer and the seller of each property in the SSP." (R. 640 ¶ 5.) But the complaint does not allege with particularity any misrepresentations made after the counterclaim defendants acquired the properties or how those misrepresentations harmed L2. *See Jano Just. Sys., Inc. v. Burton*, No. 08 C 3209, 2008 WL 5191765, at *3 (N.D. Ill. 2008) (looking to whether the underlying conduct sounds in fraud to decide whether to apply Fed. R. Civ. P. 9(b)).

17

## CONCLUSION

The counterclaim defendants' motion to dismiss [663], [664] is granted as to Count IV and denied as to Counts I, II, III, and V. The counterclaim plaintiff's request for leave to amend is granted. No further amendments will be allowed absent extraordinary circumstances. The counterclaim plaintiff shall file any amended counterclaim by July 11, 2025, and the counterclaim defendants shall answer the operative counterclaim by August 1, 2025.

Date: June 20, 2025

_____
JEREMY C. DANIEL
United States District Judge