**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| WALGREEN CO., | Case No. 1:21-cv-02522 |
| Plaintiff, | Judge Jeremy C. Daniel |
| | Magistrate Judge Daniel P. McLaughlin |
| v. | |
| | **Oral Argument Requested** |
| AARON PETERS; L2 PARTNERS, LLC; LANCE LAZARUS; DANIEL MAROTTA; TAD GALIN; JEFF RICHARDS; LJL MANAGEMENT HOLDINGS LLC; APOLLO DEVELOPMENT, LLC; TKG EQUITY LLC; VIKING REAL ESTATE LLC; ERLANGER DIXIE LLC; LOUISVILLE HIKES LANE LLC; OKC HEFNER LLC; BILL PEDERSEN; MATTHEWS REAL ESTATE INVESTMENT SERVICES; JAMES LAMBERT; ARISTEDES HASEOTES; BYRON HASEOTES; and PETER NEARY, | |
| Defendants. | |

## DEFENDANTS MATTHEWS REAL ESTATE INVESTMENT SERVICES, INC. AND BILL PEDERSEN'S RULE 11 MOTION FOR SANCTIONS

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION ...................................................................................................... 1

II.   SUMMARY OF THE ARGUMENT ......................................................................... 2

III.  LEGAL STANDARD................................................................................................. 3

IV.  FACTUAL BACKGROUND..................................................................................... 5

     A.    The Sales Estimates that Matthews Received from L2 Were Wildly Inaccurate, and Hence Cannot Be Walgreens's Proprietary Information. ............................... 5

     B.    The Two Lists of Property Addresses that L2 Sent Matthews Contained No Confidential Data, and Hence Cannot be Walgreens's Proprietary Information... 7

     C.    Matthews Did Not Conceal Any Maintenance Credits......................................... 8

     D.    Pedersen's 2015 Email Does Not Evidence Receipt or Misuse of Confidential Information ......................................................................................................... 9

     E.    The Timing of Walgreens's Purported Evidence Against Matthews Shows that it Cannot Support a Claim Against Matthews........................................................ 10

     F.    Matthews Did Not Misappropriate Walgreens's Trade Secrets ......................... 11

V.   ARGUMENT............................................................................................................. 11

     A.    Count One (DTSA) Lacks any Evidentiary Basis as Against Matthews............. 11

     B.    Count Two (RICO) Lacks any Evidentiary Basis as Against Matthews ............. 13

     C.    Count Three (RICO Conspiracy) Lacks Any Evidentiary Basis as Against Matthews............................................................................................................ 13

VI.  THE COURT SHOULD ORDER SANCTIONS .................................................. 14

VII. CONCLUSION........................................................................................................ 15

Defendants Matthews Real Estate Investment Services, Inc. and Bill Pederson (together, "**Matthews**") hereby move for sanctions pursuant to Federal Rule of Civil Procedure 11(b)(3) against Plaintiff Walgreen Co. ("**Walgreens**") and its counsel.

## I.       INTRODUCTION

After conducting extensive discovery in a related lawsuit then pending in Tennessee State Court,[1] Walgreens and its counsel chose to sue Matthews in *this* action by filing first an amended complaint, and then a second amended complaint (the "**SAC**"). The sole basis for Walgreens's claims against Matthews in the SAC is the allegation that Matthews received from the L2 defendants certain confidential and proprietary information concerning sales figures and other statistics of various Walgreens store locations, which information Matthews allegedly used to broker the sale of those Walgreens store locations to the L2 defendants. Walgreens's allegation is not only unsupported by the evidence, but it is contradicted by Walgreens's own internal documents.

In the SAC, Walgreens quotes extensively from the depositions it took in the Tennessee Action. Those quotes make clear that, prior to filing the SAC, Walgreens conducted far-reaching discovery into the alleged theft of trade secrets by L2 and the alleged transmission of those trade secrets to Matthews. Discovery in the Tennessee Action included deposing the very people who are alleged to have shared trade secrets with Matthews.[2] But despite Walgreens's broad discovery in the Tennessee Action, Walgreens had – and still has – no evidence that Matthews ever received or used any allegedly stolen trade secrets. In suing Matthews in this action, Walgreens and its

---

[1] *Walgreens v. L2 Partners, LLC et al.,* 21CV-50235, Franklin County, Tennessee (the "**Tennessee Action**").

[2] In the Tennessee Action, Matthews was subpoenaed and produced extensive documentation relating to these allegations. Rowe Decl. ¶ 5.

counsel violated Rule 11 of the Federal Rules of Civil Procedure, by which each pleading filed with the Court certifies that "the factual allegations have evidentiary support or, if specifically so identified, are reasonably based on belief or a lack of information." Fed. R. Civ. P. 11(b)(3).

The egregious nature of Walgreens's and its counsel's Rule 11 violation became even more clear when discovery in this case revealed that what little information Matthews *did* receive about Walgreens (2015 estimates of sales numbers for a few Walgreens stores), could *never* have been misappropriated from Walgreens because those estimates do not come close to matching Walgreens's actual sales data. By analogy, Walgreens accuses Matthews of using a stolen answer key; the problem is that the answers are wrong and hence could not have originated from Walgreens's *real* answer key. Matthews did not learn of this disconnect until recently, but Walgreens and its counsel had the real answer key all along. Well before filing the SAC, they knew (or at the very least should have known), that the data they claim Matthews misused did not match Walgreens's data at all. The claims against Matthews should be dismissed, and monetary sanctions should be issued against Walgreens and its counsel.

## II.     SUMMARY OF THE ARGUMENT

Walgreens filed the SAC on July 15, 2022, asserting the following claims against Matthews:

- Count I:  Misappropriation of Trade Secrets, 18 U.S.C. § 1836, Defend Trade Secrets Act ("**DTSA**");

- Count II:  Violation of 18 U.S.C. § 1962(c), Racketeering and Corrupt Organizations Act ("**RICO**"); and

- Count III:  Violation of 18 U.S.C. § 1962(2), RICO Conspiracy.

As against Matthews, all three claims are predicated on the baseless allegation that

2

Matthews received and misused Walgreens's confidential store sales data.[3] But despite extensive discovery in both this action and the Tennessee Action, Walgreens and its counsel have never had any evidence to support that claim. Indeed, Walgreens and its counsel *know* – and have always known – that the only information Matthews received consisted of store sales *estimates* that diverged so wildly from Walgreens's *actual* store sales figures that they could not have originated from Walgreens.

Pursuant to Rule 11(b)(3), by signing and filing the SAC, Walgreen's counsel certified that the factual contentions in Counts I, II, and III have evidentiary support. Fed. R. Civ. P. 11(b)(3). Yet Counts I, II, and III as against Matthews not only lack any evidentiary support, but are contrary to the actual evidence which Walgreens and its counsel possessed prior to filing the SAC.[4] For these reasons, Matthews requests the Court grant this Motion and award sanctions against Walgreens and its counsel.

### III.  LEGAL STANDARD

Rule 11(b)(3) provides that an attorney or party who signs a pleading "certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." *See U.S. Bank Nat'l Ass'n v. Sullivan-Moore*, 406 F.3d 465, 470 (7th Cir. 2005) ("Rule 11 'requires counsel to read and consider before litigating'") (quoting *Thornton v. Wahl*, 787 F.2d 1151, 1154 (7th Cir. 1986)). Rule 11 requires a court to assess "'whether the

---

[3] See SAC ¶¶ 179-190 (Count I), ¶¶ 195-196 (Count II), and ¶214 (Count III).

[4] Matthews's counsel has repeatedly urged Walgreens's counsel to take Matthews's deposition, but Walgreens's counsel has declined, even going so far as to unilaterally cancel Matthews's deposition that had been scheduled for June 9 and 10, 2025. (Rowe Decl., ¶ 6.) It appears that Walgreens's counsel does not want more confirmation of what they already know: Matthews neither received nor misused any of Walgreens's trade secrets.

party or his counsel should have known that his position is groundless.'" *CUNA Mut. Ins. Soc'y v. Office & Prof'l Empls. Int'l Union, Local 39,* 443 F.3d 556, 560 (7th Cir. 2006) (quoting *Chicago Newspaper Publishers' Asso. v. Chicago Web Printing Pressmen's Union No. 7,* 821 F.2d 390, 397 (7th Cir. 1987) (citations omitted).

In other words, Rule 11 requires attorneys and parties to conduct "reasonable research into the bases of legal claims before filing suit." *Dohm v. Gilday*, No. 02-C-9056, 2004 WL 1474581, *1 (N.D. Ill. June 25, 2004). *See also, City of Livonia Empls.' Ret. Sys. v. Boeing Co.*, 306 F.R.D. 175, 180 (N.D. Ill. 2014) ("Rule 11 imposes on attorneys an affirmative duty to conduct a reasonable inquiry into the facts and the law before filing, and … the applicable standard is one of reasonableness under the circumstances.") (ellipses in original, internal quotations omitted) (quoting *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 551 (1991)). Where, as here, the plaintiff asserts RICO claims, the Rule 11 bar is even higher:

> Given the resulting proliferation of civil RICO claims and the potential for frivolous suits in search of treble damages, greater responsibility will be placed on the bar to inquire into the factual and legal bases of potential claims or defenses prior to bringing such suit or risk sanctions for failing to do so."

*Chapman & Cole v. Itel Container Int'l B.V.,* 865 F2d 676, 685 (5th Cir. 1989).

Further, "if facts are discovered that show there is no longer a good faith basis for a position taken by a party, a pleading, motion, or other paper signed after those facts come to light reaffirming that position can be the basis of a violation of [Rule 11]." *Childs v. State Farm Mut. Auto. Ins. Co.*, 29 F.3d 1018, 1024 n.18 (5th Cir. 1994). Where the court determines that Rule 11(b) has been violated, the court "may impose an appropriate sanction on an attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c); *Royce v. Michael R. Needle P.C.*, 950 F.3d 939, 957 (7th Cir. 2020). Rule 11 sanctions may include, "if imposed on motion and warranted for effective deterrence, an order directing payment to the

4

movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." Fed. R. Civ. P. 11(c).

## IV. FACTUAL BACKGROUND

### A. The Sales Estimates that Matthews Received from L2 Were Wildly Inaccurate, and Hence Cannot Be Walgreens's Proprietary Information.

Matthews Real Estate Investment Services, Inc. is a real estate brokerage company that advises clients buying and selling commercial real estate. Declaration of Bill Pedersen ("Pedersen Decl."), ¶ 2. Pedersen, a licensed real estate agent, joined the company in 2015. Pedersen Decl., ¶ 3. That same year (2015), Pedersen began working with Defendant L2 Partners, LLC ("**L2**"), at which time he marketed for sale an L2-owned, Walgreens-leased property in Shawnee, Kansas. Pedersen Decl., ¶ 4. Also that same year, Matthews and L2 discussed Matthews assisting with the sale of other L2-owned properties, including a Walgreens in Springfield, Oregon. Pedersen Decl., ¶ 5. In connection with both the Shawnee and Springfield Properties, L2 provided Matthews with slide decks containing basic information such as the price, the lease term, and estimated sales for these properties (which L2 owned). Pedersen Decl., ¶¶ 4-5. For Shawnee, L2 provided "Reported Sales of ███████ and "Est. ████ in Total Sales." Pedersen Decl., ¶ 6 and Exhibit A thereto. For the Springfield Property, L2 provided "Est. ████ in Total Sales," which Matthews naturally understood to mean that the property had estimated total sales of ███████. Pedersen Decl., ¶ 5 and Exhibit 6 thereto.

The estimated (rather than actual) nature of the sales figures is significant, because it shows that the sales information L2 provided to Matthews was not confidential. Specifically, as required by many of its leases, Walgreens reported a *portion* of its sales revenue to its landlords (including L2), but it did not tell those landlords the *total* sales of a store. Pedersen Decl., ¶ 7. When providing sales data to its landlords, Walgreens excluded various products and, thus, reported sales that were

only a portion of the store's total actual sales. *Id.* This partial reporting of sales data was provided for in the Walgreens leases, and thus disclosed to any potential buyer of any Walgreens property. It was also widely known in commercial real estate generally, so buyers, sellers, their brokers, and lenders routinely employed shorthand methods for estimating total sales based on Walgreens's reported sales. Pedersen Decl., ¶ 6. One lender with whom Matthews interacted used a range of 2.63–3.23 times reported sales to derive an estimate of total sales. Pedersen Decl., ¶ 7. Matthews understood that L2 used a factor of 3.5 times reported sales. *Id.* Unsurprisingly, these total sales estimates were just that—estimates based on non-confidential partial sales data reported by Walgreens. These non-confidential estimates cannot support a DTSA, RICO, or RICO conspiracy claim against Matthews.

The particularly egregious nature of Walgreens's Rule 11 violation became even more apparent when Walgreens was forced to disclose their actual sales data in discovery in this case. That discovery revealed that not only were the estimates provided to Matthews non-confidential, *but they weren't even close to accurate when compared to Walgreens's actual sales data*. For instance, while L2 told Matthews that the Springfield, Oregon store had "Est. ▮▮▮▮ in Total Sales," Walgreens's own data establishes that the store actually had total sales in the range of ▮▮ ▮▮▮▮ per year. Declaration of Jill Rowe ("Rowe Decl."), ¶ 3 and Exhibit A thereto. The estimate L2 provided to Matthews was thus wrong by at least ▮▮▮▮. To Matthews's knowledge, none of the sales estimates it received from L2 match up with Walgreens's *actual* sales data.[5] Rowe Decl., ¶ 4. Walgreens has failed, despite repeated discovery requests, to produce any evidence that the data Matthews possessed matched any actual Walgreens data. To state the obvious, incorrect data that did not come from Walgreens cannot support a DTSA, RICO or RICO

---

[5] Walgreens's actual sales data was produced as "Attorneys' Eyes Only." Hence, this data has not been shared with Mr. Pedersen.

conspiracy claim against Matthews.

**B.** **The Two Lists of Property Addresses that L2 Sent Matthews Contained No Confidential Data, and Hence Cannot be Walgreens's Proprietary Information**

Other than these inaccurate, non-confidential sales estimates, the only other "data" provided to Matthews by L2 is two lists of property addresses that contained no confidential information whatsoever. Walgreens identifies these two lists as if they are evidence of Matthews's wrongdoing, but Walgreens received the lists in discovery and hence *knows* they contain no confidential information.

Specifically, after the sales of the L2 properties described above, Matthews subsequently assisted L2 in the potential purchase of additional properties leased to Walgreens. (Pedersen Decl., ¶ 9.) Whereas L2 had previously provided Matthews with sales estimates for the Walgreens-leased properties L2 already owned, L2 never provided Matthews with any information about the financial performance of stores L2 was interested in *acquiring*. *Id.* Potential L2 acquisitions were sourced in two ways. First, Matthews would learn through its routine brokerage activities of Walgreens properties that were being marketed for sale, and Matthews would simply pass along to L2 whatever information the selling owner provided. Pedersen Decl., ¶ 10. Second, and only on two occasions described in detail below, L2 identified specific properties it was potentially interested in acquiring and asked Matthews to ask those owners if they might be interested in selling. *Id.*

The first of those two occasions was January 7, 2020, when L2 sent Matthews a "list of targeted Walgreens" that contained forty-nine addresses and nothing more. Pedersen Decl., ¶ 11 and Exhibit C thereto. No sales data or other information — let alone any purportedly confidential or proprietary information belonging to Walgreens — was communicated to Matthews concerning any of those forty-nine properties. *Id.* The second occasion was July 22, 2020, when L2 sent

7

Matthews a list of forty-seven addresses that L2 called a "list of Walgreen stores we'd be interested in." Pedersen Decl., ¶ 12 and Exhibit D thereto. Yet again, no sales data or other information was communicated to Matthews concerning any of those forty-seven properties. *Id.*

To persuade this Court that Walgreens's claims against Matthews should survive Matthews's previously filed Motion to Dismiss, Walgreens and its counsel drafted the SAC to imply that these two lists contain confidential and proprietary financial data purportedly stolen by L2 from Walgreens's files.[6] That implication was sufficient to permit Walgreens to survive Matthews's motion to dismiss. But discovery in this action has subsequently proved that the implication is, and always was, flatly untrue. Neither list contained any references to any store's actual sales or any other confidential information. Pedersen Decl., ¶ 13. Nor did L2 tell Matthews how these lists of Walgreens store addresses were compiled. *Id.* Rather, L2 simply gave Matthews two lists of addresses for properties L2 was interested in potentially buying. *Id.* To again state the obvious, two non-confidential lists of property addresses cannot support a DTSA, RICO, or RICO conspiracy claim against Matthews.

### C. **Matthews Did Not Conceal Any Maintenance Credits**

When this Court denied Matthews's motion to dismiss, it did so in part based on Walgreens's vague allegation in the SAC that "L2 Defendants, or their broker, asked landlords to conceal the Partial Refund from Walgreens and delay executing an agreement." (Doc. No. 366, at pages 6, 13, citing paragraphs 85-89 of the SAC.) Notably, Walgreens phrased these allegations in the disjunctive ("L2 Defendants or their broker") and failed to specify which of L2's many brokers might have participated in the alleged partial refund scheme.[7]

---

[6] See, e.g., SAC, ¶ 56.

[7] Throughout the SAC, Walgreens refers to unspecified "brokers" as participating in L2's alleged wrongdoing. As Walgreens knows from its discovery in the Tennessee Action and in this action, Matthews was just one of many brokers who worked with L2.

As Walgreens and its counsel know, there is no evidence that Matthews asked landlords to conceal any partial refund from Walgreens, instructed any landlords to omit details about maintenance credits, or instructed any landlords to delay issuing refunds until after the ROFR period had ended. Matthews never did any such thing. Pedersen Decl., ¶ 14.

Indeed, the SAC's allegations regarding the alleged "Partial Refund Scheme" are quite specific, listing six specific properties, providing highly specific transaction details, and attaching specific exhibits to support the allegations. SAC, ¶¶ 85-141.[8] Despite this specificity as to all of the other transaction details, the SAC never once identifies Matthews as being involved in the "Partial Refund Scheme." Walgreens and its counsel know which brokers were involved in these transactions, and they know Matthews was not one of them. When they prepared these SAC allegations referring to "L2 or its broker," they knew quite well that the unnamed "broker" was not Matthews. While Walgreens's vague, disjunctive allegations may have sufficed for motion to dismiss purposes, they do not satisfy Rule 11, which requires actual evidence.

**D.  Pedersen's 2015 Email Does Not Evidence Receipt or Misuse of Confidential Information**

It is anticipated that Walgreens will claim that a September 25, 2015, email from Mr. Pederson to a potential buyer evidences Matthews's knowledge that L2 was stealing Walgreens's trade secrets. See SAC, Ex. 9. In that email, Pedersen writes:

> One of the partners at the sellers company is a former executive at Walgreens and **still has very strong ties to their real estate department**. He has access to information that most don't have access to and this becomes useful when looking at store performance.

Far from evidencing knowledge of misappropriation, this email confirms Mr. Pedersen's belief that L2 was obtaining its information openly from its partner's good relationships with

---

[8] Matthews was not L2's broker for any of the six transactions identified in the SAC's "Partial Refund Scheme" allegations. Pedersen Decl., ¶ 15.

Walgreens's employees (i.e., using his ongoing "very strong ties to their real estate department"). Pedersen Decl., ¶16. As much as Walgreens and its counsel try to interpret the email otherwise, it does not evidence Matthews's misuse of trade secrets.

### E. The Timing of Walgreens's Purported Evidence Against Matthews Shows that it Cannot Support a Claim Against Matthews

Walgreens's and its counsel's Rule 11 violation becomes even more apparent when considering the timing of their supposed evidence against Matthews. Tellingly, the SAC implicitly admits that Walgreens and its counsel have no evidence that L2 or anyone else misappropriated trade secrets prior to 2019.[9] See SAC, ¶ 2. No matter how hard Walgreens and its counsel try to construe them otherwise, Mr. Pedersen's 2015 emails do not evidence knowledge of an alleged theft of trade secrets four years in the future.

It is clear from the SAC that the only misappropriation Walgreens even arguably has evidence to support is data allegedly taken by Defendant Aaron Peters after October 2019. *See* SAC, ¶¶ 39-56 (describing Defendant Aaron Peters' December 2019 termination of employment with Walgreens, his alleged download of Walgreens's data, and the alleged subsequent disclosure and use of that data by L2). Indeed, the SAC defines the "Illegally Obtained Data" as the files that Mr. Peters allegedly took from Walgreens in late 2019. SAC, ¶¶ 3, 39. Mr. Pedersen's 2015 emails cannot possibly be evidence that Mr. Pedersen knew that Aaron Peters would, four years later, leave the employ of Walgreens and take Walgreens's information with him. Walgreens's and its counsel's Rule 11 violations are only highlighted by their tortured efforts to construe 2015 communications as evidence of alleged DTSA and RICO violations that would not occur for

---

[9] "As set forth herein, since at least *January 2019*, L2 Defendants, along with the Matthews Defendants and Named Investors, have engaged in a systematic scheme to enrich themselves at Walgreens's expense by buying and selling Walgreens-leased properties (or "Walgreens properties") and preventing Walgreens from exercising its contractual right of first refusal…" SAC, ¶ 2 (italics added).

another four years.

### F. Matthews Did Not Misappropriate Walgreens's Trade Secrets

In short, and contrary to the allegations of the SAC, Matthews could not have misused Walgreens's trade secrets because it never received them. The few sales estimates that Matthews did receive were wildly inaccurate and hence could not have come from Walgreens. The two lists that Walgreens highlights in the SAC as having been sent to Matthews were mere lists of addresses with *no* confidential information. And Mr. Pedersen's 2015 communications neither evidence nor imply knowledge of alleged misdeeds by other parties four years in the future. Walgreens's counsel artfully drafted the SAC, despite the lack of evidence, in such a manner as to force Matthews to defend this lawsuit. Walgreens and its counsel should be sanctioned for violating Rule 11.

## V. ARGUMENT

Walgreens's allegations against Matthews are false and have no evidentiary basis. Matthews never misappropriated Walgreens's trade secrets nor possessed, let alone used, any such trade secrets. At most, Matthews received from the owner of two Walgreens-leased properties the owner's sales estimates for those Walgreens stores, but those sales estimates so materially diverged from Walgreens's actual data that no reasonable person could conceive the sales estimates were derived from Walgreens's actual data. Walgreens knew its allegations against Matthews were without basis when Walgreens filed its claims, and those claims cannot withstand Rule 11 scrutiny.

### A. Count One (DTSA) Lacks any Evidentiary Basis as Against Matthews

A valid DTSA claim requires a "disclosure or use of a trade secret" by a person who "at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was" (1) "derived from or through a person who had used improper means to acquire the trade secret," (2) "acquired under circumstances giving rise to a duty to maintain the secrecy of the trade

11

secret," or (3) "derived from or through a person who owed a duty. . . to maintain the secrecy of the trade secret." 18 U.S.C. § 1839(5)(B); see *Sonrai Sys., LLC v. Waste Connections, Inc.*, 658 F. Supp. 3d 604, 613 (N.D. Ill. Feb. 28, 2023).

By signing the SAC, Walgreens's counsel certified he had actual evidence that Matthews disclosed or used Walgreens's trade secrets. Yet even today, no such evidence exists. As Walgreens and its counsel knew from their discovery in the Tennessee Action, Matthews only received *estimates* of store sales that diverged widely from Walgreens's internal data.

The fact that the figures received by Matthews consisted of inaccurate estimates is obvious For example, the slide deck for the Springfield property, which Walgreens claims is "the earliest known example of L2 Partners' theft" see SAC ¶ 63, refers to "Est. ▇▇ in Total Sales." Pedersen Decl., ¶ 5 and Exhibit B thereto. Matthews understood the "Est.," along with the rounded numbers, to be indicative of an estimate of total sales, not actual store sales, and certainly not an example of L2's alleged theft of confidential store sales information. Pedersen Decl., ¶¶ 4-5. If L2 had actually stolen Walgreens's sales information in 2015, it would have found a very different number for actual sales, between ▇▇▇ and ▇▇▇. Rowe Decl., ¶ 3 and Exhibit A. Walgreens knows — and has always known — that its Springfield, Oregon store did not have ▇▇ ▇▇ in total sales in 2015. Accordingly, Walgreens knows — and has always known — the information provided to Matthews was not actually Walgreens's data. Walgreens violated Rule 11 when it amended its complaint to allege facts it knew were untrue.

Walgreens's allegations fare no better as to any other property. Virtually every reference to "total sales" is described as "Est. $__M in Total Sales." For the three properties that did not explicitly employ the "Est." prefix, those communications still used round numbers, qualifiers, and "±" designations, reflecting that such numbers were estimates. Matthews always understood

12

L2's statements about "total store sales" or "actual store sales" to be estimates, and not evidence of any theft. Pedersen Decl., ¶ 8. Matthews had no reason to suspect that the estimates L2 provided were acquired by improper means (if indeed they were). Matthews understood, correctly, that L2 was providing estimates relating to individual store financial performance, as was customary in the industry. *Id.*

The evidence in Walgreens's own possession establishes that the information L2 shared with Matthews was not Walgreens's information. Indeed it was flat out wrong. In alleging otherwise in the SAC, Walgreens and its counsel violated Rule 11.

### B.  Count Two (RICO) Lacks any Evidentiary Basis as Against Matthews

To prevail on its RICO claim, Walgreens must establish that Matthews engaged in the "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 655 (7th Cir. 2015). As noted above, Rule 11 imposes an even higher evidentiary burden on plaintiffs alleging RICO violations. *Chapman & Cole v. Itel Container Int'l B.V.*, 865 F2d 676, 685 (5th Cir. 1989) ("Greater responsibility will be placed on the bar to inquire into the factual and legal bases" of potential RICO claims.)

As with the DTSA claim, Walgreens's RICO claim against Matthews is predicated on Matthews's alleged misappropriation of Walgreens's data. SAC, ¶ 195. Walgreens's trade secrets allegations do not support a RICO claim any better than they support a DTSA claim. As discussed above, it is undisputed that Matthews knew nothing about L2's alleged misappropriation of Walgreens's data, the so-called "Trade Secret Predicate Acts" in the SAC. In alleging otherwise, Walgreens and its counsel violated Rule 11.

### C.  Count Three (RICO Conspiracy) Lacks Any Evidentiary Basis as Against Matthews

To allege a RICO conspiracy claim without violating Rule 11, Walgreens must have had

evidence proving "that the conspiracy existed and that each named defendant knowingly became a member of the conspiracy with an intention to further that conspiracy." *Inteliquent, Inc. v. Free Conferencing Corp.*, 503 F. Supp. 3d 608, 632 (N.D. Ill. 2020) (citing *United States v. Volpendesto*, 746 F.3d 273, 284 (7th Cir. 2014)). Thus, Walgreens must have had evidence that (1) an agreement to facilitate the activities of those who operate the enterprise and (2) an agreement to commit at least two predicate acts. *Frost Nat'l Bank v. Midwest Autohaus*, 241 F.3d 862, 869 (7th Cir. 2001).

Like Counts I and II, Walgreens's RICO conspiracy claim against Matthews is predicated on its allegation that Matthews received and misused Walgreens's confidential information. SAC, ¶ 214. Because there is no evidence establishing that Matthews did any such thing, Walgreens's RICO conspiracy claim violates Rule 11. See *United Food & Commer. Worker Unions & Emplrs. Midwest Health Bens. Fund v. Walgreen Co.*, 719 F.3d 849, 856–857 (7th Cir. 2013).

## VI. THE COURT SHOULD ORDER SANCTIONS

For the reasons set forth above, Counts I, II, and III lack any evidentiary support with respect to Matthews. Walgreens and its counsel knew this when they filed the SAC, but they filed it anyway. They then compounded their Rule 11 violation by contesting Matthews's previously filed Motion to Dismiss, moving to defer a ruling on Matthews's motion for summary judgment, and forcing Matthews through extensive and costly discovery.

Where a court finds that Rule 11 has been violated, sanctions are mandatory. *Chapman & Cole v. Itel Container Int'l B.V.*, 865 F.2d 676, 686 (5th Cir. 1989). "[W]hether sanctions are viewed as a form of cost-shifting, compensating opposing parties injured by the vexatious or frivolous litigation forbidden by Rule 11, or as a form of punishment imposed on those who violate the rule, the imposition of sanctions pursuant to Rule 11 is meant to deter attorneys from violating

the rule." *Id.*, quoting *Thomas v. Capital Secur. Svcs., Inc.*, 836 F.2d 866, 877 (5th Cir. 1988).

On July 14, 2025, Matthews's counsel served a copy of this motion on Walgreens's counsel in accordance with Rules 5 and 11(c)(2) of the Federal Rules of Civil Procedure. Walgreens and its counsel had 21 days after service of the motion to withdraw their baseless allegations against Matthews in the SAC, but they failed to do so.[10] Accordingly, sanctions are appropriate pursuant to Rule 11(b)(3). *See*, *e.g.*, *Am. Roller Co., LLC v. Foster Adams Leasing, LLP*, 421 F. Supp. 2d 1109, 1116 (N.D. Ill. 2006) (Rule 11 "allows the imposition of sanctions upon a finding that a factual allegation had no evidentiary support, unless there was a specific disclaimer that additional investigation is necessary"; awarding sanctions); *Brandt v. Schal Assocs., Inc.*, 121 F.R.D. 368, 389 (N.D. Ill. 1988) (awarding sanctions where allegations of fraud were not well grounded in fact); *see also Methode Electrs., Inc. v. Adam Techs., Inc.*, 371 F.3d 923, 925-926 (7th Cir. 2004) (affirming court's use of inherent power to award sanctions where allegations lacked an evidentiary basis and were false).

## VII.  CONCLUSION

Based on Walgreens's and its counsel's violation of Rule 11, the Matthews Defendants requests that the Court enter an Order:

a. Striking from Counts I, II, and III of the SAC the allegations against Matthews Real Estate Investment Services, Inc. and Bill Pedersen.

b. Requiring Walgreens and its counsel to pay Matthews's reasonable attorneys' fees and other expenses incurred as a result of having to defend this baseless litigation.

c. Granting Matthews such other and further relief as the Court deems just and appropriate.

---

[10] A copy of the cover letter is attached as Exhibit B to the accompanying Declaration of Jill Rowe.

Respectfully submitted,

Date: <u>August 12</u>, 2025

_____
Jill B. Rowe
Fields Alexander (admitted *pro hac vice*)
falexander@beckredden.com
Marcos Rosales (admitted *pro hac vice*)
mrosales@beckredden.com
Kaitie Sorenson (admitted *pro hac vice*)
ksorenson@beckredden.com
    Beck Redden LLP
    1221 McKinney St. Suite 4500
    Houston, TX 77010
    Phone: (713) 951-3700

Paul S. Mudrich (admitted *pro hac vice*)
paul.mudrich@matthews.com
Jill B. Rowe (admitted *pro hac vice*)
jill.rowe@matthews.com
    Matthews Real Estate Investment
    Services, Inc.
    1600 West End, Suite 1500
    Nashville, TN 37203
    Phone: (415) 418-7906

Mary Eileen Cunniff Wells
mwells@millershakman.com
Miller Shakman Levine & Feldman LLP
30 West Monroe St., Suite 1900
Chicago, Illinois 60603
Phone: (312) 263-3700

**COUNSEL FOR MATTHEWS REAL
ESTATE INVESTMENT SERVICES,
INC. AND BILL PEDERSEN**

### CERTIFICATE OF SERVICE

I hereby certify that on August 12, 2025, a true and correct copy of the foregoing was served by CM/ECF upon counsel of record.

/s/ *Jill B. Rowe*
Jill B. Rowe